1  Robert Tyler, Esq. CA Bar No. 179572
   btyler@faith-freedom.com
2  Mariah Gondeiro, Esq. CA Bar No. 323683
   mgondeiro@faith-freedom.com
3  Julianne Fleischer, Esq. CA Bar No. 337006
   jfleischer@faith-freedom.com
4  ADVOCATES FOR FAITH & FREEDOM
   25026 Las Brisas Road
5  Murrieta, California 92562
   Telephone:  (951) 600-2733
6  Facsimile:   (951) 600-4996

7  Attorneys for Plaintiffs **Calvary Chapel San Jose**
   **and Pastor Mike McClure**

8

9          **IN THE UNITED STATES DISTRICT COURT**

10        **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11

12 **CALVARY CHAPEL SAN JOSE**, a          Case No.:
   California nonprofit corporation;
13 **PASTOR MIKE MCCLURE**, an             **COMPLAINT FOR DAMAGES**
   individual;
14                                          1) **Deprivation of the Fourth**
                                              **Amendment**
15          Plaintiffs,                     2) **Deprivation of the**
                                              **Establishment Clause to the**
16     vs.                                    **First Amendment**
                                            3) **Deprivation of the Free**
17 **SANTA CLARA COUNTY**; and                **Exercise Clause to the First**
   **SAFEGRAPH**;                             **Amendment**
18                                          4) **First Amendment Retaliation**
          Defendants.
19

20

21                 **INTRODUCTION**

22     1.     In early 2020, Santa Clara County ("the County"), at the behest of Dr.

23 Sara Cody and County Counsel James Williams, enforced the Nation's first shelter-

24 in-place order to combat the spread of COVID-19. Governments across the country

25 followed suit and soon nearly the entire Nation was subject to stay-at-home orders.

26 Throughout the year, the County issued subsequent orders that dictated when, how,

27 and where individuals could go.

28     2.     Many state and county agencies chose not to strictly enforce their

orders, leaving their edicts as guidelines that people could choose to follow or ignore. However, the County vigorously enforced its orders and adopted a system that authorized crippling fines on churches and other entities that did not comply.

3.    Indeed, the County still seeks to collect millions in fines from Calvary Chapel San Jose and Pastor Mike McClure (collectively, "Calvary") for gathering during the COVID-19 pandemic, even though the United States Supreme Court has admonished the County for issuing unconstitutional COVID-19 orders. *See, e.g., South Bay Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021); *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021).

4.    Unbeknownst to the public, Defendants embarked on an invasive and warrantless geofencing operation to track residents in the County.

5.    Geofencing is a location-based tool used by the government to track individuals through their cell phone data. This tool is generally used in police investigations of criminal activity and requires the government to obtain a warrant, which is limited in time and scope.

6.    Defendants specifically targeted Calvary Chapel San Jose ("CCSJ") using the geofencing tool without a warrant. The County sought to use the information in its ongoing state enforcement action against the County filed in the Santa Clara County Superior Court.

7.    Defendants put multiple geofences around the church's property so they could track when and where individuals were on the premises. This operation took place over a year with seemingly no oversight, boundaries, or limitations – meaning Defendants could track churchgoers in the sanctuary, prayer room, or bathroom.

8.    This type of expansive geofencing operation is not only an invasion of privacy but represents a terrifying precedent if allowed to go unaddressed. As it stands, Defendants assert that, as long as they call it research, any level of government can target and spy on any individual or group at any time for any

duration. The government can then wield any collected data against said individuals or groups who oppose their orders. This is not just un-American; it is downright Orwellian.

9.     Warrantless fishing expeditions, especially geared at individuals exercising their First Amendment rights or individuals who fervently dispute the government's policies, is a practice counter to the foundational concepts upon which this Nation was built.

10.     Plaintiffs bring this lawsuit on behalf of themselves and all CCSJ churchgoers who fell victim to Defendants' geofencing surveillance during the COVID-19 pandemic.

11.     Through this lawsuit, Plaintiffs seek to ensure CCSJ and other churches are protected from unlawful and invasive government surveillance and entanglement.

## PARTIES - PLAINTIFF

12.     Plaintiff **CALVARY CHAPEL SAN JOSE**, a California non-profit corporation ("CCSJ"), is a Christian church organized exclusively for religious purposes. CCSJ is located in the city of San Jose, California.

13.     CCSJ is comprised of churchgoers whose religious beliefs require they gather for the teaching of God's Word, worship, prayer, and fellowship. Church is not treated as a social event for CCSJ churchgoers. CCSJ is an intimate setting where churchgoers can worship and draw closer to God. Indeed, CCSJ believes its church and sanctuary is a sacred place that should be free from government entanglement and surveillance.

14.     During the COVID-19 pandemic, CCSJ and its members vigorously opposed the County's COVID-19 orders. Unlike other churches, they chose to ignore the orders and attend church in adherence to their sincerely held religious beliefs.

15.     Plaintiff **MIKE MCCLURE** is a resident of Santa Clara County and

serves as the lead pastor of CCSJ. He, too, vigorously opposed the COVID-19 orders because they infringed upon the Church's religious tenets regarding worship, fellowship, and prayer.

## PARTIES - DEFENDANT

16.     Defendant **SANTA CLARA COUNTY** is a political subdivision of the State. It is sued herein under *Monell v. Department of Social Services,* 436 U.S. 658 (1978).

17.     Defendant **SAFEGRAPH** is headquartered in Denver, Colorado but has an office in San Francisco, California, where it conducts its business for its California clients. It is a data company that obtains and sells location data from the cell phones of millions of users. SafeGraph also acquires its location data from other data brokers and government agencies. SafeGraph's clients include hedge funds, real-estate investors, advertisers, governments, and more. SafeGraph is considered one of the leading sources for points-of-interests data, business listings, and visitor foot-traffic insights.

18.     In 2019, SafeGraph launched its subsidiary, Veraset, which offers granular population movement data and unaggregated visitation data. Together, they offer expansive location-based data relied upon by marketers, retailers, advertisers, investors, governments, and more.

## JURISDICTION AND VENUE

19.     This civil rights action raises federal questions under the United States Constitution and federal law, particularly 42 U.S.C. § 1983.

20.     This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

21.     This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of

1  the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under

2  42 U.S.C. § 1988.

3       22.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a

4  substantial part of the events or omissions giving rise to Plaintiff's claims occurred

5  in this district.

6  **STATEMENT OF FACTS**

7  **A.**    **SafeGraph Tracked CCSJ Congregants' Private, Sensitive Location**

8        **History At The Behest Of The County**

9       23.    Throughout the COVID-19 pandemic, SafeGraph worked with

10  government entities like the Center for Disease Control and Prevention ("CDC"),

11  San Francisco, San Jose, and Santa Clara County to surveil the visit patterns at

12  various businesses and organizations.

13       24.    SafeGraph's research and data was derived from cell phone users'

14  location data.

15       25.    At the behest of the County, SafeGraph put two geofences around CCSJ

16  and surveilled the churchgoers within the church premises for over a year during the

17  COVID-19 pandemic.

18       26.    Defendants specifically targeted CCSJ because of the County's

19  ongoing state enforcement action against Calvary. Defendants did not surveil all

20  businesses and entities in the County during the COVID-19 pandemic.

21       27.    The first geofence, identified in red in Figure 1, surrounds the parcel of

22  CCSJ, including the lawn and parking lots and extends to the adjacent streets.

23       28.    The second geofence, identified in yellow in Figure 1, surrounds the

24  buildings within the parcel of land, including the sanctuary, Calvary Christian

25  Academy (i.e., church school), and ministry housing.

26

27

28



29. Figure 1

30. The County simply did not approve or acquiesce to SafeGraph's surveillance of CCSJ.

31. The surveillance was initiated by the County, and the County gave SafeGraph specific instructions to monitor the visit patterns of CCSJ congregants and employees.

32. The surveillance operation was ratified by County Counsel James Williams and County Health Officer Dr. Sara Cody – officials who are considered final policy makers in their respective departments.

33. Dr. Sara Cody oversees the County's health department and had final authority regarding the implementation of policies related to COVID-19, as well as research projects analyzing the effects of the County's orders.

34. James Williams oversaw the County's legal department and provided legal advice to the County throughout the COVID-19 pandemic. Specifically, he was required to approve of Defendants' geofencing operation to ensure it complied with the law.

35. Defendants gathered location information of all individuals who entered the geofences.

36. Defendants did not narrow the search parameters of their geofencing

operation. In other words, Defendants were able to gather location data from congregants from anywhere within the bounds of the geofences, including the nursery, prayer room, offices, classrooms, sanctuary, and bathroom.

37.     As ratified by Dr. Cody and James Williams, Defendants collected location data from CCSJ and other businesses and organizations within the County for over one year – as part of a well-orchestrated geofencing operation.

38.     The County sought to weaponize the location data against CCSJ in its ongoing state enforcement action filed in the Santa Clara County Superior Court, where they seek to collect millions from the church for violating COVID-19 public health orders.

39.     Geofencing is a location-based tool that tracks individuals through their cell phone data. Geofencing involves constructing a virtual boundary around a geographic area using machine learning and identifying all users present within that area during a given time window.

40.     Geofences are created using mapping software and rely on location data. Location data consists of data indicating the geographical position of a device, including data relating to the latitude, longitude, and altitude of the device, the direction of travel of the user, and the time the location information was recorded.

41.     Generally, geofences are enforced by law enforcement after they acquire a warrant from a judge. Warrants are limited in time and scope.

42.     The Defendants did not acquire a warrant prior to putting a geofence around CCSJ.

43.     Even though geofences generally derive from anonymized data, the privacy of users within the geofence is still at issue.

44.     Location data is more precise and revealing than cell-site location information, as it shows a person's pattern of life.

45.     Geofences reveal sensitive, private information about where people travelled and can create inferences about what a person might have been doing.

These tools provide a story about where and with whom people socialize, visit, worship, and much more.

46. As the court in *United States v. Chatrie* astutely observed, "[e]ven anonymized location data – from innocent people – can reveal astonishing glimpses into individuals' private lives when the Government collects data across even a one-or-two-hour period." 590 F. Supp. 3d 901, 931 n. 39 (E.D. Va. 2022).

47. Researchers have repeatedly demonstrated cross-referencing datasets can reveal the identifying information of nearly every anonymized user.

48. Data scientists from Imperial College London and UC Louvain found that it was not particularly hard for companies to identify the person behind "anonymized" data using other data sets. The researchers developed a machine learning model that was able to correctly re-identify 99.98% of Americans in any anonymized dataset using just 15 characteristics including age, gender, and marital status. A true and correct copy of this study is attached hereto as **Exhibit A**.

49. In another study that investigated smartphone location data, researchers were able to uniquely identify 95% of the individuals in a data set with just four spatial-temporal points. A true and correct copy of this study is attached hereto as **Exhibit B**.

50. The County was also able to acquire private, sensitive information of CCSJ congregants through its geofencing operation because of its prior knowledge of CCSJ's operations.

51. For instance, during its ongoing state enforcement action against Calvary, the County took the depositions of numerous CCSJ employees and congregants where it gleaned information such as when and where individuals worked at CCSJ and where congregants prayed privately.

52. Thus, even if SafeGraph says its data is anonymized, it can still identify the identities of CCSJ churchgoers within the geofences, including individuals praying in private, intimate settings.

**B.     SafeGraph Gathers Its Location Data Through Various Means**

   1.  *SafeGraph's Software Development Kit ("SDK")*

53. SafeGraph harvests its user location data from apps that use its SDK. SafeGraph's SDK gathers information from any geo-tracking feature in cell-phone apps. Thus, if an app acquires a user's location data, SafeGraph could also receive that data.

54. Among the top apps that contain SafeGraph are a basketball forum (RealGM Forum), a forum for firearms enthusiasts (Ruger Forum), an off-road travel forum (SA 4x4 Community Forum), and an Apple products discussion forum (iMore Forums).

55. Indeed, SafeGraph and its subsidiary, Veraset, have touted the fact that it sources from thousands of apps and SDKs to avoid a biased sample.

56. Smartphone users who download these apps are not informed that SafeGraph has access to their location data.

57. The apps do not inform smartphone users that their location data is being disclosed to third-party data companies like SafeGraph.

   2.  *Google's Real-Time Bidding Auctioning Process and Location History*

58. SafeGraph also gathers location data through Google's real-time bidding ("RTB") auction process. Google customers are not informed their personal information is sold in Google's RTB process.

59. RTB is the process by which internet publishers auction off ad space in their apps or on their websites. In doing so, they share sensitive user data – including geolocation, device IDs, and browsing history with dozens of different data companies and data brokers like SafeGraph.

60. Each RTB auction typically sees user data passing through various layers of companies on its way from a device to an advertiser. This convoluted system of data collection enables surveillance by advertisers and data brokers like

ADVOCATES
FOR FAITH & FREEDOM

SafeGraph. SafeGraph, therefore, can acquire data from Google's location history database.

61.   In 2009, Google introduced location history, a feature that allows Google to track users' location.

62.   Location history is collected from users of both Android devices and Apple iPhones.

63.   Google's location history database contains information about hundreds of millions of devices around the world.

64.   Google's location history is generated from search queries, users' IP addresses, device sensors, Global Positioning Systems (GPS), information from nearby Wi-Fi networks, and information from nearby Bluetooth devices. *See Chatrie,* 590 F. Supp. 3d at 908. This allows Google to determine where a user is at a given date and time. *Id.* at 908.

65.   Google captures location data from different services like the Android operating system, Google-owned mobile applications, and in-browser mobile searches via Google.

66.   85% of Americans currently own a smartphone with mobile internet.[1] Approximately 46.8% of these smartphone users operate on Google's Android operating system.

67.   Google owns three of the five most popular smartphone applications in the United States, including Gmail, Google Maps, and Google Search.[2]

68.   Google controls about 62% of mobile browsers, 69% of desktop browsers, and the operating systems of 71% of mobile devices. 92% of internet

---

[1] *Mobile Fact Sheet*, PEW RSCH. CTR. (Apr. 7, 2021), https://perma.cc/5UX9-P7PU.

[2] S. O'Dea, *U.S. Smartphone Subscriber Share by Operating Platform 2012-2021, by Month*, STATISTA (Aug. 11, 2021), https://perma.cc/3KRQ-TS53 (to locate, select "View the live page").



1   searches go through Google.

2       69.   Any smartphone user can opt into Google's location history when they

3   create a Google account.

4       70.   However, Google does not provide clear directions on how to opt out

5   and into Google's location history.

6       71.   On Google Maps, a user can inadvertently opt into location history by

7   clicking on "YES I'M IN" in response to the prompt, "Get the most from Google

8   Maps." The prompt makes no mention of location history.

9       72.   Within Google Maps, the "LEARN MORE" option does not direct the

10  user to any specific language concerning location data or location history.

11      73.   Google's Terms of Service does not mention location history, and

12  Google's Privacy Policy, which is 27 pages, only mentions location history twice.

13  The court in *Chatrie* explains why the notice is inadequate and misleading:

> In the first instance, it says, in full: "You can also turn on
> Location History if you want to create a private map of
> where you go with your signed-in devices." If anything, the
> phrase "private map" is misleading and suggests that
> Google does not have access to the data. In the second
> instance, the policy says, in full: "Decide what types of
> activity you'd like saved in your account. For example, you
> can turn on Location History if you want traffic predictions
> for your daily commute, or you can save your YouTube
> Watch History to get better video suggestions." Of course,
> "traffic predictions" do not begin to suggest that Google
> will keep a 24/7 "journal" of a user's whereabouts. But even
> if it did, a user would have no way of knowing that the pop-
> up "opt-in" screen relates to the Location History feature.

21      74.   Opting into location history may be automatic on mobile devices

22  running the android operating system.

23      75.   Users are not notified how frequently Google collects their data and the

24  amount of data Google collects.

25      76.   Google does not inform users that location history is collected

26  regardless of whether users are actively engaging with Google apps and even when

27  users have their phones in airplane mode.

77.    A user must also navigate a confusing maze to pause and delete location history.

78.    Internal communications among Google employees reveals that the company's own engineers are not even sure how to delete location history.

79.    Even if a user figures out how to delete his or her location history, that information is still available to Google.

80.    Google does not inform users that their data is being sold among hundreds of unseen parties.

81.    SafeGraph acquires location data from smartphones, including Android and iPhone users whose data is stored in Google's location history database.

82.    Plaintiffs are made up of Android and iPhone users whose location data was derived through either Google's RTB process or SafeGraph's SDKs.

83.    Plaintiffs never consented to SafeGraph or the County obtaining their location data from their Smartphones.

## FIRST CAUSE OF ACTION

### Violation of the Fourth Amendment to the United States Constitution
### (42 U.S.C. § 1983)

84.    Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 83, as if fully set forth herein.

85.    The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

86.    "The 'basic purpose of this Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citing *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967)).

87.    "When an individual 'seeks to preserve something as private,' and his

expectation of privacy is 'one that society is prepared to recognize as reasonable,' ... official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter*, 138 S. Ct. at 2213 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

88.   Defendants' acquisition of location data through a geofence intruded upon the Plaintiffs' reasonable expectation of privacy because it disclosed private, sensitive information about the Plaintiffs engaged in private worship and religious practice.

89.   As the Supreme Court in *Carpenter* affirmed, access to such information implicates two lines of precedent: one addressing a "person's expectation of privacy in his physical location and movements" and the other "draw[ing] a line between what a person keeps to himself and what he shares with others." 138 S. Ct. at 2215-16.

90.   Defendants' geofence operation implicated the Plaintiffs' "reasonable expectation of privacy in the whole of [their] physical movements." *Id.* at 2217. By obtaining historical location data generated by cell phone holders, the Defendants could obtain "an all-encompassing record of the holder's whereabouts," thus "revealing not only his particular movements" but the most intimate details of his or her life. *Id.* at 2217-18; *see also Riley v. California*, 573 U.S. 372, 403 (2014) ("With all [modern cell phones] contain and all they may reveal, they hold for many Americans 'the privacies of life.'").

91.   CCSJ is also a sacred place where congregants go to worship God in an intimate setting. Plaintiffs do not go with the expectation that they will be covertly surveilled by the government.

92.   Defendants did not obtain a warrant before putting a geofence around CCSJ's property to track the church congregants.

93.   Even if Defendants obtained a warrant, they did not have probable cause. Plaintiffs were not suspected criminals. They were, and are, law-abiding

citizens who were exercising their constitutionally protected rights.

94.    Defendants' geofence operation was not limited in time and scope. Indeed, the operation, which took place over one year, had seemingly no oversight, boundaries, or limitations. Defendants had unbridled discretion to search any person who came within the bounds of the geofence at any time and in any location such as the parking lot, nursery, prayer room, church school, or bathroom.

95.    The government's goal of obtaining incriminating evidence against CCSJ does not justify departure from the customary Fourth Amendment requirements.

96.    As a direct and proximate result of Defendants' violation of the Fourth Amendment, Plaintiffs have suffered the loss of their fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

### Violation of the Establishment Clause under the First Amendment to the United States Constitution

### (42 U.S.C. § 1983)

97.    Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 96, as if fully set forth herein.

98.    "[T]he First Amendment forbids an official purpose to disapprove of a religion or of religion in general." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). The government neutrality required under the Establishment Clause is thus violated as much by government disapproval of religion as it is by government approval of religion. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *See also School Dist. of Abington particular v. Schempp*, 374 U.S. 203, 215 (1963).

99.    The Supreme Court has instructed that "the Establishment Clause must be interpreted by reference to historical practices and understandings." *Kennedy v.*

*Bremerton School Dist.*, 142 S. Ct. 2407, 2428 (2022) (cleaned up). "The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.*

100.   SafeGraph, at the behest of the County, impermissibly targeted CCSJ, so the County could obtain incriminating evidence against the church in their ongoing state enforcement action where they seek to collect millions of dollars from the church.

101.   The surveillance was comprehensive and continuous.

102.   There were no specific precautions taken to limit the scope and duration of the surveillance.

103.   Defendants' conduct was a practice the Framers sought to prohibit when they adopted the First Amendment.

104.   As the Supreme Court affirmed, "[h]istory abundantly documents the tendency of Government – however benevolent and benign its motives – to view with suspicion those who most fervently dispute its policies….The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power." *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 314 (1972).

105.   Defendants did not implement their geofencing operation to advance a legitimate, secular goal such as promoting public health or curtailing criminal activity. If so, Defendants would have monitored all businesses and entities in the County.

106.   Defendants targeted CCSJ, so the County could weaponize potentially incriminating evidence against the church in the County's ongoing state enforcement action.

107.   Defendants ultimately demonstrated hostility towards religion – namely CCSJ – because the impetus driving their surveillance operation was CCSJ's

refusal to comply with the County's orders restricting their religious exercise (i.e. prayer, worship, etc). In other words, Defendants punished Calvary for exercising their sincerely held religious beliefs.

108.   As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

## THIRD CAUSE OF ACTION

### Violation of the Free Exercise Clause under the First Amendment to the United States Constitution

### (42 U.S.C. § 1983)

109.   Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 108, as if fully set forth herein.

110.   A regulation is not neutral and generally applicable if it discriminates against a religious practice on its face, or if in its real operation it targets a religious practice. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Further, a regulation or practice is not generally applicable where it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original).

111.   Defendants' geofencing operation was not neutral and generally applicable because not all businesses and entities were subject to surveillance.

112.   Defendants specifically targeted CCSJ because of the County's ongoing state enforcement action where it sought to weaponize potentially incriminating evidence against Calvary.

113.   The Defendants' targeting of CCSJ through their geofencing operation falls in line with the County's history of discrimination against religion and CCSJ during the COVID-19 pandemic. The County consistently imposed harsher

restrictions on churches and fined Calvary millions of dollars while overlooking other large gatherings.

114.   Similarly, the Defendants imposed an expansive geofencing operation on CCSJ while overlooking other large gathering places like protests, weddings, and graduation parties.

115.   Defendants have no rational, legitimate, or compelling interest in surveilling a church to obtain incriminating evidence against it.

116.   As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

**FOURTH CAUSE OF ACTION**

**First Amendment Retaliation**

**(42 U.S.C. § 1983)**

117.   Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 116, as if fully set forth herein.

118.   Clearly established law bars the government from retaliating against Americans for exercising their constitutional rights and from taking actions designed to deter people from exercising their constitutional rights.

119.   During the COVID-19 pandemic, Plaintiffs were exercising their sincerely held religious beliefs by gathering at CCSJ in worship, prayer, and fellowship.

120.   In the fall of 2020, the County initiated a state enforcement action against Calvary to collect unpaid fines relating to their violations of the County's COVID-19 orders. The County sought to punish Calvary for exercising their religious rights in violation of the County's draconian orders.

121.   In addition to issuing crippling fines against Calvary, the County, with

ADVOCATES
FOR FAITH & FREEDOM

the help of SafeGraph, sought to punish Calvary by spying on church congregants during the COVID-19 pandemic. The County sought to weaponize location data against Calvary in the County's ongoing state enforcement action.

122.    Again, the impetus of Defendants' geofencing operation was Calvary's refusal to abdicate their religious tenets during the COVID-19 pandemic.

123.    As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.    Nominal damages for violation of their civil rights;

B.    Compensatory damages in an amount to be proven at trial;

C.    For costs, attorneys' fees, and interest, as allowed by law; and

D.    For such other relief the Court determines is proper.

Respectfully submitted,

DATED:  August 22, 2023          ADVOCATES FOR FAITH & FREEDOM

By: *Mariah Gondeiro*
    Mariah Gondeiro, Esq.
    Attorneys for Plaintiffs