Robert Tyler, Esq. CA Bar No. 179572
btyler@faith-freedom.com
Mariah Gondeiro, Esq. CA Bar No. 323683
mgondeiro@faith-freedom.com
Julianne Fleischer, Esq. CA Bar No. 337006
jfleischer@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone:  (951) 600-2733
Facsimile:   (951) 600-4996

Attorneys for Plaintiffs **Calvary Chapel San Jose**
**and Pastor Mike McClure**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALVARY CHAPEL SAN JOSE**, a California nonprofit corporation; **PASTOR MIKE MCCLURE**, an individual;<br><br>       Plaintiffs,<br><br>   vs.<br><br>**SANTA CLARA COUNTY**; **SAFEGRAPH**; and **DANIEL E. HO**;<br><br>       Defendants. | Case No.:  3:23-cv-04277-VC<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES**<br><br>1) **Deprivation of the Fourth Amendment**<br>2) **Deprivation of the Establishment Clause to the First Amendment**<br>3) **Deprivation of the Free Exercise Clause to the First Amendment**<br>4) **First Amendment Retaliation** |

## INTRODUCTION

1.    In early 2020, Santa Clara County ("the County"), at the behest of Dr. Sara Cody and County Counsel James Williams, enforced the Nation's first shelter-in-place order to combat the spread of COVID-19. Governments across the country followed suit and soon nearly the entire Nation was subject to stay-at-home orders. Throughout the year, the County issued subsequent orders that dictated when, how, and where individuals could go.

2.     Many state and county agencies chose not to strictly enforce their orders, leaving their edicts as guidelines that people could choose to follow or ignore. However, the County vigorously enforced its orders and adopted a system that authorized crippling fines on churches and other entities that did not comply.

3.     Indeed, the County still seeks to collect millions in fines from Calvary Chapel San Jose and Pastor Mike McClure (collectively, "Calvary") for gathering during the COVID-19 pandemic, even though the United States Supreme Court has admonished the County for issuing unconstitutional COVID-19 orders. *See, e.g., South Bay Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021); *Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021).

4.     Unbeknownst to the public, Defendants embarked on an invasive and warrantless geofencing operation to track residents in the County. This geofencing operation was separate from the County's enforcement of the COVID-19 fines. The Defendants tracked residents in the county for research purposes. However, the County's geofencing operation, similar to its COVID-19 enforcement measures, was not neutrally applied. Not all entities and activities were subject to surveillance.

5.     Geofencing is a location-based tool used by the government to track individuals through their cell phone data. This tool is generally used in police investigations of criminal activity and requires the government to obtain a warrant, which is limited in time and scope.

6.     Defendants specifically targeted Calvary Chapel San Jose ("CCSJ") using the geofencing tool without a warrant. The County sought to use the information in its ongoing state enforcement action against the County filed in the Santa Clara County Superior Court.

7.     Defendants put multiple geofences around the church's property so they could track when and where individuals were on the premises. This operation took place over a year with seemingly no oversight, boundaries, or limitations –

meaning Defendants could track churchgoers in the sanctuary, prayer room, or bathroom.

8.     This type of expansive geofencing operation is not only an invasion of privacy but represents a terrifying precedent if allowed to go unaddressed. As it stands, Defendants assert that, as long as they call it research, any level of government can target and spy on any individual or group at any time for any duration. The government can then wield any collected data against said individuals or groups who oppose their orders. This is not just un-American; it is downright Orwellian.

9.     Warrantless fishing expeditions, especially geared at individuals exercising their First Amendment rights or individuals who fervently dispute the government's policies, is a practice counter to the foundational concepts upon which this Nation was built.

10.     Plaintiffs bring this lawsuit on behalf of themselves and all CCSJ churchgoers who fell victim to Defendants' geofencing surveillance during the COVID-19 pandemic.

11.     Through this lawsuit, Plaintiffs seek to ensure CCSJ and other churches are protected from unlawful and invasive government surveillance and entanglement.

## PARTIES - PLAINTIFF

12.     Plaintiff **CALVARY CHAPEL SAN JOSE**, a California non-profit corporation ("CCSJ"), is a Christian church organized exclusively for religious purposes. CCSJ is located in the city of San Jose, California.

13.     CCSJ is comprised of churchgoers whose religious beliefs require they gather for the teaching of God's Word, worship, prayer, and fellowship. Church is not treated as a social event for CCSJ churchgoers. CCSJ is an intimate setting where churchgoers can worship and draw closer to God. Indeed, CCSJ believes its church

1  and sanctuary is a sacred place that should be free from government entanglement
2  and surveillance.

3  14.    During the COVID-19 pandemic, CCSJ and its members vigorously
4  opposed the County's COVID-19 orders. Unlike other churches, they chose to
5  ignore the orders and attend church in adherence to their sincerely held religious
6  beliefs.

7  15.    Plaintiff **MIKE MCCLURE** is a resident of Santa Clara County and
8  serves as the lead pastor of CCSJ. He, too, vigorously opposed the COVID-19 orders
9  because they infringed upon the Church's religious tenets regarding worship,
10 fellowship, and prayer.

**PARTIES - DEFENDANT**

12 16.    Defendant **SANTA CLARA COUNTY** is a political subdivision of the
13 State. It is sued herein under *Monell v. Department of Social Services,* 436 U.S. 658
14 (1978).

15 17.    Defendant **SAFEGRAPH** is headquartered in Denver, Colorado but
16 has an office in San Francisco, California, where it conducts its business for its
17 California clients. It is a data company that obtains and sells location data from the
18 cell phones of millions of users. SafeGraph also acquires its location data from other
19 data brokers and government agencies. SafeGraph's clients include hedge funds,
20 real-estate investors, advertisers, governments, and more. SafeGraph is considered
21 one of the leading sources for points-of-interests data, business listings, and visitor
22 foot-traffic insights.

23 18.    Defendant **DANIEL E. HO** is a professor at Stanford Law School and
24 resides in Santa Clara County. He acted as an agent of the County by assisting it in
25 analyzing and collecting data derived from location data.

**JURISDICTION AND VENUE**

27 19.    This civil rights action raises federal questions under the United States
28 Constitution and federal law, particularly 42 U.S.C. § 1983.

20.    This Court has subject matter jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

21.    This Court has authority to grant the requested declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, implemented through Rule 57 of the Federal Rules of Civil Procedure. This Court is also authorized to grant injunctive relief and damages under 28 U.S.C. § 1343, pursuant to Rule 65 of the Federal Rules of Civil Procedure, and reasonable attorney's fees and costs under 42 U.S.C. § 1988.

22.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

**STATEMENT OF FACTS**

**A.    SafeGraph Tracked CCSJ Congregants' Private, Sensitive Location History At The Behest Of The County**

23.    Throughout the COVID-19 pandemic, SafeGraph worked with government entities like the Center for Disease Control and Prevention ("CDC"), San Francisco, San Jose, and Santa Clara County to surveil the visit patterns at various businesses and organizations.

24.    SafeGraph's research and data was derived from cell phone users' location data.

25.    At the behest of the County, SafeGraph put two geofences around CCSJ and surveilled the churchgoers within the church premises for over a year during the COVID-19 pandemic.

26.    Defendants specifically targeted CCSJ. Defendants did not surveil all businesses and entities in the County during the COVID-19 pandemic.

27.    The first geofence, identified in red in Figure 1, surrounds the parcel of CCSJ, including the lawn and parking lots and extends to the adjacent streets.

28.    The second geofence, identified in yellow in Figure 1, surrounds the buildings within the parcel of land, including the sanctuary, Calvary Christian Academy (i.e., church school), and ministry housing.



29.    Figure 1

30.    The County did not simply approve or acquiesce to SafeGraph's surveillance of CCSJ.

31.    The surveillance was initiated by the County, and the County requested this information to monitor visit patterns at different points of interest in the County for a year.  In other words, SafeGraph was acting as an instrument of the County to assist the County in understanding the effects of its COVID-19 orders.

32.    The surveillance operation was ratified by County Counsel James Williams and County Health Officer Dr. Sara Cody – officials who are considered final policy makers in their respective departments.

33.    Dr. Sara Cody oversees the County's health department and had final authority regarding the implementation of policies related to COVID-19, as well as research projects analyzing the effects of the County's orders. Specifically, during COVID-19, she was responsible for using data to help shape public health strategy and policy. Researching data derived from geofencing or electronic surveillance practices comes under the umbrella of Dr. Cody's duties.

34.     James Williams oversaw the County's legal department and provided legal advice to the County throughout the COVID-19 pandemic. Specifically, he was required to approve of Defendants' geofencing operation to ensure it complied with the law. In his role as chief legal advisor, he oversees the county elected officials, the Board of Supervisors, and the department heads, including Dr. Sara Cody.

35.     James Williams also served as a director for the Emergency Operations Center. In that role, he helped inform the COVID-19 pandemic response, including analyzing and reviewing data related to the County's COVID-19 orders. Such data would have included information derived from location data.

36.     Daniel Ho also acted as an agent of the County. He led a research team to assist the County in understanding the data derived from the geofencing operation, including the geofences surrounding CCSJ. He provided insights to the County to help inform it of the pandemic response. Specifically, the County contracted with Daniel Ho to help it analyze the location data derived from the electronic surveillance of CCSJ.

37.     Defendants gathered location information of all individuals who entered the geofences in Figure 1.

38.     Defendants did not narrow the search parameters of their geofencing operation. In other words, Defendants were able to gather location data from congregants from anywhere within the bounds of the geofences, including the nursery, prayer room, offices, classrooms, sanctuary, and bathroom.

39.     As ratified by Dr. Cody and James Williams, Defendants collected location data from CCSJ and other businesses and organizations within the County for over one year – as part of a well-orchestrated geofencing operation.

40.     The County sought to weaponize the location data against CCSJ in its ongoing state enforcement action filed in the Santa Clara County Superior Court, where they seek to collect millions from the church for violating COVID-19 public health orders.

41.     Geofencing is a location-based tool that tracks individuals through their cell phone data. Geofencing involves constructing a virtual boundary around a geographic area using machine learning and identifying all users present within that area during a given time window.

42.     Geofences are created using mapping software and rely on location data. Location data consists of data indicating the geographical position of a device, including data relating to the latitude, longitude, and altitude of the device, the direction of travel of the user, and the time the location information was recorded.

43.     Generally, geofences are enforced by law enforcement after they acquire a warrant from a judge. Warrants are limited in time and scope.

44.     The Defendants did not acquire a warrant prior to putting a geofence around CCSJ.

45.     Even though geofences generally derive from anonymized data, the privacy of users within the geofence is still at issue.

46.     Location data is more precise and revealing than cell-site location information, as it shows a person's pattern of life.

47.     Geofences reveal sensitive, private information about where people travelled and can create inferences about what a person might have been doing. These tools provide a story about where and with whom people socialize, visit, worship, and much more.

48.     As the court in *United States v. Chatrie* astutely observed, "[e]ven anonymized location data – from innocent people – can reveal astonishing glimpses into individuals' private lives when the Government collects data across even a one-or-two-hour period." 590 F. Supp. 3d 901, 931 n. 39 (E.D. Va. 2022).

49.     Researchers have repeatedly demonstrated cross-referencing datasets can reveal the identifying information of nearly every anonymized user.

50.     Data scientists from Imperial College London and UC Louvain found that it was not particularly hard for companies to identify the person behind

"anonymized" data using other data sets. The researchers developed a machine learning model that was able to correctly re-identify 99.98% of Americans in any anonymized dataset using just 15 characteristics including age, gender, and marital status. A true and correct copy of this study is attached hereto as **Exhibit A**.

51.     In another study that investigated smartphone location data, researchers were able to uniquely identify 95% of the individuals in a data set with just four spatial-temporal points. A true and correct copy of this study is attached hereto as **Exhibit B**.

52.     The County was also able to acquire private, sensitive information of CCSJ congregants through its geofencing operation because of its prior knowledge of CCSJ's operations.

53.     For instance, during its ongoing state enforcement action against Calvary, the County took the depositions of numerous CCSJ employees and congregants where it gleaned information such as when and where individuals worked at CCSJ and where congregants prayed privately.

54.     Thus, even if SafeGraph says its data is anonymized, it can still identify the identities of CCSJ churchgoers within the geofences, including individuals praying in private, intimate settings.

**B.      SafeGraph Gathers Its Location Data Through Various Means**

        1.      *SafeGraph's Software Development Kit ("SDK")*

55.     SafeGraph harvests its user location data from apps that use its SDK. SafeGraph's SDK gathers information from any geo-tracking feature in cell-phone apps. Thus, if an app acquires a user's location data, SafeGraph could also receive that data.

56.     Among the top apps that contain SafeGraph are a basketball forum (RealGM Forum), a forum for firearms enthusiasts (Ruger Forum), an off-road travel forum (SA 4x4 Community Forum), and an Apple products discussion forum (iMore Forums).

57.   Indeed, SafeGraph and its subsidiary, Veraset, have touted the fact that it sources from thousands of apps and SDKs to avoid a biased sample.

58.   Smartphone users who download these apps are not informed that SafeGraph has access to their location data.

59.   The apps do not inform smartphone users that their location data is being disclosed to third-party data companies like SafeGraph.

2.   *Google's Real-Time Bidding Auctioning Process and Location History*

60.   SafeGraph also gathers location data through Google's real-time bidding ("RTB") auction process. Google customers are not informed their personal information is sold in Google's RTB process.

61.   RTB is the process by which internet publishers auction off ad space in their apps or on their websites. In doing so, they share sensitive user data – including geolocation, device IDs, and browsing history with dozens of different data companies and data brokers like SafeGraph.

62.   Each RTB auction typically sees user data passing through various layers of companies on its way from a device to an advertiser. This convoluted system of data collection enables surveillance by advertisers and data brokers like SafeGraph. SafeGraph, therefore, can acquire data from Google's location history database.

63.   In 2009, Google introduced location history, a feature that allows Google to track users' location.

64.   Location history is collected from users of both Android devices and Apple iPhones.

65.   Google's location history database contains information about hundreds of millions of devices around the world.

66.   Google's location history is generated from search queries, users' IP addresses, device sensors, Global Positioning Systems (GPS), information from

1   nearby Wi-Fi networks, and information from nearby Bluetooth devices. *See*

2   *Chatrie,* 590 F. Supp. 3d at 908. This allows Google to determine where a user is at

3   a given date and time. *Id.* at 908.

4       67.    Google captures location data from different services like the Android

5   operating system, Google-owned mobile applications, and in-browser mobile

6   searches via Google.

7       68.    85% of Americans currently own a smartphone with mobile internet.[1]

8   Approximately 46.8% of these smartphone users operate on Google's Android

9   operating system.

10      69.    Google owns three of the five most popular smartphone applications in

11  the United States, including Gmail, Google Maps, and Google Search.[2]

12      70.    Google controls about 62% of mobile browsers, 69% of desktop

13  browsers, and the operating systems of 71% of mobile devices. 92% of internet

14  searches go through Google.

15      71.    Any smartphone user can opt into Google's location history when they

16  create a Google account.

17      72.    However, Google does not provide clear directions on how to opt out

18  and into Google's location history.

19      73.    On Google Maps, a user can inadvertently opt into location history by

20  clicking on "YES I'M IN" in response to the prompt, "Get the most from Google

21  Maps." The prompt makes no mention of location history.

22      74.    Within Google Maps, the "LEARN MORE" option does not direct the

23  user to any specific language concerning location data or location history.

24

25  _____

26

27  [1] *Mobile Fact Sheet*, PEW RSCH. CTR. (Apr. 7, 2021), https://perma.cc/5UX9-P7PU.

28  [2] S. O'Dea, *U.S. Smartphone Subscriber Share by Operating Platform 2012-2021, by Month*, STATISTA (Aug. 11, 2021), https://perma.cc/3KRQ-TS53 (to locate, select "View the live page").

ADVOCATES
FOR FAITH & FREEDOM

75.     Google's Terms of Service does not mention location history, and Google's Privacy Policy, which is 27 pages, only mentions location history twice. The court in *Chatrie* explains why the notice is inadequate and misleading:

> In the first instance, it says, in full: "You can also turn on Location History if you want to create a private map of where you go with your signed-in devices." If anything, the phrase "private map" is misleading and suggests that Google does not have access to the data. In the second instance, the policy says, in full: "Decide what types of activity you'd like saved in your account. For example, you can turn on Location History if you want traffic predictions for your daily commute, or you can save your YouTube Watch History to get better video suggestions." Of course, "traffic predictions" do not begin to suggest that Google will keep a 24/7 "journal" of a user's whereabouts. But even if it did, a user would have no way of knowing that the pop-up "opt-in" screen relates to the Location History feature.

76.     Opting into location history may be automatic on mobile devices running the android operating system.

77.     Users are not notified how frequently Google collects their data and the amount of data Google collects.

78.     Google does not inform users that location history is collected regardless of whether users are actively engaging with Google apps and even when users have their phones in airplane mode.

79.     A user must also navigate a confusing maze to pause and delete location history.

80.     Internal communications among Google employees reveals that the company's own engineers are not even sure how to delete location history.

81.     Even if a user figures out how to delete his or her location history, that information is still available to Google.

82.     Google does not inform users that their data is being sold among hundreds of unseen parties.

83.     SafeGraph acquires location data from smartphones, including Android and iPhone users whose data is stored in Google's location history database.

84.     Plaintiffs are made up of Android and iPhone users whose location data was derived through either Google's RTB process or SafeGraph's SDKs.

85.     Plaintiffs never consented to SafeGraph or the County obtaining their location data from their Smartphones.

## FIRST CAUSE OF ACTION

### Violation of the Fourth Amendment to the United States Constitution

### (42 U.S.C. § 1983)

86.     Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 85, as if fully set forth herein.

87.     The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

88.     "The 'basic purpose of this Amendment,' our cases have recognized, 'is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (citing *Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523, 528 (1967)).

89.     "When an individual 'seeks to preserve something as private,' and his expectation of privacy is 'one that society is prepared to recognize as reasonable,' ... official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter*, 138 S. Ct. at 2213 (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)).

90.     Defendants' acquisition of location data through a geofence intruded upon the Plaintiffs' reasonable expectation of privacy because it disclosed private, sensitive information about the Plaintiffs engaged in private worship and religious practice.

91.     As the Supreme Court in *Carpenter* affirmed, access to such information implicates two lines of precedent: one addressing a "person's

expectation of privacy in his physical location and movements" and the other "draw[ing] a line between what a person keeps to himself and what he shares with others." 138 S. Ct. at 2215-16.

92.   Defendants' geofence operation implicated the Plaintiffs' "reasonable expectation of privacy in the whole of [their] physical movements." *Id.* at 2217. By obtaining historical location data generated by cell phone holders, the Defendants could obtain "an all-encompassing record of the holder's whereabouts," thus "revealing not only his particular movements" but the most intimate details of his or her life. *Id.* at 2217-18; *see also Riley v. California*, 573 U.S. 372, 403 (2014) ("With all [modern cell phones] contain and all they may reveal, they hold for many Americans 'the privacies of life.'").

93.   CCSJ is also a sacred place where congregants go to worship God in an intimate setting. Plaintiffs do not go with the expectation that they will be covertly surveilled by the government.

94.   Defendants did not obtain a warrant before putting a geofence around CCSJ's property to track the church congregants.

95.   Even if Defendants obtained a warrant, they did not have probable cause. Plaintiffs were not suspected criminals. They were, and are, law-abiding citizens who were exercising their constitutionally protected rights.

96.   Defendants' geofence operation was not limited in time and scope. Indeed, the operation, which took place over one year, had seemingly no oversight, boundaries, or limitations. Defendants had unbridled discretion to search any person who came within the bounds of the geofence at any time and in any location such as the parking lot, nursery, prayer room, church school, or bathroom.

97.   The government's goal of obtaining incriminating evidence against CCSJ does not justify departure from the customary Fourth Amendment requirements.



ADVOCATES
FOR FAITH & FREEDOM

98. As a direct and proximate result of Defendants' violation of the Fourth Amendment, Plaintiffs have suffered the loss of their fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

## SECOND CAUSE OF ACTION

### Violation of the Establishment Clause under the
### First Amendment to the United States Constitution

### (42 U.S.C. § 1983)

99. Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 98, as if fully set forth herein.

100. "[T]he First Amendment forbids an official purpose to disapprove of a religion or of religion in general." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993). The government neutrality required under the Establishment Clause is thus violated as much by government disapproval of religion as it is by government approval of religion. *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *See also School Dist. of Abington particular v. Schempp*, 374 U.S. 203, 215 (1963).

101. The Supreme Court has instructed that "the Establishment Clause must be interpreted by reference to historical practices and understandings." *Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407, 2428 (2022) (cleaned up). "The line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.*

102. SafeGraph, at the behest of the County, impermissibly targeted CCSJ, so the County could obtain incriminating evidence against the church in their ongoing state enforcement action where they seek to collect millions of dollars from the church.

103. The surveillance was comprehensive and continuous.

104.   There were no specific precautions taken to limit the scope and duration of the surveillance.

105.   Defendants' conduct was a practice the Framers sought to prohibit when they adopted the First Amendment.

106.   As the Supreme Court affirmed, "[h]istory abundantly documents the tendency of Government – however benevolent and benign its motives – to view with suspicion those who most fervently dispute its policies….The price of lawful public dissent must not be a dread of subjection to an unchecked surveillance power." *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 314 (1972).

107.   Defendants did not implement their geofencing operation to advance a legitimate, secular goal such as promoting public health or curtailing criminal activity. If so, Defendants would have monitored all businesses and entities in the County.

108.   Defendants targeted CCSJ, so the County could weaponize potentially incriminating evidence against the church in the County's ongoing state enforcement action.

109.   Defendants ultimately demonstrated hostility towards religion – namely CCSJ – because the impetus driving their surveillance operation was CCSJ's refusal to comply with the County's orders restricting their religious exercise (i.e. prayer, worship, etc). In other words, Defendants punished Calvary for exercising their sincerely held religious beliefs.

110.   As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

### THIRD CAUSE OF ACTION

**Violation of the Free Exercise Clause under the
First Amendment to the United States Constitution**

**(42 U.S.C. § 1983)**

111.   Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 110, as if fully set forth herein.

112.   A regulation is not neutral and generally applicable if it discriminates against a religious practice on its face, or if in its real operation it targets a religious practice. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993). Further, a regulation or practice is not generally applicable where it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original).

113.   Defendants' geofencing operation was not neutral and generally applicable because not all businesses and entities were subject to surveillance.

114.   Defendants specifically targeted CCSJ because of the County's ongoing state enforcement action where it sought to weaponize potentially incriminating evidence against Calvary.

115.   The Defendants' targeting of CCSJ through their geofencing operation falls in line with the County's history of discrimination against religion and CCSJ during the COVID-19 pandemic. The County consistently imposed harsher restrictions on churches and fined Calvary millions of dollars while overlooking other large gatherings.

116.   Similarly, the Defendants imposed an expansive geofencing operation on CCSJ while overlooking other large gathering places like protests, weddings, and graduation parties.

117.   Defendants have no rational, legitimate, or compelling interest in surveilling a church to obtain incriminating evidence against it.

118.   As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

## FOURTH CAUSE OF ACTION
### First Amendment Retaliation
### (42 U.S.C. § 1983)

119.   Plaintiffs re-allege and incorporate by reference the allegations in the preceding paragraphs 1 through 118, as if fully set forth herein.

120.   Clearly established law bars the government from retaliating against Americans for exercising their constitutional rights and from taking actions designed to deter people from exercising their constitutional rights.

121.   During the COVID-19 pandemic, Plaintiffs were exercising their sincerely held religious beliefs by gathering at CCSJ in worship, prayer, and fellowship.

122.   In the fall of 2020, the County initiated a state enforcement action against Calvary to collect unpaid fines relating to their violations of the County's COVID-19 orders. The County sought to punish Calvary for exercising their religious rights in violation of the County's draconian orders.

123.   In addition to issuing crippling fines against Calvary, the County, with the help of SafeGraph, sought to punish Calvary by spying on church congregants during the COVID-19 pandemic. The County sought to weaponize location data against Calvary in the County's ongoing state enforcement action.

124.   Again, the impetus of Defendants' geofencing operation was Calvary's refusal to abdicate their religious tenets during the COVID-19 pandemic.

125.   As a direct and proximate result of Defendants' violation of the First Amendment, Plaintiffs have suffered irreparable harm, including the loss of their

fundamental constitutional rights. Plaintiffs are entitled to nominal damages, compensatory damages in an amount to be proven at trial, and attorneys' fees under 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for relief as follows:

A.    Nominal damages for violation of their civil rights;

B.    Compensatory damages in an amount to be proven at trial;

C.    For costs, attorneys' fees, and interest, as allowed by law; and

D.    For such other relief the Court determines is proper.

Respectfully submitted,

DATED:  October 27, 2023    ADVOCATES FOR FAITH & FREEDOM

By: _Mariah Gondeiro_
    Mariah Gondeiro, Esq.
    Attorneys for Plaintiffs



EXHIBIT "A"

**nature COMMUNICATIONS**

ARTICLE

https://doi.org/10.1038/s41467-019-10933-3          OPEN

# Estimating the success of re-identifications in incomplete datasets using generative models

Luc Rocher [1,2,3], Julien M. Hendrickx[1] & Yves-Alexandre de Montjoye[2,3]

While rich medical, behavioral, and socio-demographic data are key to modern data-driven research, their collection and use raise legitimate privacy concerns. Anonymizing datasets through de-identification and sampling before sharing them has been the main tool used to address those concerns. We here propose a generative copula-based method that can accurately estimate the likelihood of a specific person to be correctly re-identified, even in a heavily incomplete dataset. On 210 populations, our method obtains AUC scores for predicting individual uniqueness ranging from 0.84 to 0.97, with low false-discovery rate. Using our model, we find that 99.98% of Americans would be correctly re-identified in any dataset using 15 demographic attributes. Our results suggest that even heavily sampled anonymized datasets are unlikely to satisfy the modern standards for anonymization set forth by GDPR and seriously challenge the technical and legal adequacy of the de-identification release-and-forget model.

[1] Information and Communication Technologies, Electronics and Applied Mathematics (ICTEAM), Université catholique de Louvain, B-1348 Louvain-la-Neuve, Belgium. [2] Department of Computing, Imperial College London, London SW7 2AZ, UK. [3] Data Science Institute, Imperial College London, London SW7 2AZ, UK. Correspondence and requests for materials should be addressed to Y.-A.d.M (email: deMontjoye@imperial.ac.uk)

In the last decade, the ability to collect and store personal data has exploded. With two thirds of the world population having access to the Internet[1], electronic medical records becoming the norm[2], and the rise of the Internet of Things, this is unlikely to stop anytime soon. Collected at scale from financial or medical services, when filling in online surveys or liking pages, this data has an incredible potential for good. It drives scientific advancements in medicine[3], social science[4,5] and AI[6] and promises to revolutionize the way businesses and governments function[7,8].

However, the large-scale collection and use of detailed individual-level data raise legitimate privacy concerns. The recent backlashes against the sharing of NHS [UK National Health Service] medical data with DeepMind[9] and the collection and subsequent sale of Facebook data to Cambridge Analytica[10] are the latest evidences that people are concerned about the confidentiality, privacy, and ethical use of their data. In a recent survey, >72% of U.S. citizens reported being worried about sharing personal information online[11]. In the wrong hands, sensitive data can be exploited for blackmailing, mass surveillance, social engineering, or identity theft.

De-identification, the process of anonymizing datasets before sharing them, has been the main paradigm used in research and elsewhere to share data while preserving people's privacy[12–14]. Data protection laws worldwide consider anonymous data as not personal data anymore[15,16] allowing it to be freely used, shared, and sold. Academic journals are, e.g., increasingly requiring authors to make anonymous data available to the research community[17]. While standards for anonymous data vary, modern data protection laws, such as the European General Data Protection Regulation (GDPR) and the California Consumer Privacy Act (CCPA), consider that each and every person in a dataset has to be protected for the dataset to be considered anonymous[18–20]. This new higher standard for anonymization is further made clear by the introduction in GDPR of pseudonymous data: data that does not contain obvious identifiers but might be re-identifiable and is therefore within the scope of the law[16,18].

Yet numerous supposedly anonymous datasets have recently been released and re-identified[15,21–31]. In 2016, journalists re-identified politicians in an anonymized browsing history dataset of 3 million German citizens, uncovering their medical information and their sexual preferences[23]. A few months before, the Australian Department of Health publicly released de-identified medical records for 10% of the population only for researchers to re-identify them 6 weeks later[24]. Before that, studies had shown that de-identified hospital discharge data could be re-identified using basic demographic attributes[25] and that diagnostic codes, year of birth, gender, and ethnicity could uniquely identify patients in genomic studies data[26]. Finally, researchers were able to uniquely identify individuals in anonymized taxi trajectories in NYC[27], bike sharing trips in London[28], subway data in Riga[29], and mobile phone and credit card datasets[30,31].

Statistical disclosure control researchers and some companies are disputing the validity of these re-identifications: as datasets are always incomplete, journalists and researchers can never be sure they have re-identified the right person even if they found a match[32–35]. They argue that this provides strong plausible deniability to participants and reduce the risks, making such de-identified datasets anonymous including according to GDPR[36–39]. De-identified datasets can be intrinsically incomplete, e.g., because the dataset only covers patients of one of the hospital networks in a country or because they have been sub-sampled as part of the de-identification process. For example, the U.S. Census Bureau releases only 1% of their decennial census and sampling fractions for international census range from 0.07% in India to 10% in South American countries[40]. Companies are adopting similar approaches with, e.g., the Netflix Prize dataset including <10% of their users[41].

Imagine a health insurance company who decides to run a contest to predict breast cancer and publishes a de-identified dataset of 1000 people, 1% of their 100,000 insureds in California, including people's birth date, gender, ZIP code, and breast cancer diagnosis. John Doe's employer downloads the dataset and finds one (and only one) record matching Doe's information: male living in Berkeley, CA (94720), born on January 2nd 1968, and diagnosed with breast cancer (self-disclosed by John Doe). This record also contains the details of his recent (failed) stage IV treatments. When contacted, the insurance company argues that matching does not equal re-identification: the record could belong to 1 of the 99,000 other people they insure or, if the employer does not know whether Doe is insured by this company or not, to anyone else of the 39.5M people living in California.

Our paper shows how the likelihood of a specific individual to have been correctly re-identified can be estimated with high accuracy even when the anonymized dataset is heavily incomplete. We propose a generative graphical model that can be accurately and efficiently trained on incomplete data. Using socio-demographic, survey, and health datasets, we show that our model exhibits a mean absolute error (MAE) of 0.018 on average in estimating population uniqueness[42] and an MAE of 0.041 in estimating population uniqueness when the model is trained on only a 1% population sample. Once trained, our model allows us to predict whether the re-identification of an individual is correct with an average false-discovery rate of <6.7% for a 95% threshold ($\hat{\xi}_x > 0.95$) and an error rate 39% lower than the best achievable population-level estimator. With population uniqueness increasing fast with the number of attributes available, our results show that the likelihood of a re-identification to be correct, even in a heavily sampled dataset, can be accurately estimated, and is often high. Our results reject the claims that, first, re-identification is not a practical risk and, second, sampling or releasing partial datasets provide plausible deniability. Moving forward, they question whether current de-identification practices satisfy the anonymization standards of modern data protection laws such as GDPR and CCPA and emphasize the need to move, from a legal and regulatory perspective, beyond the de-identification release-and-forget model.

## Results

**Using Gaussian copulas to model uniqueness**. We consider a dataset $\mathcal{D}$, released by an organization, and containing a sample of $n_D$ individuals extracted at random from a population of $n$ individuals, e.g., the US population. Each row $\boldsymbol{x}^{(i)}$ is an individual record, containing $d$ nominal or ordinal attributes (e.g., demographic variables, survey responses) taking values in a discrete sample space $\mathcal{X}$. We consider the rows $\boldsymbol{x}^{(i)}$ to be independent and identically distributed, drawn from the probability distribution $X$ with $\mathbb{P}(X = \boldsymbol{x})$, abbreviated $p(\boldsymbol{x})$.

Our model quantifies, for any individual $\boldsymbol{x}$, the likelihood $\xi_{\boldsymbol{x}}$ for this record to be unique in the complete population and therefore always successfully re-identified when matched. From $\xi_{\boldsymbol{x}}$, we derive the likelihood $\kappa_{\boldsymbol{x}}$ for $\boldsymbol{x}$ to be correctly re-identified when matched, which we call correctness. If Doe's record $\boldsymbol{x}^{(d)}$ is unique in $\mathcal{D}$, he will always be correctly re-identified ($\kappa_{\boldsymbol{x}^{(d)}} = 1$ and $\xi_{\boldsymbol{x}^{(d)}} = 1$). However, if two other people share the same attribute ($\boldsymbol{x}^{(d)}$ not unique, $\xi_{\boldsymbol{x}^{(d)}} = 0$), Doe would still have one chance out of three to have been successfully re-identified ($\kappa_{\boldsymbol{x}^{(d)}} = 1/3$). We model $\xi_{\boldsymbol{x}}$ as:

$$\xi_{\boldsymbol{x}} \equiv \mathbb{P}\Big(\boldsymbol{x} \text{ unique in } (\boldsymbol{x}^{(1)}, \ldots, \boldsymbol{x}^{(n)}) \mid \exists i, \boldsymbol{x}^{(i)} = \boldsymbol{x}\Big) \quad (1)$$

$$= (1 - p(\boldsymbol{x}))^{n-1} \qquad (2)$$

and $\kappa_x$ as:

$$\kappa_x \equiv \mathbb{P}\Big(\boldsymbol{x} \text{ correctly matched in } (\boldsymbol{x}^{(1)}, \dots, \boldsymbol{x}^{(n)}) \mid \exists i, \boldsymbol{x}^{(i)} = \boldsymbol{x}\Big) \qquad (3)$$

$$= \frac{1}{n} \frac{1 - \xi_x^{n/(n-1)}}{1 - \xi_x^{1/(n-1)}} \qquad (4)$$

with proofs in "Methods".

We model the joint distribution of $X_1, X_2, \dots X_d$ using a latent Gaussian copula[43]. Copulas have been used to study a wide range of dependence structures in finance[44], geology[45], and biomedicine[46] and allow us to model the density of $X$ by specifying separately the marginal distributions, easy to infer from limited samples, and the dependency structure. For a large sample space $\mathcal{X}$ and a small number $n_\mathcal{D}$ of available records, Gaussian copulas provide a good approximation of the density using only $d(d-1)/2$ parameters for the dependency structure and no hyperparameter.

The density of a Gaussian copula $C_\Sigma$ is expressed as:

$$c_\Sigma(\boldsymbol{u}) = \frac{1}{\sqrt{\det \Sigma}} \exp\left(-\frac{1}{2}\Phi^{-1}(\boldsymbol{u})^T \cdot (\Sigma^{-1} - I) \cdot \Phi^{-1}(\boldsymbol{u})\right) \qquad (5)$$

with a covariance matrix $\Sigma$, $\boldsymbol{u} \in [0, 1]^d$, and $\Phi$ the cumulative distribution function (CDF) of a standard univariate normal distribution.

We estimate from $\mathcal{D}$ the marginal distributions $\Psi$ (marginal parameters) for $X_1, \dots, X_d$ and the copula distribution $\Sigma$ (covariance matrix), such that $p(\boldsymbol{x})$ is modeled by

$$q(\boldsymbol{x} \mid \Sigma, \Psi) = \int_{F_1^{-1}(x_1 - 1 \mid \Psi)}^{F_1^{-1}(x_1 \mid \Psi)} \dots \int_{F_d^{-1}(x_d - 1 \mid \Psi)}^{F_d^{-1}(x_d \mid \Psi)} c_\Sigma(\boldsymbol{u}) \, \mathrm{d}\boldsymbol{u} \qquad (6)$$

with $F_j$ the CDF of the discrete variable $X_j$. In practice, the copula distribution is a continuous distribution on the unit cube, and $p(\boldsymbol{x})$ its discrete counterpart on $\mathcal{X}$ (see Supplementary Methods).

We select, using maximum likelihood estimation, the marginal distributions from categorical, logarithmic, and negative binomial count distributions (see Supplementary Methods). Sampling the complete set of covariance matrices to estimate the association structure of copulas is computationally expensive for large datasets. We rely instead on a fast two-step approximate inference method: we infer separately each pairwise correlation factor $\Sigma_{ij}$ and then project the constructed matrix $\Sigma$ on the set of symmetric positive definite matrices to accurately recover the copula covariance matrix (see "Methods").

We collect five corpora from publicly available sources: population census (USA and MERNIS) as well as surveys from the UCI Machine Learning repository (ADULT, MIDUS, HDV). From each corpus, we create populations by selecting subsets of attributes (columns) uniformly. The resulting 210 populations cover a large range of uniqueness values (0–0.96), numbers of attributes (2–47), and records (7108–9M individuals). For readability purposes, we report in the main text the numerical results for all five corpora but will show figures only for USA. Figures for MERNIS, ADULT, MIDUS, and HDV are similar and available in Supplementary Information.

Figure 1a shows that, when trained on the entire population, our model correctly estimates population uniqueness $\Xi_X = \sum_{\boldsymbol{x} \in \mathcal{X}} p(\boldsymbol{x})(1 - p(\boldsymbol{x}))^{n-1}$, i.e., the expected percentage of unique individuals in $(\boldsymbol{x}^{(1)}, \boldsymbol{x}^{(2)}, \dots, \boldsymbol{x}^{(n)})$. The MAE between the empirical uniqueness of our population $\Xi_X$ and the estimated

uniqueness $\widehat{\Xi_X}$ is $0.028 \pm 0.026$ [mean ± s.d.] for USA and $0.018 \pm 0.019$ on average across every corpus (see Table 1). Figure 1a and Supplementary Fig. 1 furthermore show that our model correctly estimates uniqueness across all values of uniqueness, with low within-population s.d. (Supplementary Table 3).

Figure 1b shows that our model estimates population uniqueness very well even when the dataset is heavily sampled (see Supplementary Fig. 2, for other populations). For instance, our model achieves an MAE of $0.029 \pm 0.015$ when the dataset only contains 1% of the USA population and an MAE of $0.041 \pm 0.053$ on average across every corpus. Table 1 shows that our model reaches a similarly low MAE, usually <0.050, across corpora and sampling fractions.

**Likelihood of successful re-identification**. Once trained, we can use our model to estimate the likelihood of his employer having correctly re-identified John Doe, our 50-year-old male from Berkeley with breast cancer. More specifically, given an individual record $x$, we can use the trained model to compute the likelihood $\widehat{\xi_x} = (1 - q(\boldsymbol{x} \mid \Sigma, \Psi))^{n-1}$ for this record $x$ to be unique in the population. Our model takes into account information on both marginal prevalence (e.g., breast cancer prevalence) and global attribute association (e.g., gender and breast cancer). Since the cdf. of a Gaussian copula distribution has no close-form expression, we evaluate $q(\boldsymbol{x} \mid \Sigma, \Psi)$ with a numerical integration of the latent continuous joint density inside the hyper-rectangle defined by the $d$ components $(x_1, x_2, \dots, x_d)$[47,48]. We assume no prior knowledge on the order of outcomes inside marginals for nominal attributes and randomize their order.

Figure 2a shows that, when trained on 1% of the USA populations, our model predicts very well individual uniqueness, achieving a mean AUC (area under the receiver-operator characteristic curve (ROC)) of 0.89. For each population, to avoid overfitting, we train the model on a single 1% sample, then select 1000 records, independent from the training sample, to test the model. For re-identifications that the model predicts to be always correct ($\widehat{\xi_x} > 0.95$, estimated individual uniqueness >95%), the likelihood of them to be incorrect (false-discovery rate) is 5.26% (see bottom-right inset in Fig. 2a). ROC curves for the other populations are available in Supplementary Fig. 3 and have overall a mean AUC of 0.93 and mean false-discovery rate of 6.67% for $\widehat{\xi_x} > 0.95$ (see Supplementary Table 1).

Finally, Fig. 2b shows that our model outperforms even the best theoretically achievable prediction using only population uniqueness, i.e., assigning the score $\xi_x^{(\mathrm{pop})} = \Xi_X$ to every individual (ground truth population uniqueness, see Supplementary Methods). We use the Brier Score (BS)[49] to measure the calibration of probabilistic predictions: $\mathrm{BS} = \frac{1}{n} \sum_{i=1}^{n} \left(\xi_{\boldsymbol{x}^{(i)}} - \widehat{\xi_{\boldsymbol{x}^{(i)}}}\right)^2$ with, in our case, $\xi_{\boldsymbol{x}^{(i)}}$ the actual uniqueness of the record $\boldsymbol{x}^{(i)}$ (1 if $\boldsymbol{x}^{(i)}$ is unique and 0 if not) and $\widehat{\xi_{\boldsymbol{x}^{(i)}}}$ the estimated likelihood. Our model obtains scores on average 39% lower than the best theoretically achievable prediction using only population uniqueness, emphasizing the importance of modeling individuals' characteristics.

**Appropriateness of the de-identification model**. Using our model, we revisit the (successful) re-identification of Gov. Weld[25]. We train our model on the 5% Public Use Microdata Sample (PUMS) files using ZIP code, date of birth, and gender and validate it using the last national estimate[50]. We show that, as a male born on July 31, 1945 and living in Cambridge (02138), the information used by Latanya Sweeney at the time, William Weld was unique with a 58% likelihood ($\xi_x = 0.58$ and $\kappa_x = 0.77$), meaning that Latanya Sweeney's re-identification had 77%

NATURE COMMUNICATIONS | https://doi.org/10.1038/s41467-019-10933-3



**Fig. 1** Estimating the population uniqueness of the USA corpus. **a** We compare, for each population, empirical and estimated population uniqueness (boxplot with median, 25th and 75th percentiles, maximum 1.5 interquartile range (IQR) for each population, with 100 independent trials per population). For example, date of birth, location (PUMA code), marital status, and gender uniquely identify 78.7% of the 3 million people in this population (empirical uniqueness) that our model estimates to be 78.2 ± 0.5% (boxplot in black). **b** Absolute error when estimating USA's population uniqueness when the disclosed dataset is randomly sampled from 10% to 0.1%. The boxplots (25, 50, and 75th percentiles, 1.5 IQR) show the distribution of mean absolute error (MAE) for population uniqueness, at one subsampling fraction across all USA populations (100 trials per population and sampling fraction). The $y$ axis shows both $p$, the sampling fraction, and $n_S = p \times n$, the sample size. Our model estimates population uniqueness very well for all sampling fractions with the MAE slightly increasing when only a very small number of records are available ($p = 0.1\%$ or 3061 records)

**Table 1 Mean absolute error (mean ± s.d.) when estimating population uniqueness (100 trials per population)**

| | | MERNIS | USA | ADULT | HDV | MIDUS |
|---|---|---|---|---|---|---|
| Corpus | $n$ | 8,820,049 | 3,061,692 | 32,561 | 8403 | 7108 |
| | $c$ | 10 | 40 | 50 | 50 | 60 |
| | [min $\Xi$, max $\Xi$] | [0.087, 0.844] | [0.000, 0.961] | [0.000, 0.794] | [0.002, 0.941] | [0.052, 0.944] |
| Sampling fraction | 100% | 0.029 ± 0.019 | 0.028 ± 0.026 | 0.018 ± 0.016 | 0.006 ± 0.009 | 0.018 ± 0.014 |
| | 10% | 0.030 ± 0.019 | 0.028 ± 0.016 | 0.022 ± 0.020 | 0.011 ± 0.009 | 0.035 ± 0.044 |
| | 5% | 0.029 ± 0.019 | 0.027 ± 0.016 | 0.027 ± 0.023 | 0.015 ± 0.012 | 0.037 ± 0.055 |
| | 1% | 0.029 ± 0.019 | 0.029 ± 0.015 | 0.027 ± 0.014 | 0.045 ± 0.050 | 0.055 ± 0.079 |
| | 0.5% | 0.028 ± 0.019 | 0.029 ± 0.015 | 0.048 ± 0.039 | | |
| | 0.1% | 0.026 ± 0.017 | 0.058 ± 0.037 | | | |

Our model correctly estimates population uniqueness even when only a small to very small fraction of the population is available. $n$ denotes the population size and $c$ the corpus size (the total number of populations considered per corpus). We do not estimate population uniqueness when the sampled dataset contains <50 records



**Fig. 2** The model predicts correct re-identifications with high confidence. **a** Receiver operating characteristic (ROC) curves for USA populations (light ROC curve for each population and a solid line for the average ROC curve). Our method accurately predicts the (binary) individual uniqueness. (Inset) False-discovery rate (FDR) for individual records classified with $\xi > 0.9$, $\xi > 0.95$, and $\xi > 0.99$. For re-identifications that the model predicts are likely to be correct ($\hat{\xi}_x > 0.95$), only 5.26% of them are incorrect (FDR). **b** Our model outperforms by 39% the best theoretically achievable prediction using population uniqueness across every corpus. A red point shows the Brier Score obtained by our model, when trained on a 1% sample. The solid line represents the lowest Brier Score achievable when using the exact population uniqueness while the dashed line represents the Brier Score of a random guess prediction (BS = 1/3)



**Fig. 3** Average individual uniqueness increases fast with the number of collected demographic attributes. **a** Distribution of predicted individual uniqueness knowing ZIP code, date of birth, and gender (resp. ZIP code, date of birth, gender, and number of children) in blue (resp. orange). The dotted blue line at $\widehat{\xi}_{\boldsymbol{x}} = 0.580$ (resp. dashed orange line at $\widehat{\xi}_{\boldsymbol{x}} = 0.997$) illustrates the predicted individual uniqueness of Gov. Weld knowing the same combination of attributes. (Inset) The correctness $\kappa_{\boldsymbol{x}}$ is solely determined by uniqueness $\xi_{\boldsymbol{x}}$ and population size $n$ (here for Massachusetts). We show individual uniqueness and correctness for William Weld with three (in blue) and four (in orange) attributes. **b** The boxplots (25, 50, and 75th percentiles, 1.5 IQR) show the average uniqueness $\langle\xi_{\boldsymbol{x}}\rangle$ knowing $k$ demographic attributes, grouped by number of attributes. The individual uniqueness scores $\xi_{\boldsymbol{x}}$ are estimated on the complete dataset in Massachusetts, based on the 5% Public Use Microdata Sample files. While few attributes might not be sufficient for a re-identification to be correct, collecting a few more attributes will quickly render the re-identification very likely to be successful. For instance, 15 demographic attributes would render 99.98% of people in Massachusetts unique. **c** Uniqueness varies with the specific value of attributes. For instance, a 33-year-old is less unique than a 58-year-old person. We here either (*i*) randomly replace the value of one baseline attribute (ZIP code, date of birth, or gender) or (*ii*) add one extra attribute, both by sampling from its marginal distribution, to the uniqueness of a 58-year-old male from Cambridge, MA. The dashed baseline shows his original uniqueness $\widehat{\xi}_{\boldsymbol{x}} = 0.580$ and the boxplots the distribution of individual uniqueness obtained after randomly replacing or adding one attribute. A complete description of the attributes and method is available in Supplementary Methods.

chances of being correct. We show that, if his medical records had included number of children—5 for William Weld—, her re-identification would have had 99.8% chances of being correct! Figure 3a shows that the same combinations of attributes (ZIP code, date of birth, gender, and number of children) would also identify 79.4% of the population in Massachusetts with high confidence ($\widehat{\xi}_{\boldsymbol{x}} > 0.80$). We finally evaluate the impact of specific attributes on William Weld's uniqueness. We either change the value of one of his baseline attributes (ZIP code, date of birth, or gender) or add one extra attribute, in both cases picking the attribute at random from its distribution (see Supplementary Methods). Figure 3c shows, for instance, that individuals with 3 cars or no car are harder to re-identify than those with 2 cars. Similarly, it shows that it would not take much to re-identify people living in Harwich Port, MA, a city of <2000 inhabitants.

Modern datasets contain a large number of points per individuals. For instance, the data broker Experian sold Alteryx access to a de-identified dataset containing 248 attributes per household for 120M Americans[51]; Cambridge university

researchers shared anonymous Facebook data for 3M users collected through the myPersonality app and containing, among other attributes, users' age, gender, location, status updates, and results on a personality quiz[52]. These datasets do not necessarily share all the characteristics of the one studied here. Yet, our analysis of the re-identification of Gov. Weld by Latanya Sweeney shows that few attributes are often enough to render the likelihood of correct re-identification very high. For instance, Fig. 3b shows that the average individual uniqueness increases fast with the number of collected demographic attributes and that 15 demographic attributes would render 99.98% of people in Massachusetts unique.

Our results, first, show that few attributes are often sufficient to re-identify with high confidence individuals in heavily incomplete datasets and, second, reject the claim that sampling or releasing partial datasets, e.g., from one hospital network or a single online service, provide plausible deniability. Finally, they show that, third, even if population uniqueness is low—an argument often used to justify that data are sufficiently de-identified to be

Case 3:23-cv-04277-VC   Document 27   Filed 10/27/23   Page 26 of 35

considered anonymous[53]—, many individuals are still at risk of being successfully re-identified by an attacker using our model.

As standards for anonymization are being redefined, led by national and regional data protection authorities in the EU, it is essential for them to be robust and account for new threats like the one we present in this paper. They need to take into account the individual risk of re-identification and the lack of plausible deniability—even if the dataset is incomplete—, as well as legally recognize the broad range of provable privacy-enhancing systems and security measures that would allow data to be used while effectively preserving people's privacy[54,55].

## Discussion

In this paper, we proposed and validated a statistical model to quantify the likelihood for a re-identification attempt to be successful, even if the disclosed dataset is heavily incomplete.

Beyond the claim that the incompleteness of the dataset provides plausible deniability, our method also challenges claims that a low population uniqueness is sufficient to protect people's privacy[53,56]. Indeed, an attacker can, using our model, correctly re-identify an individual with high likelihood even if the population uniqueness is low (Fig. 3a). While more advanced guarantees like $k$-anonymity[57] would give every individual in the dataset some protection, they have been shown to be NP-Hard[58], hard to achieve in modern high-dimensional datasets[59], and not always sufficient[60].

While developed to estimate the likelihood of a specific re-identification to be successful, our model can also be used to estimate population uniqueness. We show in Supplementary Note 1 that, while not its primary goal, our model performs consistently better than existing methods to estimate population uniqueness on all five corpora (Supplementary Fig. 4, $P < 0.05$ in 78 cases out of 80 using Wilcoxon's signed-rank test)[61–66] and consistently better than previous attempts to estimate individual uniqueness[67,68]. Existing approaches, indeed, exhibit unpredictably large over- and under-estimation errors. Finally, a recent work quantifies the correctness of individual re-identification in incomplete (10%) hospital data using complete population frequencies[24]. Compared to this work, our approach does not require external data nor to assume this external data to be complete.

To study the stability and robustness of our estimations, we perform further experiments (Supplementary Notes 2–8).

First, we analyze the impact of marginal and association parameters on the model error and show how to use exogenous information to lower it. Table 1 and Supplementary Note 7 show that, at very small sampling fraction (below 0.1%), where the error is the largest, the error is mostly determined by the marginals, and converges after few hundred records when the exact marginals are known. The copula covariance parameters exhibit no significant bias and decrease fast when the sample size increases (Supplementary Note 8).

As our method separates marginals and association structure inference, exogenous information from larger data sources could also be used to estimate marginals with higher accuracy. For instance, count distributions for attributes such as date of birth or ZIP code could be directly estimated from national surveys. We replicate our analysis on the USA corpus using a subsampled dataset to infer the association structure along with the exact counts for marginal distributions. Incorporating exogenous information reduces, e.g., the mean MAE of uniqueness across all corpora by 48.6% ($P < 0.01$, Mann–Whitney) on a 0.1% sample. Exogenous information become less useful as the sampling fraction increases (Supplementary Table 2).

Second, our model assumes that $\mathcal{D}$ is either uniformly sampled from the population of interest $X$ or, as several census bureaus are doing, released with post-stratification weights to match the overall population. We believe this to be a reasonable assumption as biases in the data would greatly affect its usefulness and affect any application of the data, including our model. To overcome an existing sampling bias, the model can be (i) further trained on a random sample from the population $\mathcal{D}$ (e.g., microdata census or survey data) and then applied to a non-uniform released sample (e.g., hospital data, not uniformly sampled from the population) or (ii) trained using better, potentially unbiased, estimates for marginals or association structure coming from other sources (see above).

Third, since $\mathcal{D}$ is a sample from the population $X$, only the records that are unique in the sample can be unique in the population. Hence, we further evaluate the performance on our model only on records that are sample unique and show that it only marginally decrease the AUC (Supplementary Note 5). We therefore prefer to not restrict our predictions to sample unique records as (a) our models need to perform well on non-sample unique records for us to be able to estimate correctness and (b) to keep the method robust if oversampling or sampling with replacement were to have been used.

## Methods

**Inferring marginals distributions.** Marginals can be either (i) unknown and are estimated from the marginals of the population sample $X_S$, this is the assumption used in the main text, or (ii) known with their exact distribution and cumulative density function directly available.

In the first case, we fit marginal counts to categorical (naive plug-in estimator), negative binomial, and logarithmic distributions using maximum log-likelihood. We compare the obtained distributions and select the best likelihood according to its Bayesian information criterion (BIC):

$$\text{BIC} = -2\log \widehat{L} + k \log n_{\mathcal{D}} \quad (7)$$

where $\widehat{L}$ is the maximized value of the likelihood function, $n_{\mathcal{D}}$ the number of individuals in the sample $\mathcal{D}$, and $k$ the number of parameters in the fitted marginal distribution.

**Inferring the parameters of the latent copula.** Each cell $\Sigma_{ij}$ of the $\Sigma$ covariance matrix of a multivariate copula distribution is the correlation parameter of a pairwise copula distribution. Hence, instead of inferring $\Sigma$ from the set of all covariance matrices, we separately infer every cell $\Sigma_{ij} \in [0, 1]$ from the joint sample of $\mathcal{D}_i$ and $\mathcal{D}_j$. We first measure the mutual information $I(\mathcal{D}_i; \mathcal{D}_j)$ between the two attributes and select $\sigma = \widehat{\Sigma_{ij}}$ minimizing the Euclidean distance between the empirical mutual information and the mutual information of the inferred joint distribution.

In practice, since the cdf. of a Gaussian copula is not tractable, we use a bounded Nelder–Mead minimization algorithm. For a given $(\sigma, (\Psi_i, \Psi_j))$, we sample from the distribution $q(\cdot | \sigma, (\Psi_i, \Psi_j))$ and generate a discrete bivariate sample $Y$ from which we measure the objective:

$$f(\sigma) = \begin{cases} \left\lVert I(\mathcal{D}_i; \mathcal{D}_j) - I(Y_1; Y_2) \right\rVert_2 & \text{for } \sigma \in [0, 1] \\ +\infty & \text{otherwise} \end{cases} \quad (8)$$

We then project the obtained $\widehat{\Sigma}$ matrix on the set of SDP matrices by solving the following optimization problem:

$$\min_{A} \; \left\lVert A - \widehat{\Sigma} \right\rVert_2 \quad (9)$$
$$\text{s.t.} \quad A \succeq 0$$

**Modeling the association structure using mutual information.** We use the pairwise mutual information to measure the strength of association between attributes. For a dataset $\mathcal{D}$, we denote by $I_{\mathcal{D}}$ the mutual information matrix where each cell $I(\mathcal{D}_i; \mathcal{D}_j)$ is the mutual information between attributes $\mathcal{D}_i$ and $\mathcal{D}_j$. When evaluating mutual information from small samples, obtained scores are often overestimating the strength of association. We apply a correction for randomness using a permutation model[69]:

$$AI(\mathcal{D}_i; \mathcal{D}_j) = \frac{I(\mathcal{D}_i; \mathcal{D}_j) - \mathbb{E}(I(\mathcal{D}_i; \mathcal{D}_j))}{\max\{\mathbb{H}(\mathcal{D}_i), \mathbb{H}(\mathcal{D}_j)\} - \mathbb{E}(I(\mathcal{D}_i; \mathcal{D}_j))} \quad (10)$$

NATURE COMMUNICATIONS | https://doi.org/10.1038/s41467-019-10933-3   ARTICLE

In practice, we estimate the expected mutual information between $\mathcal{D}_i$ and $\mathcal{D}_j$ with successive permutations of $\mathcal{D}_j$. We found that the adjusted mutual information provides significant improvement for small samples and large support size $|\mathcal{X}|$ compared to the naive estimator.

**Theoretical and empirical population uniqueness.** For $n$ individuals $x^{(1)}, x^{(2)}, \ldots, x^{(n)}$ drawn from $X$, the uniqueness $\Xi_X$ is the expected percentage of unique individuals. It can be estimated either by (i) by computing the mean of individual uniqueness or (ii) by sampling a synthetic population of $n$ individuals from the copula distribution. In the former case, we have

$$\Xi_X \equiv \frac{1}{n}\, \mathbb{E}\left[\sum_{i=1}^{n}\left[x^{(i)} \text{unique in}(x^{(1)}, \ldots, x^{(n)})\right]\right] \tag{11}$$

$$= \frac{1}{n}\, \mathbb{E}\left[\sum_{x \in \mathcal{X}} T_x\right] \tag{12}$$

$$= \frac{1}{n}\sum_{x \in \mathcal{X}} \mathbb{E}[T_x] \tag{13}$$

where $T_x = [\exists! i, x^{(i)} = x]$ equals one if there exists a single individual $i$ such as $x^{(i)} = x$ and zero otherwise. $T_x$ follows a binomial distribution $B(p(x), n)$. Therefore

$$\mathbb{E}[T_x] = n\, p(x)\,(1 - p(x))^{n-1} \tag{14}$$

and

$$\Xi_X = \sum_{x \in \mathcal{X}} p(x)\,(1 - p(x))^{n-1} \tag{15}$$

This requires iterating over all combinations of attributes, whose number grows exponentially as the number of attributes increases, and quickly becomes computationally intractable. The second method is therefore often more tractable and we use it to estimate population uniqueness in the paper.

For cumulative marginal distributions $F_1, F_2, \ldots, F_d$ and copula correlation matrix $\Sigma$, the algorithm 1 (Supplementary Methods) samples $n$ individuals from $q(\cdot|\Sigma,\Psi)$ using the latent copula distribution. From the $n$ generated records $(y^{(1)}, y^{(2)}, \ldots, y^{(n)})$, we compute the empirical uniqueness

$$\Xi_X = \frac{1}{n}\left|\left\{i \in [1, n] \,/\, \forall j \neq i, y^{(i)} \neq y^{(j)}\right\}\right| \tag{16}$$

**Individual likelihood of uniqueness and correctness.** The probability distribution $q(\cdot \mid \Sigma, \Psi)$ can be computed by integrating over the latent copula density. Note that the marginal distributions $X_1$ to $X_d$ are discrete, causing the inverses $F_1^{-1}$ to $F_d^{-1}$ to have plateaus. When estimating $p(x)$, we integrate over the latent copula distribution inside the hypercube $[x_1 - 1, x_1] \times [x_2 - 1, x_2] \times \ldots \times [x_d - 1, x_d]$:

$$q(x|\Sigma,\Psi) = \mathbb{P}(x_1 - 1 < X_1 \leq x_1, \ldots, x_d - 1 < X_d \leq x_d | \Sigma, \Psi) \tag{17}$$

$$= \int_{F_1^{-1}(x_1-1|\Psi)}^{F_1^{-1}(x_1|\Psi)} \cdots \int_{F_d^{-1}(x_d-1|\Psi)}^{F_d^{-1}(x_d|\Psi)} c_\Sigma(u)\, du \tag{18}$$

$$= \int_{\phi^{-1}(F_1^{-1}(x_1-1|\Psi))}^{\phi^{-1}(F_1^{-1}(x_1|\Psi))} \cdots \int_{\phi^{-1}(F_d^{-1}(x_d-1|\Psi))}^{\phi^{-1}(F_d^{-1}(x_d|\Psi))} \phi_\Sigma(z)\, dz \tag{19}$$

with $\phi_\Sigma$ the density of a zero-mean multivariate normal (MVN) of correlation matrix $\Sigma$. Several methods have been proposed in the literature to estimate MVN rectangle probabilities. Genz and Bretz[47,48] proposed a randomized quasi Monte Carlo method which we use to estimate the discrete copula density.

The likelihood $\xi_x$ for an individual's record $x$ to be unique in a population of $n$ individuals can be derived from $p_X(X = x)$:

$$\xi_x \equiv p_X(x \text{ unique in } (x^{(1)}, \ldots, x^{(n)}) \mid \exists i, x^{(i)} = x) \tag{20}$$

$$= p_X(x \text{ unique in } (x^{(1)}, \ldots, x^{(n)}) \mid x^{(1)} = x) \tag{21}$$

$$= p_X(\forall i \in [2, n], x^{(i)} \neq x) \tag{22}$$

$$= (1 - p(x))^{n-1} \tag{23}$$

$$\widehat{\xi_x} = (1 - q(x \mid \Sigma, \Psi))^{n-1}$$

Similarly, the likelihood $\kappa_x$ for an individual's record $x$ to be correctly matched in a population of $n$ individuals can be derived from $p_X(X = x)$. With $T \equiv \sum_{i=1}^{n}[x^{(i)} = x] - 1$, the number of potential false positives in the population, we have:

$$\kappa_x \equiv \mathbb{P}(x \text{ correctly matched in } (x^{(1)}, \ldots, x^{(n)}) \mid \exists i, x^{(i)} = x) \tag{24}$$

$$= \sum_{k=0}^{n-1} \frac{1}{k+1}\mathbb{P}(T = k) \tag{25}$$

$$= \sum_{k=0}^{n-1} \frac{1}{k+1}\binom{n-1}{k} p(x)^k (1 - p(x))^{(n-1-k)} \tag{26}$$

$$= \frac{1}{n\, p(x)}\left(1 - (1 - p(x))^n\right) \tag{27}$$

Note that, since records are independent, $T$ follows a binomial distribution $B(n - 1, p(x))$.

We substitute the expression for $\xi_x$ in the last formula and obtain:

$$\kappa_x = \frac{1}{n\, p(x)}\left(1 - (1 - p(x))^n\right) \tag{28}$$

$$= \frac{1}{n}\frac{1 - \xi_x^{n/(n-1)}}{1 - \xi_x^{1/(n-1)}} \tag{29}$$

## Data availability
The USA corpus, extracted from the 1-Percent Public Use Microdata Sample (PUMS) files, is available at https://www.census.gov/main/www/pums.html. The 5% PUMS files used to estimate the correctness of Governor Weld's re-identification are also available at the same address. The ADULT corpus, extracted from the Adult Income dataset, is available at https://archive.ics.uci.edu/ml/datasets/adult. The HDV corpus, extracted from the Histoire de vie survey, is available at https://www.insee.fr/fr/statistiques/2532244. The MIDUS corpus, extracted from the Midlife in the United States survey, is available at https://www.icpsr.umich.edu/icpsrweb/ICPSR/series/203. The MERNIS corpus is a complete population database of virtually all 48 million individuals born before early 1991 in Turkey that was made available online in April 2016 after a data leak from Turkey's Central Civil Registration System. Our use of this data was approved by Imperial College as it provides a unique opportunity to perform uniqueness estimation on a complete census survey. Owing to the sensitivity of the data, we have only analyzed a copy of the dataset where every distinct value was replaced by a unique integer to obfuscate records, without loss of precision for uniqueness modeling. A complete description of each corpus is available in the Supplementary Information.

## Code availability
All simulations were implemented in Julia and Python. The source code to reproduce the experiments is available at https://cpg.doc.ic.ac.uk/individual-risk, along with documentation, tests, and examples.

Received: 27 September 2018 Accepted: 11 June 2019
Published online: 23 July 2019

## References
1. Poushter, J. Smartphone ownership and internet usage continues to climb in emerging economies (Pew Research Center, Washington, DC, 2016). http://www.pewglobal.org/2016/02/22/smartphone-ownership-and-internet-usage-continues-to-climb-in-emerging-economies/.
2. Yang, N. & Hing, E. National electronic health system. https://cdc.gov/nchs/data/ahcd/nehrs/2015_nehrs_ehr_by_specialty.pdf (2015).
3. Murdoch, T. B. & Detsky, A. S. The inevitable application of big data to health care. JAMA 309, 1351–1352 (2013).
4. Wyber, R. et al. Big data in global health: improving health in low- and middle-income countries. Bull. World Health Organ. 93, 203–208 (2015).
5. Lazer, D. et al. Life in the network: the coming age of computational social science. Science 323, 721 (2009).
6. Halevy, A., Norvig, P. & Pereira, F. The unreasonable effectiveness of data. IEEE Intell. Syst. 24, 8–12 (2009).
7. Kitchin, R. The real-time city? Big data and smart urbanism. GeoJournal 79, 1–14 (2014).
8. McAfee, A., Brynjolfsson, E., Davenport, T. H., Patil, D. J. & Barton, D. Big data: the management revolution. Harv. Bus. Rev. 90, 60–68 (2012).
9. Hodson, H. Revealed: Google AI has access to huge haul of NHS patient data. New Scientist (29 Apr 2016).
10. Cadwalladr, C. & Graham-Harrison, E. Revealed: 50 million facebook profiles harvested for Cambridge Analytica in major data breach. The Guardian (17 Mar 2018).
11. Morey, T., Forbath, T. & Schoop, A. Customer data: designing for transparency and trust. Harv. Bus. Rev. 93, 96–105 (2015).

12. Polonetsky, J., Tene, O. & Finch, K. Shades of gray: seeing the full spectrum of practical data De-Identification. *Santa Clara Law Rev.* **56**, 593–629 (2016).

13. Office for Civil Rights, HHS. *Standards for privacy of individually identifiable health information.* Federal Register. https://ncbi.nlm.nih.gov/pubmed/12180470 (2002).

14. Malin, B., Benitez, K. & Masys, D. Never too old for anonymity: a statistical standard for demographic data sharing via the HIPAA privacy rule. *J. Am. Med. Inform. Assoc.* **18**, 3–10 (2011).

15. Rothstein, M. A. Is deidentification sufficient to protect health privacy in research? *Am. J. Bioeth.* **10**, 3–11 (2010).

16. Council of European Union. Regulation (EU) 2016/679. *Off. J. Eur. Union* L **119**, 1–88 (2016).

17. Hrynaszkiewicz, I., Norton, M. L., Vickers, A. J. & Altman, D. G. Preparing raw clinical data for publication: guidance for journal editors, authors, and peer reviewers. *BMJ* **340**, c181 (2010).

18. Opinion 05/2014 on anonymisation techniques. Technical Report, Article 29 Data Protection Working Party. http://ec.europa.eu/justice/article-29/documentation/opinion-recommendation/files/2014/wp216_en.pdf (2014).

19. Rubinstein, I. Framing the discussion. https://fpf.org/wp-content/uploads/2016/11/Rubinstein_framing-paper.pdf (2016).

20. Cal. Civil Code. Assembly Bill No. 375 §§ 1798.100–1798.198 (2018).

21. Narayanan, A. & Felten, E. W. No silver bullet: de-identification still doesn't work. http://randomwalker.info/publications/no-silver-bullet-de-identification.pdf (2014).

22. Ohm, P. Broken promises of privacy: responding to the surprising failure of anonymization. *UCLA. Law Rev.* **57**, 1701 (2010).

23. Hern, A. 'Anonymous' browsing data can be easily exposed, researchers reveal. *The Guardian* (1 Aug 2017).

24. Culnane, C., Rubinstein, B. I. P. & Teague, V. Health data in an open world. Preprint at: https://arxiv.org/abs/1712.05627 (2017).

25. Sweeney, L. Weaving technology and policy together to maintain confidentiality. *J. Law Med. Ethics* **25**, 98–110. 82 (1997).

26. Loukides, G., Denny, J. C. & Malin, B. The disclosure of diagnosis codes can breach research participants' privacy. *J. Am. Med. Inform. Assoc.* **17**, 322–327 (2010).

27. Douriez, M., Doraiswamy, H., Freire, J. & Silva, C. T. Anonymizing NYC taxi data: does it matter? In *2016 IEEE International Conference on Data Science and Advanced Analytics (DSAA)*, 140–148 (IEEE, Piscataway, NJ, 2016).

28. Siddle, J. I know where you were last summer: London's public bike data is telling everyone where you've been. https://vartree.blogspot.com/2014/04/i-know-where-you-were-last-summer.html (2014). Accessed 2 Feb 2019.

29. Lavrenovs, A. & Podins, K. Privacy violations in Riga open data public transport system. In *2016 IEEE 4th Workshop on Advances in Information, Electronic and Electrical Engineering (AIEEE)*, 1–6 (IEEE, Piscataway, NJ, 2016). https://doi.org/10.1109/AIEEE.2016.7821808.

30. de Montjoye, Y.-A., Hidalgo, C. A., Verleysen, M. & Blondel, V. D. Unique in the crowd: the privacy bounds of human mobility. *Sci. Rep.* **3**, 1376 (2013).

31. de Montjoye, Y.-A., Radaelli, L., Singh, V. K. & Pentland, A. Unique in the shopping mall: on the reidentifiability of credit card metadata. *Science* **347**, 536–539 (2015).

32. Matthews, G. J. & Harel, O. Data confidentiality: a review of methods for statistical disclosure limitation and methods for assessing privacy. *Stat. Surv.* **5**, 1–29 (2011).

33. Barth-Jones, D. The 're-identification' of Governor William Weld's medical information: a critical re-examination of health data identification risks and privacy protections, then and now. https://ssrn.com/abstract=2076397 (2012).

34. El Emam, K. & Arbuckle, L. De-identification: a critical debate. https://fpf.org/2014/07/24/de-identification-a-critical-debate/ (2014).

35. Sánchez, D., Martnez, S. & Domingo-Ferrer, J. Comment on "unique in the shopping mall: on the reidentifiability of credit card metadata". *Science* **351**, 1274 (2016).

36. Reiter, J. P. Estimating risks of identification disclosure in microdata. *J. Am. Stat. Assoc.* **100**, 1103–1112 (2005).

37. Fienberg, S. E. & Sanil, A. P. A Bayesian approach to data disclosure: optimal intruder behavior for continuous data. *J. Stat.* **13**, 75 (1997).

38. Duncan, G. & Lambert, D. The risk of disclosure for microdata. *J. Bus. Econ. Stat.* **7**, 207–217 (1989).

39. Office of the Australian Information Commissioner. *De-identification and the Privacy Act.* https://www.oaic.gov.au/agencies-and-organisations/guides/de-identification-and-the-privacy-act (2018).

40. Ruggles, S., King, M. L., Levison, D., McCaa, R. & Sobek, M. IPUMS-International. *Hist. Methods* **36**, 60–65 (2003).

41. Bennett, J. & Lanning, S. The Netflix prize. In *Proc. KDD Cup and Workshop*, 35–38 (ACM, New York, NY, 2007). http://citeseerx.ist.psu.edu/viewdoc/summary?doi=10.1.1.115.6998.

42. Sweeney, L. Simple demographics often identify people uniquely. *Health* **671**, 1–34 (2000).

43. Genest, C. & Mackay, J. The joy of copulas: bivariate distributions with uniform marginals. *Am. Stat.* **40**, 280–283 (1986).

44. Cherubini, U., Luciano, E. & Vecchiato, W. *Copula Methods in Finance* (Wiley-Blackwell, Hoboken, NJ, 2004).

45. Genest, C. & Favre, A.-C. Everything you always wanted to know about copula modeling but were afraid to ask. *J. Hydrol. Eng.* **12**, 347–368 (2007).

46. Wang, W. & Wells, M. T. Model selection and semiparametric inference for bivariate failure-time data. *J. Am. Stat. Assoc.* **95**, 62–72 (2000).

47. Genz, A. Numerical computation of multivariate normal probabilities. *J. Comput. Graph. Stat.* **1**, 141–149 (1992).

48. Genz, A. & Bretz, F. *Computation of Multivariate Normal and t Probabilities* (Springer Science & Business Media, Berlin, 2009).

49. Brier, G. W. Verification of forecasts expressed in terms of probability. *Mon. Weather Rev.* **78**, 1–3 (1950).

50. Golle, P. Revisiting the uniqueness of simple demographics in the US population. In *5th ACM Workshop on Privacy in Electronic Society* (ACM, New York, NY, 2006). https://doi.org/10.1145/1179601.1179615.

51. Fox-Brewster, T. 120 million american households exposed in 'massive' ConsumerView database leak. *Forbes* (2017).

52. Waterfield, P. & Revell, T. Huge new facebook data leak exposed intimate details of 3m users. *New Scientist* (2018).

53. El Emam, K. & Arbuckle, L. *Anonymizing Health Data* (O'Reilly, Newton, MA, 2013).

54. D'Acquisto, G. et al. Privacy by design in big data: an overview of privacy enhancing technologies in the era of big data analytics. Technical Report. European Union Agency for Network and Information Security (2015).

55. Cho, H., Wu, D. J. & Berger, B. Secure genome-wide association analysis using multiparty computation. *Nat. Biotechnol.* **36**, 547–551 (2018).

56. Cavoukian, A. & Castro, D. *Big data and innovation, setting the record straight: de-identification does work.* http://www2.itif.org/2014-big-data-deidentification.pdf (2014).

57. Sweeney, L. k-anonymity: a model for protecting privacy. *Int. J. Uncertain. Fuzziness Knowl. Based Syst.* **10**, 557–570 (2002).

58. Meyerson, A. & Williams, R. On the complexity of optimal k-anonymity. In *Proc. 23rd ACM SIGMOD-SIGACT-SIGART Symposium on Principles of Database Systems*, 223–228 (2004). https://doi.org/10.1145/1055558.1055591.

59. Aggarwal, C. C. On k-anonymity and the curse of dimensionality. In *Proceedings of the 31st International Conference on Very Large Data Bases*, VLDB '05, 901–909 (VLDB Endowment, 2005). http://dl.acm.org/citation.cfm?id=1083592.1083696.

60. Li, N., Li, T. & Venkatasubramanian, S. t-closeness: privacy beyond k-anonymity and l-diversity. In *2007 IEEE 23rd International Conference on Data Engineering*, 106–115 (IEEE, 2007). https://doi.org/10.1109/ICDE.2007.367856.

61. Ewens, W. J. The sampling theory of selectively neutral alleles. *Theor. Popul. Biol.* **3**, 87–112 (1972).

62. Chen, G. & Keller-McNulty, S. Estimation of identification disclosure risk in microdata. *J. Stat.* **14**, 79 (1998).

63. Hoshino, N. Applying pitman's sampling formula to microdata disclosure risk assessment. *J. Stat.* **17**, 499 (2001).

64. Keller, W. J. & Pannekoek, J. Disclosure control of microdata. *J. Am. Stat. Assoc.* **85**, 38–45 (1990).

65. Dankar, F. K., El Emam, K., Neisa, A. & Roffey, T. Estimating the re-identification risk of clinical data sets. *BMC Med. Inform. Decis. Mak.* **12**, 66 (2012).

66. Pitman, J. Random discrete distributions invariant under size-biased permutation. *Adv. Appl. Probab.* **28**, 525–539 (1996).

67. Skinner, C. J. & Holmes, D. J. Estimating the re-identification risk per record in microdata. *J. Stat.* **14**, 361 (1998).

68. Skinner, C. & Shlomo, N. Assessing identification risk in survey microdata using Log-Linear models. *J. Am. Stat. Assoc.* **103**, 989–1001 (2008).

69. Vinh, N. X., Epps, J. & Bailey, J. Information theoretic measures for clusterings comparison: variants, properties, normalization and correction for chance. *J. Mach. Learn. Res.* **11**, 2837–2854 (2010).

## Acknowledgements

L.R. is the recipient of a doctoral fellowship from the Belgian Fund for Scientific Research (F.R.S.-FNRS). This collaboration was made possible thanks to Imperial College's European Partners Fund and a WBI World Excellence Grant. We acknowledge support from the Information Commissioner Office for the development of the online demonstration tool.

## Author contributions

L.R. designed and performed experiments, analyzed the data, and wrote the paper; Y.-A. d.M. and J.M.H. designed experiments and wrote the paper.

## Additional information

**Supplementary Information** accompanies this paper at https://doi.org/10.1038/s41467-019-10933-3.

**Competing interests:** The authors declare no competing interests.

**Reprints and permission** information is available online at http://npg.nature.com/reprintsandpermissions/

**Peer review information**: *Nature Communications* thanks Antoine Boutet, Vanessa Teague, and other anonymous reviewer(s) for their contribution to the peer review of this work.

**Publisher's note:** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

 **Open Access** This article is licensed under a Creative Commons Attribution 4.0 International License, which permits use, sharing, adaptation, distribution and reproduction in any medium or format, as long as you give appropriate credit to the original author(s) and the source, provide a link to the Creative Commons license, and indicate if changes were made. The images or other third party material in this article are included in the article's Creative Commons license, unless indicated otherwise in a credit line to the material. If material is not included in the article's Creative Commons license and your intended use is not permitted by statutory regulation or exceeds the permitted use, you will need to obtain permission directly from the copyright holder. To view a copy of this license, visit http://creativecommons.org/licenses/by/4.0/.

© The Author(s) 2019

EXHIBIT "B"



# SCIENTIFIC REPORTS

SUBJECT AREAS:

APPLIED PHYSICS

APPLIED MATHEMATICS

STATISTICS

COMPUTATIONAL SCIENCE



OPEN

# Unique in the Crowd: The privacy bounds of human mobility

Yves-Alexandre de Montjoye[1,2], César A. Hidalgo[1,3,4], Michel Verleysen[2] & Vincent D. Blondel[2,5]

[1]Massachusetts Institute of Technology, Media Lab, 20 Ames Street, Cambridge, MA 02139 USA, [2]Université catholique de Louvain, Institute for Information and Communication Technologies, Electronics and Applied Mathematics, Avenue Georges Lemaître 4, B-1348 Louvain-la-Neuve, Belgium, [3]Harvard University, Center for International Development, 79 JFK Street, Cambridge, MA 02138, USA, [4]Instituto de Sistemas Complejos de Valparaíso, Paseo 21 de Mayo, Valparaíso, Chile, [5]Massachusetts Institute of Technology, Laboratory for Information and Decision Systems, 77 Massachusetts Avenue, Cambridge, MA 02139, USA.

Received
1 October 2012

Accepted
4 February 2013

Published
25 March 2013

Correspondence and
requests for materials
should be addressed to
Y.-A. de M. (yva@mit.
edu)

We study fifteen months of human mobility data for one and a half million individuals and find that human mobility traces are highly unique. In fact, in a dataset where the location of an individual is specified hourly, and with a spatial resolution equal to that given by the carrier's antennas, four spatio-temporal points are enough to uniquely identify 95% of the individuals. We coarsen the data spatially and temporally to find a formula for the uniqueness of human mobility traces given their resolution and the available outside information. This formula shows that the uniqueness of mobility traces decays approximately as the 1/10 power of their resolution. Hence, even coarse datasets provide little anonymity. These findings represent fundamental constraints to an individual's privacy and have important implications for the design of frameworks and institutions dedicated to protect the privacy of individuals.

D erived from the Latin Privatus, meaning "withdraw from public life," the notion of privacy has been foundational to the development of our diverse societies, forming the basis for individuals' rights such as free speech and religious freedom[1]. Despite its importance, privacy has mainly relied on informal protection mechanisms. For instance, tracking individuals' movements has been historically difficult, making them de-facto private. For centuries, information technologies have challenged these informal protection mechanisms. In 1086, William I of England commissioned the creation of the Doomsday book, a written record of major property holdings in England containing individual information collected for tax and draft purposes[2]. In the late 19th century, de-facto privacy was similarly threatened by photographs and yellow journalism. This resulted in one of the first publications advocating privacy in the U.S. in which Samuel Warren and Louis Brandeis argued that privacy law must evolve in response to technological changes[3].

Modern information technologies such as the Internet and mobile phones, however, magnify the uniqueness of individuals, further enhancing the traditional challenges to privacy. Mobility data is among the most sensitive data currently being collected. Mobility data contains the approximate whereabouts of individuals and can be used to reconstruct individuals' movements across space and time. Individual mobility traces T [Fig. 1A–B] have been used in the past for research purposes[4–18] and to provide personalized services to users[19]. A list of potentially sensitive professional and personal information that could be inferred about an individual knowing only his mobility trace was published recently by the Electronic Frontier Foundation[20]. These include the movements of a competitor sales force, attendance of a particular church or an individual's presence in a motel or at an abortion clinic.

While in the past, mobility traces were only available to mobile phone carriers, the advent of smartphones and other means of data collection has made these broadly available. For example, Apple® recently updated its privacy policy to allow sharing the spatio-temporal location of their users with "partners and licensees"[21]. 65.5B geo-tagged payments are made per year in the US[22] while Skyhook wireless is resolving 400 M user's WiFi location every day[23]. Furthermore, it is estimated that a third of the 25B copies of applications available on Apple's App Store[SM] access a user's geographic location[24,25], and that the geo-location of ~50% of all iOS and Android traffic is available to ad networks[26]. All these are fuelling the ubiquity of simply anonymized mobility datasets and are giving room to privacy concerns.

A simply anonymized dataset does not contain name, home address, phone number or other obvious identifier. Yet, if individual's patterns are unique enough, outside information can be used to link the data back to an individual. For instance, in one study, a medical database was successfully combined with a voters list to extract



**Figure 1 |** (A) Trace of an anonymized mobile phone user during a day. The dots represent the locations where the user made or received a call. Every time the user has such an interaction, the closest antenna that routes the call is recorded. (B) The same user's trace as recorded in a mobility database. The Voronoi lattice, represented by the grey lines, are an approximation of the antennas reception areas, the most precise location information available to us. The user's interaction times are here recorded with a precision of one hour. (C) The same individual's trace when we lower the resolution of our dataset through spatial and temporal aggregation. Antennas are aggregated in clusters of size two and their associated regions are merged. The user's interaction are recorded with a precision of two hours. Such spatial and temporal aggregation render the 8:32 am and 9:15 am interactions indistinguishable.

the health record of the governor of Massachusetts[27]. In another, mobile phone data have been re-identified using users' top locations[28]. Finally, part of the Netflix challenge dataset was re-identified using outside information from The Internet Movie Database[29].

All together, the ubiquity of mobility datasets, the uniqueness of human traces, and the information that can be inferred from them highlight the importance of understanding the privacy bounds of human mobility. We show that the uniqueness of human mobility traces is high and that mobility datasets are likely to be re-identifiable using information only on a few outside locations. Finally, we show that one formula determines the uniqueness of mobility traces providing mathematical bounds to the privacy of mobility data. The uniqueness of traces is found to decrease according to a power function with an exponent that scales linearly with the number of known spatio-temporal points. This implies that even coarse datasets provide little anonymity.

## Results

**Uniqueness of human mobility.** In 1930, Edmond Locard showed that 12 points are needed to uniquely identify a fingerprint[30]. Our unicity test estimates the number of points $p$ needed to uniquely identify the mobility trace of an individual. The fewer points needed, the more unique the traces are and the easier they would be to re-identify using outside information. For re-identification purposes, outside observations could come from any publicly available information, such as an individual's home address, workplace address, or geo-localized tweets or pictures. To the best of our knowledge, this is the first quantification of the uniqueness of human mobility traces with random points in a sparse, simply anonymized mobility dataset of the scale of a small country.

Given $I_p$, a set of spatio-temporal points, and D, a simply anonymized mobility dataset, we evaluate $\varepsilon$, the uniqueness of traces, by extracting from $D$ the subset of trajectories $S(I_p)$ that match the $p$ points composing $I_p$ [see Methods]. A trace is unique if $|S(I_p)| = 1$, containing only one trace. For example, in Fig. 2A, we evaluate the uniqueness of traces given $I_{p=2}$. The two spatio-temporal points contained in $I_{p=2}$ are zone I from 9am to 10am and zone II from 12pm to 1pm. The red and the green traces both satisfy $I_{p=2}$, making them not unique. However, we can also evaluate the uniqueness of traces knowing $I_{p=3}$, adding as a third point zone III between 3pm and 4pm. In this case $|S(I_{p=3})| = 1$, uniquely characterize the green trace. A lower bound on the risk of deductive disclosure of a user's identity is given by the uniqueness of his mobility trace, the likelihood of this brute force characterization to succeed.

Our dataset contains 15 months of mobility data for 1.5 M people, a significant and representative part of the population of a small European country, and roughly the same number of users as the

location-based service Foursquare®[31]. Just as with smartphone applications or electronic payments, the mobile phone operator records the interactions of the user with his phone. This creates a comparable longitudinally sparse and discrete database [Fig. 3]. On average, 114 interactions per user per month for the nearly 6500 antennas are recorded. Antennas in our database are distributed throughout the country and serve, on average, ∼ 2000 inhabitants each, covering areas ranging from 0.15 km² in cities to 15 km² in rural areas. The number of antennas is strongly correlated with population density ($R^2 = .6426$) [Fig. 3C]. The same is expected from businesses, places in location-based social networks, or WiFi hotspots.

Fig. 2B shows the fraction of unique traces ($\varepsilon$) as a function of the number of available points $p$. Four randomly chosen points are enough to uniquely characterize 95% of the users ($\varepsilon > .95$), whereas two randomly chosen points still uniquely characterize more than 50% of the users ($\varepsilon > .5$). This shows that mobility traces are highly unique, and can therefore be re-identified using little outside information.

**Scaling properties.** Nonetheless, $\varepsilon$ depends on the spatial and temporal resolution of the dataset. Here, we determine this dependence by lowering the resolution of our dataset through spatial and temporal aggregation [Fig. 1C]. We do this by increasing the size of a region, aggregating neighbouring cells into clusters of $v$ cells, or by reducing the dataset's temporal resolution, increasing the length of the observation time window to $h$ hours [see Methods]. Both of these aggregations are bound to decrease $\varepsilon$, and therefore, make re-identification harder.

Fig. 4A shows how the uniqueness of mobility traces $\varepsilon$ depends on the spatial and temporal resolution of the data. This reduction, however, is quite gradual. Given four points (p=4), we find that $\varepsilon > .5$ when using a resolution of $h = 5$ hours and $v = 5$ antennas.

Statistically, we find that traces are more unique when coarse on one dimension than fine along another than when they are medium-grained along both dimensions. Indeed, given four points, $\varepsilon > .6$ in a dataset with a temporal resolution of $h = 15$ hours or a spatial resolution of $v = 15$ antennas while $\varepsilon > .4$ in a dataset with a temporal resolution of $h = 7$ hours and a spatial resolution of $v = 7$ antennas [Fig. 4A].

Next, we show that it is possible to find one formula to estimate the uniqueness of traces given both, the spatial and temporal resolution of the data, and the number of points available to an outside observer. Fig. 4B and 4C show that the uniqueness of a trace decreases as the power function $\varepsilon = \alpha - x^\beta$, for decreases in both the spatial and temporal resolution (x), and for all considered $\varepsilon = 2, 4, 6, 8$ and 10 (see Table S1). The uniqueness of human mobility can thus be expressed using the single formula: $\varepsilon = \alpha - (vh)^\beta$. We find that this power



**Figure 2 |** (A) $I_{p=2}$ means that the information available to the attacker consist of two 7am-8am spatio-temporal points (I and II). In this case, the target was in zone I between 9am to 10am and in zone II between 12pm to 1pm. In this example, the traces of two anonymized users (red and green) are compatible with the constraints defined by $I_{p=2}$. The subset $S(I_{p=2})$ contains more than one trace and is therefore not unique. However, the green trace would be uniquely characterized if a third point, zone III between 3pm and 4pm, is added ($I_{p=3}$). (B) The uniqueness of traces with respect to the number $p$ of given spatio-temporal points ($I_p$). The green bars represent the fraction of unique traces, i.e. $|S(I_p)| = 1$. The blue bars represent the fraction of $|S(I_p)| \leq 2$. Therefore knowing as few as four spatio-temporal points taken at random ($I_{p=4}$) is enough to uniquely characterize 95% of the traces amongst 1.5 M users. (C) Box-plot of the minimum number of spatio-temporal points needed to uniquely characterize every trace on the non-aggregated database. At most eleven points are enough to uniquely characterize all considered traces.

function fits the data better than other two-parameters functions such as $\alpha - \exp{(\lambda x)}$, a stretched exponential $\alpha - \exp{x^\beta}$, or a standard linear function $\alpha - \beta x$ (see Table S1). Both estimators for $\alpha$ and $\beta$ are highly significant ($p < 0.001$)[32], and the mean pseudo-$R^2$ is 0.98 for the $I_{p=4}$ case and the $I_{p=10}$ case. The fit is good at all levels of spatial and temporal aggregation [Fig. S3A–B].

The power-law dependency of $\varepsilon$ means that, on average, each time the spatial and temporal resolution of the traces are divided by two, their uniqueness decreases by a constant factor $\sim (2)^{-\beta}$. This implies that privacy is increasingly hard to gain by lowering the resolution of a dataset.

Fig. 2B shows that, as expected, $\varepsilon$ increases with $p$. The mitigating effect of $p$ on $\varepsilon$ is mediated by the exponent $\beta$ which decays linearly with $p$: $\beta = 0.157 - 0.007p$ [Fig. 4E]. The dependence of $\beta$ on $p$ implies that a few additional points might be all that is needed to identify an individual in a dataset with a lower resolution. In fact, given four points, a two-fold decrease in spatial or temporal resolution makes it 9.3% less likely to identify an individual, while given ten points, the same two-fold decrease results in a reduction of only 6.2% (see Table S1).

Because of the functional dependency of $\varepsilon$ on $p$ through the exponent $\beta$, mobility datasets are likely to be re-identifiable using information on only a few outside locations.

**Discussion**

Our ability to generalize these results to other mobility datasets depends on the sensitivity of our analysis to extensions of the data

to larger populations, or geographies. An increase in population density will tend to decrease $\varepsilon$. Yet, it will also be accompanied by an increase in the number of antennas, businesses or WiFi hotspots used for localizations. These effects run opposite to each other, and therefore, suggest that our results should generalize to higher population densities.

Extensions of the geographical range of observation are also unlikely to affect the results as human mobility is known to be highly circumscribed. In fact, 94% of the individuals move within an average radius of less than 100 km[17]. This implies that geographical extensions of the dataset will stay locally equivalent to our observations, making the results robust to changes in geographical range.

From an inference perspective, it is worth noticing that the spatio-temporal points do not equally increase the likelihood of uniquely identifying a trace. Furthermore, the information added by a point is highly dependent from the points already known. The amount of information gained by knowing one more point can be defined as the reduction of the cardinality of $S(I_p)$ associated with this extra point. The larger the decrease, the more useful the piece of information is. Intuitively, a point on the MIT campus at 3AM is more likely to make a trace unique than a point in downtown Boston on a Friday evening.

This study is likely to underestimate $\varepsilon$, and therefore the ease of re-identification, as the spatio-temporal points are drawn at random from users' mobility traces. Our $I_p$ are thus subject to the user's spatial and temporal distributions. Spatially, it has been shown that the uncertainty of a typical user's whereabouts measured by its



**Figure 3 |** (A) Probability density function of the amount of recorded spatio-temporal points per user during a month. (B) Probability density function of the median inter-interaction time with the service. (C) The number of antennas per region is correlated with its population ($R^2 = .6426$). These plots strongly emphasize the discrete character of our dataset and its similarities with datasets such as the one collected by smartphone apps.



**Figure 4 |** Uniqueness of traces [ε] when we lower the resolution of the dataset with (A) $p = 4$ and (D) $p = 10$ points. It is easier to attack a dataset that is coarse on one dimension and fine along another than a medium-grained dataset along both dimensions. Given four spatio-temporal points, more than 60% of the traces are uniquely characterized in a dataset with an $h = 15$-hours temporal resolution while less than 40% of the traces are uniquely characterized in a dataset with a temporal resolution of $h = 7$ hours and with clusters of $v = 7$ antennas. The region covered by an antenna ranges from 0.15 km$^2$ in urban areas to 15 km$^2$ in rural areas. (B–C) When lowering the temporal or the spatial resolution of the dataset, the uniqueness of traces decrease as a power function $\varepsilon = \alpha - x^\beta$. (E) While $\varepsilon$ decreases according to a power function, its exponent $\beta$ decreases linearly with the number of points $p$. Accordingly, a few additional points might be all that is needed to identify an individual in a dataset with a lower resolution.

entropy is 1.74, less than two locations[18]. This makes our random choices of points more likely to pick the user's top locations (typically "home" and "office"). Temporally, the distribution of calls during the week is far from uniform [Fig. S1] which makes our random choice more likely to pick a point at 4PM than at 3AM. However, even in this case, the traces we considered that are most difficult to identify can be uniquely identified knowing only 11 locations [Fig. 2C].

For the purpose of re-identification, more sophisticated approaches could collect points that are more likely to reduce the uncertainty, exploit irregularities in an individual's behaviour, or implicitly take into account information such as home and work-place or travels abroad[29,33]. Such approaches are likely to reduce the number of locations required to identify an individual, vis-à-vis the average uniqueness of traces.

We showed that the uniqueness of human mobility traces is high, thereby emphasizing the importance of the idiosyncrasy of human movements for individual privacy. Indeed, this uniqueness means that little outside information is needed to re-identify the trace of a targeted individual even in a sparse, large-scale, and coarse mobility dataset. Given the amount of information that can be inferred from mobility data, as well as the potentially large number of simply anonymized mobility datasets available, this is a growing concern. We further showed that while $\mathcal{E} \sim (vh)^\beta$, $\beta \sim -p/100$. Together, these determine the uniqueness of human mobility traces given the traces' resolution and the available outside information. These results should inform future thinking in the collection, use, and protection of mobility data. Going forward, the importance of location data will only increase[34] and knowing the bounds of individual's privacy will



be crucial in the design of both future policies and information technologies.

## Methods

**The dataset.** This work was performed using an anonymized mobile phone dataset that contains call information for ∼1.5 M users of a mobile phone operator. The data collection took place from April 2006 to June 2007 in a western country. Each time a user interacts with the mobile phone operator network by initiating or receiving a call or a text message, the location of the connecting antenna is recorded [Fig. 1A]. The dataset's intrinsic spatial resolution is thus the maximal half-distance between antennas. The dataset's intrinsic temporal resolution is one hour [Fig. 1B].

**Unicity test and the likelihood of deductive disclosure.** The considered dataset contains one trace $T$ for each user. The traces spatio-temporal points contain the region in which the user was and the time of the interaction. We evaluate the uniqueness of a trace given a set $I_p$ of $p$ randomly chosen spatio-temporal points. A trace is said to be to be compatible with $I_p$ if $I_p \subseteq T$ [Fig. 2A]. Note that this notion of compatibility can easily be extended to noisier or richer data. A brute force characterization is performed by extracting from the entire dataset of 1.5 M users $S(I_p)$, the set of users whose mobility traces $T$ are compatible with $I_p$. All mobility traces in the dataset $T$ are successively tested for compatibility with $I_p$. A trace is characterized "out of x", if the set of traces that are compatible with the points contains at most $x$ users: $|S(I_p)| \leq x$. A trace is uniquely characterized if the set contains exactly one trace: $|S(I_p)| = 1$. The uniqueness of traces is estimated as the percentage of 2500 random traces that are unique given $p$ spatio-temporal points. The $p$ points composing $I_p$ are taken at random among all the interactions the user had with the service. As discussed, we do not apply any constraints regarding the choice of $I_p$.

**Minimum number of spatio-temporal location needed to uniquely characterize every trace.** Fig. 2B shows that .95 < ε < 1 given $I_{p=4}$. Fig. 2C evaluates the minimum $p$ needed to uniquely characterize every trace in a given set. This set contains a random sample of 1000 heavy-users, i.e. users that used their phone at least 75 times per month as their randomly chosen points might make their trace less unique.

**Spatial aggregation.** Spatial aggregation is achieved by increasing the size of the regions in which the user is known to be during his interactions with the service. In the case of discrete data, a bijective relation exists between antennas (known in this case as centroids) and the region defined by the Voronoi tessellation. The tessellation is defined so that every point in a region is closer to the region's antenna than to any other antenna. In order to increase the region's area, one should group antennas into clusters of a given size $v$. While the problem of optimally grouping places in a 2D space into groups of given sizes $v$ is non trivial, it can be approximated through clustering methods. The canonical clustering methods focus on minimizing the within-cluster sum of squares rather than producing balanced clusters. This drawback can be controlled by the use of a Frequency Sensitive Competitive Learning scheme[35]. Fig. S2 shows the resulting group size histogram optimized for clusters of size 4. Once antennas are aggregated into groups, their associated regions are merged.

1. Clippinger, J. In *Rules for Growth: Promoting Innovation and Growth Through Legal Reform* (Kauffman Foundation, Kansas City, 2010).
2. Clanchy, M. T. *From Memory to Written Records England 1066–1307* (Harvard University Press, Cambridge, 1979).
3. Warren, S. & Brandeis, L. The right to privacy. *Harvard Law Review* **193**, 193–220 (1890).
4. Hey, T., Tansley, S. & Tolle, K. (eds) *The Fourth Paradigm: Data-Intensive Scientific Discovery* (Microsoft Research, Redmond, 2009).
5. Barabasi, A.-L. The origin of bursts and heavy tails in human dynamics. *Nature* **435**, 207–211 (2005).
6. Clauset, A. & Eagle, N. Persistence and periodicity in a dynamic proximity network. *Proc. DIMACS* (2007).
7. Eagle, N., Macy, M. & Claxton, R. Network diversity and economic development. *Science* **328**, 1029–1031 (2010).
8. Eagle, N., Pentland, A. & Lazer, D. Inferring social network structure using mobile phone data. *Proc. Natl. Acad. Sci. U.S.A.* **106**, 15274–15278 (2009).
9. Eagle, N., de Montjoye, Y.-A. & Bettencourt, L. Community computing: Comparisons between rural and urban societies using mobile phone data. *Computational Science and Engineering* **4**, 144–150 (2009).
10. Reader, T. *et al.* Predictors of short-term decay of cell phone contacts in a large scale communication network. *Social Networks* **33**, 245–257 (2011).
11. Hidalgo, C. & Rodriguez, C. The dynamics of a mobile phone network. *Physica A* **387**, 3017–3024 (2008).
12. Newman, M. E. J. *Networks: An Introduction* (Oxford University Press, New York, 2010).
13. Onnela, J.-P. *et al.* Structure and tie strengths in mobile communication networks. *Proc. Natl. Acad. Sci. U.S.A.* **104**, 7332–7336 (2007).
14. Szell, M., Lambiotte, R. & Thurner, S. Multirelational organization of large-scale social networks in an online world. *Proc. Natl. Acad. Sci. U.S.A.* **107**, 13636–13641 (2010).
15. Meloni, S. *et al.* Modeling human mobility responses to the large-scale spreading of infectious diseases. *Sci. Rep.* **1**, 62 (2011).
16. Balcan, D. *et al.* Multiscale mobility networks and the spatial spreading of infectious diseases. *Proc. Natl. Acad. Sci. U.S.A.* **106**, 21484–21489 (2009).
17. Gonzalez, M., Hidalgo, C. & Barabasi, A. Understanding individual human mobility patterns. *Nature* **453**, 779–782 (2008).
18. Song, C., Qu, Z., Blumm, N. & Barabasi, A. Limits of predictability in human mobility. *Science* **327**, 1018–1021 (2010).
19. Finding places on the go has never been easier. http://blog.foursquare.com/2012/02/08/finding-places-on-the-go-has-never-been-easier-%E2%80%93-check-out-the-new-explore-for-your-phone/, Accessed 2012 Jul. 1.
20. Blumberg, A. & Eckersley, P. On locational privacy and how to avoid losing it forever. *E.F.F.* (2009).
21. Apple privacy policy, http://www.apple.com/legal/privacy/, Accessed 2011 Jul. 25.
22. Federal reserve financial services federal reserve study shows more than three-quarters of non-cash payments are now electronic. *Federal Reserve* (2010).
23. Skyhook wireless overview, Available: http://www.skyhookwireless.com/location-intelligence/, Accessed 2012 Jul. 17.
24. Apples app store downloads top 25 billion. http://www.apple.com/pr/library/2012/03/05Apples-App-Store-Downloads-Top-25-Billion.html, Accessed 2012 Mar. 28.
25. The app genome project. http://blog.myLookout.com/, Accessed 2011 Jul. 27.
26. Mobile geo-location advertising will be a big number in 2015. http://adfonic.com/wp-content/uploads/2012/03/geo-location-white-paper.pdf, Accessed 2012 Jul. 17.
27. Sweeney, L. k-anonymity: a model for protecting privacy. *Int. J. Uncertainty Fuzziness and Knowledge-Based Systems* **10**, 557–570 (2002).
28. Zang, H. & Bolot, J. Anonymization of location data does not work: A large-scale measurement study. *Proc. Int. Conf. on Mobile computing and networking* **17**, 145–156 (2011).
29. Narayanan, A. & Shmatikov, V. Robust de-anonymization of large sparse datasets. *IEEE Trans. Secur. Priv.* **8**, 111–125 (2008).
30. Locard, E. Traité de criminalistique. (J. Desvigne et ses fils Lyon, 1931).
31. Boom! Foursquare crosses 2 million users. http://techcrunch.com/2010/07/10/foursquare-crosses-2-million-users/, Accessed 2010 Aug. 25.
32. Bates, D. & Watts, D. *Nonlinear Regression Analysis and Its Applications* (Wiley, Hoboken, 1988).
33. Golle, P. & Partridge, K. On the anonymity of home/work location pairs. *Pervasive Computing* 390–397 (2009).
34. Manyika, J. *et al.* Big data: The next frontier for innovation, competition and productivity. *McKinsey Global Institute* (2011).
35. Grossberg, S. Adaptive pattern classification and universal recoding: I. Parallel development and coding of neural feature detectors. *Biol. Cybern.* **23**, 121–134 (1976).

## Acknowledgements

We thank Damien François, Janos Kertesz, Renaud Lambiotte, Vincent Traag and Paul Van Dooren for discussions and comments on the manuscript as well as Maxime Melchior for sharing computer code and Susie Fu for help with the figures. This work was supported by a grant 09/14-017 "Action de Recherche Concerté" of the "Communauté française de Belgique" on Information Retrieval in Time Evolving Networks.

## Author contributions

Y.-A. de M. designed and performed experiments, analyzed data and wrote the paper; C.A.H. designed experiments, developed analytic tools and wrote the paper; M.V. and V.D.B. designed experiments and wrote the paper.

## Additional information

**Supplementary information** accompanies this paper at http://www.nature.com/scientificreports

**Competing financial interests:** The authors declare no competing financial interests.

**License:** This work is licensed under a Creative Commons Attribution-NonCommercial-NoDerivs 3.0 Unported License. To view a copy of this license, visit http://creativecommons.org/licenses/by-nc-nd/3.0/

**How to cite this article:** de Montjoye, Y.-A., Hidalgo, C.A., Verleysen, M. & Blondel, V.D. Unique in the Crowd: The privacy bounds of human mobility. *Sci. Rep.* **3**, 1376; DOI:10.1038/srep01376 (2013).