1

**KAUFMAN DOLOWICH, LLP**
Aimee G. Hamoy (SBN 221228)

2

180 Grand Avenue, Ste. 995
Oakland, CA 94612

3

Telephone: (510) 630-7646
Facsimile: (415) 926-7601

4

Email: ahamoy@kaufmandolowich.com

5

6

Attorney for Defendant
SAFEGRAPH

7

8

### IN THE UNITED STATES DISTRICT COURT

9

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11

CALVARY CHAPEL SAN JOSE, a
California nonprofit corporation; PASTOR

Case No.: 3:23-cv-04277-VC

12

MIKE MCCLURE, an individual;

13

Plaintiffs,

**DEFENDANT SAFEGRAPH'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF SAFEGRAPH'S MOTION TO DISMISS**

14

v.

15

SANTA CLARA COUNTY; and
SAFEGRAPH,

Hearing Date: February 15, 2024
Time: 10:00 AM

16

Judge: Hon. Vince Chhabria

17

Defendants.

Courtroom: Courtroom 4-17th Floor

18

19

20

21

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

22

Defendant SafeGraph requests this Court take judicial notice of the following documents

23

and facts:

24

1.    The existence and contents of the expert witness report prepared by Stanford Professor

25

Daniel Ho produced in discovery and filed in the case *Calvary Chapel San Jose v. Cody*,

26

5:20-cv-03794 (N.D. Cal. Jun. 9, 2020) and attached here as Exhibit 1.

27

2.    The existence and contents of the Santa Clara County Superior Court Order Granting

28

Plaintiffs' Motion for Summary Adjudication, entered on April 7, 2023, in the case *The*

1

*People of the State of Cal., Cnty. Of Santa Clara v. Calvary Chapel San Jose et al.*, No. 20CV372285 (Santa Clara Cty. Super. Ct.) and attached here as <u>Exhibit 2.</u>

3.  The existence and contents of the Northern District of California Order Granting Defendants' Motion to Dismiss and Stay Under *Younger* Abstention Doctrine, entered on March 10, 2023, in the case *Calvary Chapel San Jose et al. v Sara Cody et al.*, No. 5:20-cv-03794-BLF, ECF 279 (N.D. Cal.) and attached here as <u>Exhibit 3.</u>

4.  The existence and contents of the Northern District of California Order Granting in Part and Denying in Part Partial Motion to Dismiss and Motion to Strike Fourth Amended Complaint, entered on October 06, 2022, in the case *Calvary Chapel San Jose et al. v Sara Cody et al.*, No. 5:20-cv-03794-BLF, ECF 222 (N.D. Cal.) and attached here as <u>Exhibit 4.</u>

## <u>LEGAL STANDARD</u>

Under Federal Rule of Evidence 201(b)(2), a Court is permitted to take judicial notice of information "that can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned." Fed. R. Evid. 201(b)(2).

The Court may and should take judicial notice of <u>Exhibit 1</u>, the Ho Report, and consider its contents as true for purposes of Defendant SafeGraph's concurrent Motion to Dismiss "as though [it was] a part of the complaint itself" because the Ho Report is incorporated by reference into Plaintiffs' operative complaint, the First Amended Complaint ("FAC"). *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018); *see also Prescott v. Bayer Healthcare, LLC*, No. 20-cv-00102-NC, 2020 WL 4430958, n. 3 (N.D. Cal. July 31, 2020) (granting judicial notice of a document found to be incorporated by reference in the complaint). Extrinsic documents are incorporated by reference into a complaint when a "plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Kohja*, 899 F.3d at 1002.

Here, Plaintiffs' factual allegations in the FAC, rely entirely on the Ho Report's content. *Compare* FAC ¶ 23 *with* Exhibit 1, at 4; *compare also* FAC ¶¶ 4, 24-28 *with* Exhibit 1, at 4-5; FAC ¶¶ 18, 36 *with* Exhibit 1, at 4. The FAC directly copies and pastes a graphical illustration used in the Ho Report. *Compare* FAC ¶ 29, Figure 1 *with* Ho Report, at 5, Figure 1. Accordingly, this Court is permitted to and should take judicial notice of <u>Exhibit 1, and consider its contents as</u>

1  part of the FAC.

2  At a minimum, if the Court does not take judicial notice of the entire Ho Report, the Court

3  should take judicial notice of the following six points from the Ho Report, which are relevant and

4  provide context to Plaintiffs' allegations against SafeGraph that are based on the Ho Report: (1)

5  the statistical Patterns data in the Ho Report was derived only from consumer-permissioned, or

6  "opted-in", location information (*Ex. 1* at 4); (2) the panel of devices in SCC from which opted-

7  in data was sourced represented only 3% of the population of SCC (*Id.);* (3) Patterns provided

8  visit statistics for 25,765 different POI in SCC (*Id);* (4) Patterns did "not provide information

9  about individual users to protect privacy" (*Id);* (5) the functional limitations inherent to

10  SafeGraph's privacy protections meant that Patterns could be used only "to detect broad patterns

11  in movement and visits," not precise movements of discrete individuals (*Id);* and (6) the Ho Report

12  retroactively analyzed only on historical Patterns data originally produced and made commercially

13  available during the period of January 1, 2020 through February 28, 2021 (*Id).*

14  The Court should take judicial notice of Exhibits 2-4 because each is a true and correct

15  copy of a court filing. "A court may take judicial notice of its own records in other cases, as well

16  as the records of an inferior court in other cases."). *United States v. Wilson*, 631 F.2d 118, 119

17  (9th Cir. 1980). Matters of public record, such as those filed in federal or state court cases, are

18  proper subjects of judicial notice. *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir.

19  2012); *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (citing

20  *Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir.

21  1998)). Because Exhibits 2-4 are each a filing in a state or federal court, they are  proper subjects

22  of judicial notice and this Court should take judicial notice of Exhibit 2, Exhibit 3, and Exhibit 4.

23

24  DATED:  December 18, 2023                KAUFMAN DOLOWICH, LLP

25                                                          By: */s/ Aimee G. Hamoy*

26                                                               Aimee G. Hamoy
                                                                 Attorneys for Defendant
27                                                               SAFEGRAPH

28

DEFENDANT SAFEGRAPH'S REQUEST FOR                    Case No.: 3:23-cv-04277-VC
JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS

# EXHIBIT 1

# Expert Witness Report

Calvary Chapel San Jose, et al.

v.

County of Santa Clara, et al.

U.S. District Court, Northern District of California, Case No. 20-CV-03794 (BLF)

Prepared by:

Prof. Daniel E. Ho
Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305

I, Daniel E. Ho, under penalty of perjury, do hereby declare the following Expert Witness Report to be true and correct to the best of my knowledge:

Executed on November 10, 2022.

_____
DANIEL E. HO

## I. Introduction

I, Daniel E. Ho, declare as follows: I am a professor at Stanford University in Stanford, California. I teach administrative law and statistical inference, and my research principally focuses on quantitative empirical work pertaining to public law. I have authored several peer-reviewed articles conducting primary quantitative data analysis on public health and pandemic response, including the use of mobility data, and regulatory compliance.

In this expert witness report, I begin by summarizing my qualifications, and then outline my opinion about the data on Calvary Chapel's compliance with public health orders.

## II. Qualifications

I provide here an outline of my relevant qualifications. A recent copy of my curriculum vitae is attached to this declaration as Exhibit A. A statement of the compensation to be paid in this case is attached as Exhibit B.

I received a B.A. in political science from U.C. Berkeley in 2000 (Phi Beta Kappa), an A.M. and Ph.D. in political science from Harvard University in 2004, and a J.D. from Yale Law School in 2005. My dissertation work focused principally on quantitative methodology. Upon graduating from law school, I served as a law clerk to the Honorable Judge Stephen F. Williams on the U.S. Court of Appeals, District of Columbia Circuit and as post-doctoral fellow at the Institute for Quantitative Social Science at Harvard University.

In 2006, I joined the Stanford Law School faculty as Assistant Professor of Law and was tenured in 2010. I now serve as the William Benjamin Scott and Luna M. Scott Professor of Law, Professor of Political Science, and Senior Fellow at the Stanford Institute for Economic Policy Research. I am also an Associate Director of Stanford's Institute for Human-Centered Artificial Intelligence, a Faculty Fellow at the Center for Advanced Study in the Behavioral Sciences, and the Faculty Director of the Stanford Regulation, Evaluation, and Governance Lab (RegLab), which has worked with the Santa Clara County Public Health Department on pandemic response. My scholarship centers on quantitative empirical legal studies and regulatory policy. I have also taught as Visiting Professor of Law at N.Y.U. School of Law and Maurice R. Greenberg Visiting Professor of Law at Yale Law School.

My research has appeared in numerous law reviews -- including the *Yale Law Journal*, the *Stanford Law Review*, the *N.Y.U. Law Review*, and the *California Law Review* -- and peer-reviewed journals -- including the *Journal of the American Statistical Association*, the *Proceedings of the National Academy of Sciences*, the *American Journal of Public Health*, *JAMA Health Forum*, *Nature Medicine*, the *British Medical Journal*, the *American Statistician*, the

*Quarterly Journal of Political Science*, the *Journal of Empirical Legal Studies*, the *Journal of Legal Studies*, the *Journal of Legal Analysis*, *Political Analysis*, and *Public Opinion Quarterly*.

My research has been awarded numerous prizes, including the Best Empirical Paper Prize from the *American Law and Economics Review*, the Carole Hafner Best Paper Award at International Conference on Artificial Intelligence and Law, the Warren Miller prize for the best paper published in *Political Analysis*, the McGraw-Hill Award for the best paper published by political scientists on law and courts, the Pi Sigma Alpha award for the best paper delivered at the Midwest Political Science Association meeting, and the Robert H. Durr award for the best paper applying quantitative methods to a substantive problem at the Midwest Political Science Association meeting. The work arising out of the RegLab collaboration with the Santa Clara County Public Health Department was awarded the Innovative Practice Gold Award for "the highest level of program innovation" to serve "community during the COVID-19 pandemic" by the National Association of County and City Health Officials.

In 2022, I was appointed by Secretary of Commerce Gina Raimondo to the National Artificial Intelligence Advisory Committee, advising the White House on AI issues. I also serve as an appointed member to the Committee on National Statistics of the National Academies of Sciences, Engineering, and Medicine, and to the Administrative Conference of the United States. Since 2009, I have also served on the Board of Directors for the Society of Empirical Legal Studies, a professional organization that aims to promote empirical work pertaining to law.  I served as President of that organization in 2011-2012, hosting the largest conference dedicated to empirical work in law.  Since 2012, I have been serving as Associate Editor for the *Journal of Empirical Legal Studies* and from 2013-16, I served as co-editor of the *Journal of Law, Economics, and Organization*.

I am also active as a reviewer for many other professional journals and have presented my work and taught empirical methods across a wide variety of settings. In 2015, for instance, I was invited to teach statistics to over 100 district and appellate judges in the Ninth Circuit at their mid-winter workshop. In 2022, I taught about artificial intelligence and machine learning in a lecture series for the federal agency AI Community of Practice, hosted by the General Services Administration.

### III. Opinion on Calvary Chapel Compliance

I now provide an opinion on what mobility data reveals about compliance with Santa Clara County public health orders in response to the COVID-19 pandemic. I first provide background on the rich mobility dataset that has informed public health policy, particularly during the pandemic. I then show what this data reveals about compliance by county businesses and

religious organizations. Last, I show how Calvary Chapel appears to be an outlier, exhibiting far higher visit patterns than other institutions.

A. Mobility Data

The data used to form this opinion come from SafeGraph, a company that aggregates information from 47 million mobile devices across the United States. SafeGraph obtains this data from mobile applications when users have opted in to location tracking. This data was widely used during the pandemic to understand social distancing by public health authorities, including the Centers for Disease Control and Prevention, the California Governor's Office, Los Angeles, San Francisco, San Jose, and Santa Clara County. SafeGraph aggregates information about points-of-interest (POIs), including daily visit counts. In Santa Clara County, the data contains information about 25,765 POIs, including 1,576 religious organizations. I use SafeGraph's research release dataset, which does not provide information about individual users to protect privacy. In 2020, I led a research team that provided mobility insights based on this data to Santa Clara County health officers to inform pandemic response, which also led our team to construct an audit of the data to understand its reliability. The results were published in a peer-review proceeding (Coston et al. 2021), which showed limitations of the data but also confirmed that "SafeGraph data is able to detect broad patterns in movement and visits." We focus on the study period of 1/1/20-2/28/21.

Figure 1 is an aerial image of the location of Calvary Chapel and illustrates how SafeGraph engages in "geofencing" of mobile devices. SafeGraph matches Global Positioning System (GPS) data to individual POIs by using geographic shapefiles to attribute a visit to a location. The red boundary in Figure 1, for instance, depicts the parcel shape of Calvary Chapel of San Jose, 1175 Hillsdale Avenue. The yellow boundaries indicate the specific building shapes. For this analysis, we take the maximum visits from these POIs to provide a best estimate of visits on any given day for Calvary Chapel as a whole. Similarly, for all POIs that Safegraph indicates share a "parent POI", we take the daily maximum of any "child POI" as the visits to the POI as a whole.

Visit data, as documented by Safegraph (SafeGraph 2022), is provided based on a panel of mobile devices (averaging 65,000 unique devices per week in Santa Clara County, population 1.9 million, during the study period). A device must remain within the geofence of a POI for at least four minutes to be counted as a visit. To scale observed visits to the population as a whole, we use a standard method recommended by Safegraph and used by peer-reviewed research (Squire 2020; Chang et al. 2021; Kang et al. 2020; Maldonado et al. 2022), in which we multiply the raw visits by the ratio of total population to Safegraph panel size within each census block group (averaging 35 for the 1,075 census block groups in Santa Clara County). Using scaled visit

numbers, we compare Calvary Chapel visits against baseline patterns for the county overall, as well as against all other religious organizations in SafeGraph's dataset.



Figure 1. Two geofences (parcel boundary in red, building footprint in yellow) were used by Safegraph throughout the study period of 1/1/20-2/28/21 to attribute visits to Calvary Chapel of San Jose, 1175 Hillsdale Avenue. On each day, we took the maximum estimated visit count for either footprint. Source: Safegraph.

## B. Baseline Patterns

Figure 2 provides a sense of baseline visit patterns and the effect of the county's shelter-in-place order on mobility. The *x*-axis presents time, with vertical dashes reflecting the March 16, 2020, shelter-in-place order and the July 2, 2020, Risk Reduction Order. The *y*-axis presents the number of visits attributed to a facility, using the aforementioned scaling approach. To account for statistical uncertainty, we plot both the average over time, as well as the 95% confidence bands. The black line plots visits for all county POIs and the blue line plots visits for religious organizations, excluding Calvary Chapel.

What is immediately observable is that the shelter-in-place order dramatically lowered visits across the county in general, as well as for religious institutions. There is a sharp drop in mobility in March 2020, which is corroborated in other peer-reviewed literature (Maldonado et al. 2022; Gatalo et al. 2020). We also observe that for businesses overall, there is a weekly pattern, with lower visits occurring on weekends. We see the reverse for religious institutions, with high visits on weekends reflecting weekend services. In short, the shelter-in-place order is reflected in the dramatic change in mobility in March 2020.



Figure 2. Visit estimates are derived from Safegraph Weekly Patterns data. The time series corresponding to Religious Organizations was created by taking the daily average of all other Safegraph locations in Santa Clara County labeled as Religious Organizations (n = 1,575, excluding Calvary Chapel). The 95% confidence interval is also presented. The time series corresponding to all county Points of Interest was created by taking the daily average of all Safegraph locations in Santa Clara County (n = 25,765). Source: Safegraph.

## C. Calvary Chapelis an Outlier in Visits

While mobility was sharply curtailed across the County, that was not the case for Calvary Chapel. Figure 3 overlays the visit patterns from Calvary Chapel. As before, the black and blue lines indicate all county POIs and all other religious institutions, respectively. The brown line plots visit patterns for Calvary Chapel. Two patterns emerge. First, while Calvary's visit patterns also drop immediately after the shelter-in-place order was issued, visit patterns start to increase in May 2020, nearing the pre-pandemic baseline visits levels of Calvary. Second, after July 2020, we observe much sharper peaks associated with weekend services and visits to Calvary grow substantially, exceeding pre-pandemic weekend visits. The highest estimated daily visit count pre-pandemic was 670, compared to 1700 in early 2021. This stands in sharp contrast to the average patterns across all other religious institutions, which remain stable and substantially below the pre-pandemic visit levels for the entire observation period.

While mobile device estimates are subject to estimation uncertainty and potential coverage gaps, the fact that these patterns are so persistent week-after-week confirms that these are not statistical flukes. Based on mobility data and consistent with ongoing violations that I understand were observed by the County, Calvary Chapel exhibited unusual and high visit patterns.

6



Figure 3. Visit estimates are derived from Safegraph Weekly Patterns data. The time series corresponding to Calvary Chapel was created by taking the maximum daily visit count attributed to either the parcel or building footprint at 1175 Hillsdale Avenue, San Jose. The time series corresponding to Religious Organizations was created by taking the daily average of all other Safegraph locations in Santa Clara County labeled as Religious Organizations (n = 1,575, excluding Calvary Chapel). The time series corresponding to All County Points of Interest was created by taking the daily average of all Safegraph locations in Santa Clara County (n = 25,765). Daily new COVID-19 cases in Santa Clara County, with a 7-day moving average, are also presented. Source: Safegraph, Santa Clara County.

To test this formally, Figure 4 presents a simple outlier analysis. We plot the distribution (histograms) of average weekend visits for all religious institutions available in the county. We plot these for three periods: the pre-pandemic period from January 1 to March 15, 2020 (top panel); the period between the shelter-in-place order and the Risk Reduction Order from March 16, 2020 to July 1, 2020 (middle panel); and the period from July 2, 2020 to February 28, 2021 (bottom panel). The vertical line indicates the average weekend visit counts for Calvary. While Calvary exhibits more average visits than other religious institutions pre-pandemic (94.2% percentile rank, *p*-value = 0.1) – indicating that it is a large congregation – it grows to become a highly statistically significant outlier during the pandemic. It ranks in the top percentile of religious institutions experiencing visits after the shelter-in-place order (99.3% percentile rank, *p*-value < 0.01) and exhibits the second highest average weekend visits (estimated to be 1,100) of any religious institution in the period after the Risk Reduction Order (99.9% percentile rank, *p*-value < 0.01).



Figure 4. Three histograms of average weekend visits to Safegraph locations in Santa Clara County labeled as Religious Organizations (n = 1,576), summarized in three different periods: before the shelter-in-place order, 1/1/20-3/15/20 (top panel); between the shelter-in-place order and the risk-reduction order, 3/16/20-7/1/20 (middle panel); and after the risk-reduction order 7/2/20-2/28/21 (bottom panel). The vertical lines correspond to the average weekend visits for Calvary Chapel of San Jose during that time period.

\* \* \* \*

In sum, the analysis of rich mobility data – relied upon extensively across public health departments – shows that the visit patterns to Calvary Chapel were extreme and higher than other religious institutions in the County. Given available knowledge about the spread of COVID-19 in indoor spaces with unmasked activity (e.g., signing), there were strong reasons to believe that Calvary posed an unusually high risk.

# References

Chang, Serina, Emma Pierson, Pang Wei Koh, Jaline Gerardin, Beth Redbird, David Grusky, and Jure Leskovec. 2021. "Mobility Network Models of COVID-19 Explain Inequities and Inform Reopening." *Nature* 589 (7840): 82–87. https://doi.org/10.1038/s41586-020-2923-3.

Coston, Amanda, Neel Guha, Derek Ouyang, Lisa Lu, Alexandra Chouldechova, and Daniel E. Ho. 2021. "Leveraging Administrative Data for Bias Audits: Assessing Disparate Coverage with Mobility Data for COVID-19 Policy." In *Proceedings of the 2021 ACM Conference on Fairness, Accountability, and Transparency*, 173–84.

Gatalo, Oliver, Katie Tseng, Alisa Hamilton, Gary Lin, and Eili Klein. 2020. "Associations between Phone Mobility Data and COVID-19 Cases." *The Lancet Infectious Diseases* 0 (0). https://doi.org/10.1016/S1473-3099(20)30725-8.

Kang, Yuhao, Song Gao, Yunlei Liang, Mingxiao Li, Jinmeng Rao, and Jake Kruse. 2020. "Multiscale Dynamic Human Mobility Flow Dataset in the U.S. during the COVID-19 Epidemic." *Scientific Data* 7 (1): 390. https://doi.org/10.1038/s41597-020-00734-5.

Maldonado, Peter, Angie Peng, Derek Ouyang, Jenny Suckale, and Daniel E. Ho. 2022. "Science Translation During the COVID-19 Pandemic: An Academic-Public Health Partnership to Assess Capacity Limits in California." *American Journal of Public Health* 112 (2): 308–15. https://doi.org/10.2105/AJPH.2021.306576.

SafeGraph. 2022. "Weekly Patterns Documentation." 2022. https://docs.safegraph.com/docs/weekly-patterns.

Squire, Ryan. 2020. "Google Colaboratory." Advanced Methods for Correlating SafeGraph Patterns With Other Datasets Across Time. July 2020. https://colab.research.google.com/drive/1LgAFBCaEih8YVb9oXVn5B0X42dXoBxPN?usp=sharing#scrollTo=B_dNARQFd50D.

# EXHIBIT 2



1

2

3

4

5

6

7                    **SUPERIOR COURT OF CALIFORNIA**

8                        **COUNTY OF SANTA CLARA**

9

10   THE PEOPLE OF THE STATE OF            Case No. 20CV372285
     CALIFORNIA, COUNTY OF SANTA
11   CLARA, and SARA H. CODY, M.D., in her   **ORDER GRANTING PLAINTIFFS'**
     official capacity as Health Officer for the   **MOTION FOR SUMMARY**
12   County of Santa Clara,                 **ADJUDICATION; DENYING**
                                            **DEFENDANTS' MOTION TO STAY**
13
                         Plaintiffs,
14
          v.
15
     CALVARY CHAPEL SAN JOSE; MIKE
16   MCCLURE, and DOES 1-50,

17                       Defendants.

18

19

20

21          Plaintiffs' the People of the State of California, the County of Santa Clara (the "County"),

22   and Dr. Sara H. Cody in her official capacity as Health Officer for the County of Santa Clara's

23   (collectively, "Plaintiffs") motion for summary adjudication against defendants Calvary Chapel

24   San Jose ("Calvary") and Mike McClure ("McClure") (collectively, "Defendants") came on for

25   hearing before the Court on March 14, 2023.  Pursuant to California Rule of Court 3.1308, the

26   Court issued its tentative ruling on March 13, 2023.  The parties appeared for argument, and the

27   Court took the matter under submission.  Having considered the argument, briefing and relevant

28   case law, the Court now issues its final ruling.

                                            1

# I.    Background

## A.    Factual

Except as noted below, the parties largely agree to the material facts that give rise to this case.

Covid-19 is a contagious disease the outbreak of which led the County to declare a local health emergency on February 3, 2020. (Defendants' Supplemental Response to Plaintiffs' Separate Statement of Undisputed Facts ("DSU") Nos. 1-2.) A month later, on March 4, 2020, Governor Newsom declared a state of emergency, and a week later the President declared a national emergency. (DSU Nos. 3, 4.) The World Health Organization declared Covid-19 a pandemic on March 11, 2020, and experts consider this outbreak the worst public health epidemic since the influenza outbreak of 1918. (Declaration of Sara H. Cody, M.D. In Support of Plaintiffs' Motion for Summary Adjudication ("Cody Decl."), ¶¶ 6-7.)

Santa Clara County is comprised of 15 cities with a population of approximately 1.9 million people. (Cody Decl., ¶ 5.) To address the spread of Covid-19 between and amongst those 1.9 million people, between March 2020 and June 2021, the County Health Officer issued public health orders. (DSU Nos. 5, 15.) These public health orders included:

- July 2, 2020 (effective July 13): Order (County) Establishing Mandatory Risk Reduction Measures Applicable to All Activities and Sectors to Address the Covid-19 Pandemic (the "Risk Reduction Order"). (DSU Nos. 6, 7.)
    - This order required, *inter alia*, that all individuals wear face coverings when entering business facilities or using public transportation, and submit a Social Distancing Protocol ("SDP"). The SDP required businesses to attest that they would implement various categories of Covid-19 safety measures, including, but not limited to: (1) training personnel about Covid-19; (2) instituting a process for reporting positive Covid-19 cases to the County; and (3) agreeing to follow any applicable State or County public health orders, guidance, or directives. (DSU No. 28.)

2

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

- October 5, 2020: Order of the Health Officer of the County of Santa Clara Establishing Mandatory Risk Reduction Measures Applicable to All Activities and Sectors to Address the Covid-19 Pandemic (the "Revised Risk Reduction Order"), which order superseded the Risk Reduction Order on October 14, 2020. (DSU No. 8, 9).

  o This order required compliance with the California Department of Public Health's ("CDPH") mandatory guidance on face coverings, which required the use of face coverings in *all* indoor public spaces with limited exceptions such as for those with medical conditions or disabilities, and while actively eating or drinking. The order still required all businesses to submit an SDP.

- May 18, 2021: Order of the Health Officer of the County of Santa Clara Establishing Focused Safety Measures to Protect the Community from Covid-19 (the "Safety Measures Order"). (DSU No. 10.) This superseded the Revised Risk Reduction Order on May 19, 2021. (DSU No. 11).

  o Under this order, businesses were no longer required to submit SDPs, but were required to follow the County's May 18, 2021 Mandatory Directive on Face Coverings (see below).

- May 18, 2021: By the County Health Officer, a Mandatory Directive on Face Coverings. (DSU No. 12.).

  o This order required compliance with the May 3, 2021 CDPH mandatory guidance regarding face coverings.

- June 21, 2021: By the County, Order of the Health Officer of the County of Santa Clara Phasing Out the May 18, 2021 Health Order Given Widespread Community Vaccination (the "Phase Out Order"). (DSU No. 13.).

  o This order rescinded the provisions of the May 18, 2021 Order relevant to this case.

- Between June 18, 2020 and May 3, 2021: the California Department of Public Health issued Guidance for the Use of Face Coverings. (DSU No. 15.)

3

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

On August 11, 2020, the County Board of Supervisors adopted Urgency Ordinance No. NS-9.921 (the "Urgency Ordinance"). (DSU No. 14.) This ordinance was adopted to create a comprehensive program to civilly enforce the various public health orders and, as relevant here, did two key things: (1) declared that violations of the State and County public health orders constitute an imminent threat and menace to public health and are therefore a public nuisance; and (2) set a range of fines for violations of public health orders. Civil penalties differed depending on whether the subject violation involved non-commercial versus commercial activities, and the latter was defined to mean "any activity associated with a Business or with a commercial transaction." (Plaintiffs' Request for Judicial Notice ("RJN"), Exhibit 159 at §2(b)(2).) A "Business," in turn, is defined by the Urgency Ordinance as "any for-profit, non-profit, or educational entity, whether a corporate entity, organization, partnership, or sole proprietorship, and regardless of the nature of the service, the function it performs, or its corporate or entity structure." (*Id.*)

Calvary is a domestic non-profit corporation operating a church at 1175 Hillsdale Avenue in San Jose and McClure is its Senior Pastor, and thus qualifies as a "business" under the Urgency Ordinance. (DSU Nos. 16, 17.) Calvary offers many services like marriage and addiction counseling, prayer, women's coffee and teas, men's breakfast, bible studies, and youth ministry programs like Friday night fellowship, summer fun days, and summer and winter camps. (Declaration of Mike McClure in Support of Defendants Calvary Chapel San Jose's and Mike McClure's Opposition to Plaintiffs' Partial Motion for Summary Adjudication ("McClure Decl."), ¶ 3.) Calvary also has a ministry through its branch, Calvary Christian Academy (the "Academy"), which is located across the street from the church. (McClure Decl., ¶ 2.)

In March 2020, Calvary closed in-person services and contends that in so doing immediately experienced a decline in spiritual, emotional, and mental health amongst its congregants. (McClure Decl. ¶ 4.) According to its Pastor, Mike McClure, "fellowship requires the gathering of ALL church member [sic] together in person, as fellowship represents the Body of Christ." (McClure Decl. ¶ 8.) Pastor McClure further cites to Acts 2:42 as an example of what he describes as "the early church": "And they continued steadfastly in the

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

apostles' doctrine and fellowship, and in breaking of bread, and in prayers." (McClure Decl. ¶ 9; see also *id.* at ¶ 11 ("Hebrews 10:25 exhorts Christians to not give up meeting together, 'as some are in the habit of doing, but encouraging one another—and all the more as you see the Day approaching'".)

Accordingly, Calvary reopened and began holding in-person worship on May 31, 2020. (McClure Decl., ¶ 4.) From that date through May 2021, Calvary held two Sunday services, averaging attendance of 300-500 congregants; prayer gatherings one or twice a week ranging from 2 to 20 attendees; and about 1000 baptisms per year from May 2020 through August 2022. (McClure Decl., ¶¶ 8, 17-18.) Although Calvary contends masks were made available and there was ample space in the church to permit social distancing, there is no dispute that at least during each of these services, baptisms and prayer meetings, attendees were not *required* to wear face coverings or to socially distance, and that none of these activities was held outside. (See generally McClure Decl., ¶¶ 7, 9-16; see also Declaration of Stephanie Mackey in Support of Plaintiffs' Motion for Summary Adjudication ("Mackey Decl.") and accompanying exhibits; Plaintiffs' Statement of Undisputed Facts ("PSU") Nos. 18, 19.) Defendants' maintain, however, there is no evidence such indoor, unmasked events occurred every day between November 9, 2020 and June 21, 2021, since Defendants did not inspect Calvary's premises every one of those days. (DSU, No. 18.)

Defendants were not only holding these events without masks or social distancing, but were also live streaming and otherwise advertising online that they were doing so, sometimes commenting directly on Calvary's dispute with the County over the Public Health Orders. (Mackey Decl. and accompanying exhibits.) For example, on December 13, 2020, Pastor McClure states: "I do applaud you. Thank you, thank you for coming in this dark time. . .to gather together to obey God's word and we're not here to fight the government but to stand for the freedom that God has given us and the right to worship." (Mackey Decl., ¶ 26, Ex. 43.) At several services, Pastor McClure refers to the service as a "protest" (Mackey Decl., ¶ 7, Ex. 8; ¶ 9, Ex. 12; ¶ 17, Ex. 27; ¶ 28, Ex. 48; ¶ 38, Ex. 72), elsewhere he advises that "People are going to do what they want to do, I'm not a policeman. . . ." (Mackey Decl., ¶ 24, Ex. 41.)

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

There also appear to be at least some services where Pastor McClure is advising or at least strongly suggesting that his congregants not wear masks or social distance, even if they might get sick and/or die:

> October 11, 2020: "Obviously, you're here today so you don't care if you get sick. No one here, by the way, has gotten sick, gone to the hospital, or died from this thing, by the way. *You're all like, 'I'm ready to die, I don't care, I'm going to church.'*" (Mackey Decl., ¶ 11, Ex. 16 (emphasis added).)

> November 22, 2020: "There's all these studies that say look, don't wear your mask when you're exercising, you know, um, [laughs] I think you shouldn't wear 'em when you're, you know, I can't think with them on, that's just me. . . You have a 99.99% chance of not dying if you catch the virus." (Mackey Decl., ¶ 19, Ex. 32.)

> January 10, 2021: "You can't tell a Christian not to preach the name of Jesus Christ, or to praise his name, or to gather in his name—the right from God—*And who cares what the cost is. . . .*" (Mackey Decl., ¶ 34, Ex. 61(emphasis added).)

> January 10, 2021: "The third misconception. . . for Christians is that [the world] think[s] they can, like brutalize them or threaten them to get them to do what they want. . . 'Speak no more, teach no more in his name or else we're gonna go after you. Your fines are going to go up to $1.5 million. $80,000 and $23,000 for you personally!' And that's what they're doing to me now and it's like, OK, but you know. . . *I'm willing to die for the truth.* I've died a long time ago. . . .I think about our government's infringement on our liberties. I think about this whole thing, Covid-19, it's. . .it was all set up. We were played. This whole thing, it's a lie. I mean, not that it's not a disease. But they're using it to take control and to stop you and I from worshipping God. That's what they're doing. . . They're

6

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

trying to take away our freedom.    This is religious persecution in America."
(Mackey Decl., ¶ 35, Ex. 65 (emphasis added).)

April 11, 2021:  "One of these reporters outside the courthouse. . . one time he
says, 'Just tell me, why aren't you wearing a mask?'. . .So, I said, 'Well, because
*I'm not afraid to die.*  But I bet you're wearing yours—and I'm not saying
wearing a mask or not wearing a mask-most of the time we're wearing these
things because we're afraid to die.  We're trying to protect ourselves in any way
possible.'  And I said, 'Is that true?'  And he said, 'Yeah, I would think you
would do anything to save your life.'  And I said, 'That's where you're wrong
with Christians, because *we're told to lose our life.*  And if we lose it for Jesus
Christ and the sake of the gospel, we will find it.'. . . *And I can assure you I am
not afraid of Covid.  I am not afraid of Covid-21, 22, 23 [laughter]*."  (Mackey
Decl., ¶ 59, Ex. 113 (emphasis added).)

April 25, 2021:  "Everyone believes this, you go hide in your houses and
quarantine and you need to save yourself.  I have often asked myself, 'Why are
people so mad if I don't have a mask on?"  And I have realized it's because it's
not about my safety, it's about their safety.  And apparently, their mask isn't
enough.  I have to have one on even though they have two on!  I look and think,
there have been two Stanford studies that say how bad it is, because you're
literally just breathing $CO_2$.  You're gonna give yourself Covid.  It's not good for
you.  It's just not, it's not healthy to wear a mask all day.  If that offends you, let
the truth hurt.  It's just not good for you. . . It makes us almost moldable so the
elites can lead a society that's not thinking clearly because they're not getting
enough oxygen [laughter]. . .You know, all of this is being foisted upon us to
control us and bring us to the point where we don't trust anybody and anything. . .

7

You see, a lot of what's happening today is witchcraft in our culture. . .."
(Mackey Decl., ¶ 63, Ex. 120.)

Pastor McClure's comments also suggest that Calvary experienced increased donations as a result of the services reflected in the Exhibits attached to the Mackey declaration.   At a March 21, 2021 service, Pastor McClure states:  "We had a construction loan of $1.9 million and. . . people all over the country now, who have been watching what's going on here.. . they've sent some money to help us pay down our debt. . . So we had $1.9 million dollars last year in this construction loan. . . and now we're down to under $700,000 today."  (Mackey Decl., ¶ 53, Ex. 103.)

Pastor McClure and other Calvary staff testified that between August 2020 and June 2021, staff and attendees of the church contracted Covid-19 and displayed symptoms consistent with the virus. (PSU Nos. 47, 48.)  However, Calvary contends that "Plaintiffs cannot trace one Covid-19 case to the church."  (DSU Nos. 47-48.)  It is undisputed, however, that in late December 2020 and early January 2021, certain students and teachers at the Academy tested positive for Covid-19, and the school was closed for two weeks due to the "aggressive" spread of the virus through the school.  (DSU No. 50.)  The families of some of the Academy's students and staff attend church at Calvary, although Defendants contend there is no evidence they attended the church during the time they were sick.  (DSU No. 51.)  Defendants did not report the positive Covid-19 cases to the County, although Defendants appear to argue that they did not make such reports because the cases were not "confirmed".  (DSU No. 52.)

As a result of Calvary's activities, on November 9, 2020, the County issued a Notice of Violation ("NOV") to Defendants for failing to require personnel, congregants and visitors to wear face coverings as required by the Revised Reduction Order and the Gatherings Directive. (PSU No. 20.)  The NOV included a separate $1,000 fine for each violation.  (PSU No. 21.) Under the Urgency Ordinance, each $1,000 fine doubled every day the violations were not corrected up to a maximum of $5,000, and then continued to accrue daily at $5,000 until the violations were corrected.  (PSU No. 22.)  The violations would be deemed corrected if Defendants submitted a sworn compliance statement confirming correction of the violations

8

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

1    noted in the Notice; no such compliance statement was ever submitted.  (PSU Nos. 23, 24.)

2    According to Plaintiffs', Defendants' fines for failing to require personnel or attendees to wear

3    face coverings began accruing on November 9, 2020, and between that date and June 21, 2021,

4    amount to $2,234,000.   (PSU Nos. 25, 26.) Defendants contend not only that there is no

5    evidence that they failed to wear face coverings every day between November 9, 2020 and June

6    21, 2021, but also that they never received proper notice of the November 9, 2020 NOV

7    because it was improperly served. (DSU Nos. 18-23, 25-26.)

8          The County also contends that between August 23, 2020 and May 18, 2021, Defendants

9    did not submit an SDP through the County's online portal. (DSU No. 29.)  Defendants dispute

10   this, as they claim they attempted to submit an SDP but it was not complete, so the County

11   rejected it. (DSU No. 29 ("Undisputed that Calvary did not submit a **completed** SDP, Calvary

12   did attempted to submit a modified form."); Supplemental Declaration of Mariah R. Gondeiro

13   In Support of Defendants' Opposition ("Supp. Gondeiro Decl.).)

14         On August 23, 2020, the County issued a NOV to Defendants for failing to submit an

15   SDP, charging the minimum $250 fine. (DSU Nos. 30, 31.) Under the Urgency Ordinance, the

16   $250 fine doubled every day that Defendants failed to submit an SDP until the fine reached

17   $5,000, after which the fine accrued at $5,000 per day every day thereafter. (DSU No. 32.)

18   Defendants' fines for failing to submit an SDP began accruing on August 23, 2020 and ran

19   through May 18, 2021, when the Social Distancing Protocol was rescinded, and total

20   $1,327,750. (DSU Nos. 33, 34.)

21         Defendants appealed the notices of violation and fines in the amount of $327,500 that

22   were imposed between August 23, 2020 and October 18, 2020 to the Office of the County

23   Hearing Officer; these included the August 23, 2020 NOV for the SDP violation and the

24   associated $250 fine and fines that accrued thereafter. (DSU Nos. 35, 36.) In the course of their

25   appeal, Defendants conceded that they violated various public health orders.  (DSU No. 37.)

26   On November 2, 2020, the County Hearing Officer upheld the notices of violations cited

27   between August 23, 2020 and October 18, 2020, including the SDP violation and fines. (DSU

28   No. 38.)

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY**

Defendants challenged the County Hearing Officer's decision by filing a writ in the Superior Court. (DSU No. 39.) In that proceeding, Defendants did challenge the constitutionality of the SDP requirements and the amount of fines imposed, but they aver that they did not have "a meaningful opportunity to litigate" their constitutional claims. (DSU No. 40.) And, while the Court upheld the County Hearing Officer's decision and rejected Defendants' First Amendment Challenge to the SDP requirement and their Eighth Amendment challenge to the fines imposed by the County up to that date, it cannot be disputed that the focus of the parties' briefing and argument during that proceeding was the County's ban on indoor gatherings. (DSU No. 41.) On May 7, 2021, Defendants filed a notice of appeal of the foregoing order, but voluntarily abandoned that appeal on June 24, 2021 because Defendants understood the Court's ruling to be non-appealable. (DSU Nos. 42, 43.)

To date, Defendants have failed to pay the outstanding administrative fines for the face covering and SDP violations, and owe a late fee of 10 percent on those amounts. (PSU Nos. 44, 45.) Defendants therefore owe $3,917,925 in fines for the face covering and SDP violations. (Plaintiffs' RJN, Exhibit 191.) However, Plaintiffs state that in an exercise of prosecutorial discretion, they seek a reduced amount of $2.8 million. Defendants again dispute that they owe these monies. (DSU Nos. 45-46.) And, while Defendants cannot dispute that they possess the funds to pay the fines and late fees, they contend that these fines are unconstitutionally excessive, they did not act with the requisite culpability to justify these fines and that requiring them to pay this amount will impair their ability to minister to the public. (DSU No. 53.)

**B.    Procedural**

Plaintiffs initiated this action and sought injunctive relief in October 2020. On November 2, 2020, the Court issued a temporary restraining order, and on November 24, 2020 issued a modified temporary restraining order and preliminary injunction enjoining Calvary from violating restrictions on indoor gatherings and requirements for face coverings and social distancing and from operating without submitting a SDP to the County.

Calvary violated these court orders. As a result, Defendants sought then obtained a contempt order on December 17, 2020. After further non-compliance, the Court issued a

10

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY

further contempt order on February 16, 2021 and ordered Calvary and McClure to pay monetary sanctions pursuant to Code of Civil Procedure sections 177.5 and Code of Civil Procedure section 1218, subdivision (a).

Calvary sought review of the contempt and sanctions orders in the instant action and two other actions involving the same parties.  On August 15, 2022, the appellate court reversed the sanctions order and annulled the contempt orders pursuant to the then recent United States Supreme Court decisions regarding the First Amendment's Protection of the free exercise of religion in the context of public health orders (see, e.g., *Tandon v. Newsom* (2021) 593 U.S. __ [141 S. Ct. 1294]).  The appellate court concluded that, under those decisions, the temporary restraining orders and preliminary injunctions were facially unconstitutional because they banned indoor worship.  The appeal did not address the propriety of the County's orders requiring face masking and social distancing protocol or the fines assessed for Defendants' violations of those orders.  The appellate court nevertheless found it was required to reverse the imposition of fines and sanctions in their entirety because the trial court's orders had not differentiated between indoor gatherings and other forms of wrongdoing.

Plaintiffs filed the operative FAC on July 29, 2021, asserting claims for: (1) public nuisance per se; (2) public nuisance; (3) violation of County and State public health orders; (4) violation of County Urgency Ordinance No. NS-9.21; and (5) violation of Government Code § 25132.  On August 26, 2022, Plaintiffs filed the instant motion seeking to summarily adjudicate the first, third, fourth and fifth causes of action in their favor.  Defendants oppose the motion.

**II.    Defendants' Request for Additional Discovery**

Defendants insist that summary adjudication is inappropriate at this time because further discovery is needed.  Defendants made this same argument by ex parte application filed on December 29, 2022, which application identified the need to (1) obtain correspondence regarding complaints concerning non-commercial activities and (2) conduct the deposition of the enforcement officer who signed off on the November 9, 2020 NOV.  Although there was some confusion regarding resetting of this hearing, the Court ultimately considered and rejected Defendants' discovery argument.  Moreover, since their ex parte application, it appears that

11

1  Defendants have deposed the enforcement officer who served the November 9, 2020 NOV, and

2  missed the deadline to compel the additional discovery they maintain they have yet to receive

3  from the County. (See Plaintiffs' Reply at p. 10, fn. 20.)

4        The Court has also reviewed the entirety of the evidence Defendants submitted to the

5  Court with their opposition, including the portions of deposition transcripts of Dr. Sara Cody,

6  Dr. Sarah Rudman, Michael Balliet, and Melissa Huerta and the Declarations of Mike McClure,

7  William M. Shepherd, Carson Atherley, Barry Arata, Stephen E. Petty, P.E., C.I.H., C.SP., Ram

8  Duriseti, M.D., PhD, Mariah Gondeiro, and Nada N. Higuera.  The Court also reviewed and

9  considered (over Plaintiffs' objections) Defendants' late filed Supplemental Response to

10  Plaintiffs' Separate Statement of Undisputed Material Facts and Supplemental Declaration of

11  Mariah R. Gondeiro In Support of Defendants' Opposition, including Exhibit A to that

12  Supplemental Declaration.  Although Defendants submitted these materials to the Court after

13  the Court issued its tentative ruling and they are therefore improperly late, neither document

14  changes the evidence already submitted in the case—Defendants' Supplement Response to

15  Undisputed Facts is based on the same evidence the Court already considered in its tentative

16  ruling, and the Supplemental Declaration attaches an email confirming Defendants submitted a

17  revised SDP through counsel on or around February 19, 2021—a fact Plaintiffs do not dispute.

18        Defendants' own evidence demonstrates that Defendants did ask questions of Dr. Sara

19  Cody, Dr. Sarah Rudman, Michael Balliet, and Melissa Huerta about the potential selective

20  enforcement of the Urgency Ordinance.  Defendants have also had over two years to pursue

21  discovery both here and in the federal action, have consistently maintained that the County's

22  health orders were unconstitutional since the appeal of the administrative proceeding, and

23  obtained several opinions from appellate courts and the U.S. Supreme Court outlining that

24  court's clear views regarding the constitutionality of COVID-19 public health orders (or lack

25  thereof).  On this record, there is no good cause for a continuance for further discovery to be

26  conducted; the matter is ripe for summary adjudication.  *See Johnson v. Alameda County Med.*

27  *Ctr.* (2012) 205 Cal.App.4th 521, 532; *Santos v. Crenshaw Mfg., Inc.* (2020) 55 Cal.App.5th 39,

28

12

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY**

1   47; *Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246; *Mengers v. Department of Transp.* (2020)

2   59 Cal.App.5th 13, 25-26; *Yuzon v. Collins* (2004) 116 Cal.App.4th 149 166-168.

3   **III.**    **Requests for Judicial Notice**

4        **A.**    **Plaintiffs' Request**

5        Plaintiffs request that the Court take judicial notice of materials relating to the Covid-19

6   pandemic, including: government-issued (at federal, state and county level) proclamations and

7   public health orders; ordinances issued by the County and other Bay Area counties; guidance

8   issued by the California Department of Public Health; items from the administrative hearing

9   before the Santa Clara County Office of the County Hearing Officer; social distancing protocol

10   forms issued by the County; items from Calvary's appeal of fines issued by the County in the

11   matter entitled *Calvary Chapel San Jose v. County of Santa Clara,* Case No. 20CV374470; and

12   transcripts from the contempt hearing before the Court. (See Declaration of Karun Tilak in

13   Support of Motion for summary Adjudication ("Tilak Decl."), pp. 150-178.)

14        Each of the foregoing items are proper subjects of judicial notice pursuant to Evidence

15   Code section 452, subdivisions (b), (c), (d) and (h), as "[r]egulations and legislative enactments

16   issued by or under the authority of the United States or any public entity in the United States,"

17   "[o]fficial acts of the legislative, executive, and judicial departments of the United States and of

18   any state of the United States," "[r]ecords of [] any court of this state or [] any court of record of

19   the United State or of any state of the United States," and "facts and propositions that are not

20   reasonably subject to dispute." Accordingly, Plaintiffs' request for judicial notice is

21   GRANTED.

22        **B.**    **Defendants' Request**

23        Defendants request the Court take judicial notice of Mandatory Directives for case

24   reporting, capacity limitations and gatherings for different types of activities, businesses and

25   industries issued by the County (Exhibits 1-17, 22, 23); ordinances and other orders relating to

26   Covid-19 adopted and/or issued by the County or other Bay Area counties (Exhibits 18-21); and

27   Covid-19 guidance materials issued by the State of California or the California Department of

28   Public Health (Exhibits 24-26, 28). The foregoing materials are proper subjects of judicial

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY**

1   notice under Evidence Code section 452, subdivisions (b) and (c).  Accordingly, Defendants'

2   request for judicial notice is GRANTED.

3   **IV.   Plaintiffs' Motion for Summary Adjudication**

4       **A. Burden of Proof**

5       The party moving for summary judgment/adjudication bears the initial burden of

6   production to make a prima facie case showing that there are no triable issues of material fact –

7   one sufficient to support the position of the party in question that no more is called for.

8   (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851.)  Plaintiffs moving for

9   summary judgment bear the burden of persuasion that each element of the cause of action in

10   question has been proved, and hence there is no defense thereto. (Code Civ. Proc., § 437c.)

11   Plaintiffs, who bear the burden of proof at trial by preponderance of evidence, therefore "must

12   present evidence that would require a reasonable trier of fact to find the underlying material fact

13   more likely than not- otherwise he would not be entitled to judgment as a matter of law, but

14   would have to present his evidence to a trier of fact." (*Aguilar, supra,* 25 Cal.4th at 851.)  The

15   defendant has no evidentiary burden until the plaintiff produces admissible and undisputed

16   evidence on each element of a cause of action. (Weil & Brown, Cal. Prac. Guide: Civ. Proc.

17   Before Trial (The Rutter Group 2013), ¶ 10:238.)  If the plaintiff meets this initial burden, the

18   burden then shifts to the defendant to "show that a triable issue of one or more material facts

19   exists as to that cause of action." (Code Civ. Proc., § 437c, subd. (p)(1).)

20       **B. First and Third Causes of Action:  Nuisance Per Se and Violation of County**

21           **and State Public Health Orders**

22       Plaintiffs' first and third causes of action are predicated on Defendants' alleged

23   violations of the Risk Reduction Order, the Revised Risk Reduction Order, and the Safety

24   Measures Order (collectively, the "Public Health Orders") by their failure to (1) wear face

25   coverings or maintain adequate distances between personnel and attendees and (2) submit an

26   SDP to the County.

27       "A nuisance per se arises when a legislative body with appropriate jurisdiction, in the

28   exercise of the police power, expressly declares a particular … activity, or circumstance, to be a

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY**

1  nuisance." (*City of Claremont v. Kruse* (2009) 177 Cal.App.4th 1153, 1163, internal citations

2  and quotations omitted.)  "Where the law expressly declares something to be a nuisance, then

3  no inquiry beyond its existence need be made." (*Id.*, internal citations and quotations omitted.)

4  The County Board of Supervisors, a legislative body, possesses the appropriate

5  jurisdiction (see Cal. Const., art. XI, § 7), and its regulatory power "not only includes nuisances,

6  but extends to everything expedient for the preservation of the public health and the prevention

7  of contagious diseases" (*Ex parte Shrader* (1867) 33 Cal. 279, 284; see Gov. Code, §§ 25845

8  and 53069.4).  The Board exercised this power by enacting the Urgency Ordinance, and in

9  doing so expressly declared any violation of the Public Health Orders to be a nuisance.

10  (Plaintiffs' RJN, Ex. 159, §§ 1(a), 3.)

11  While Defendants contend they did not hold church events so cannot have been

12  observed violating the mask requirements every day, Defendants' violations of the Public

13  Health Orders' face coverings and SDP requirements are otherwise undisputed. (PSU Nos. 18,

14  19, 29, 37.)  It is also undisputed that the Public Health Orders required Defendants' personnel

15  and members of the public entering Defendants' facilities to wear face coverings.  Defendants

16  expressly admitted under oath that they refused to require or enforce the wearing of face

17  coverings during the time period they were required to do so; they publicly broadcasted large

18  events where face coverings were not worn; and County enforcement officers confirmed

19  through regular inspections that personnel and attendees were not required to wear face

20  coverings.  Defendants also admit they never submitted a completed SDP to the County through

21  its online portal.  (DSU No. 29.)  Although, according to Defendants, they twice attempted to do

22  so, but the County refused their submission.

23  Plaintiffs have plainly established that (1) Defendants violated the Public Health Orders,

24  and (2) these violations are a nuisance because the Urgency Ordinance so states, and thus

25  Plaintiffs have met their initial burden on the first and third causes of action.

26

27

28

15

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

**C. Fourth and Fifth Causes of Action:  Violation of County Urgency Ordinance No. NC-9.21 and Violation of Government Code Section 25132**

Per its express terms, violations of the Public Health Orders qualified as violations of the Urgency Ordinance, which authorizes the County "to file a civil action on behalf of the County … to recover all associated County costs, attorneys' fees, and any fines or penalties imposed" imposed thereunder.  (Plaintiffs' RJN, Exhibit 159 at §§ 3 and 4.f.2.)  Government Code Section 25132 similarly authorizes the County to prosecute such an action.  (See Gov. Code, § 25132, subdivision (a) ["[t]he violation of a county ordinance may be prosecuted by county authorities in the name of the people of the State of California, or redressed by civil action."].)

Defendants clearly violated the Public Health Orders' face covering and SDP requirements. (DSU Nos. 18, 19, 29, 37.)  The August 23, 2020 NOV imposed a fine of $250 for Defendants' failure to submit a completed SDP as required, and these fines continued to accrue as Defendants did not submit a completed SDP through the County's online portal at any time between August 23, 2020 and May 18, 2021. (PSU Nos. 29, 37.)  The August 23 SDP fine started at $250 (the minimum), doubled to $500 on August 24, $1,000 on August 25, $2,000 on August 26, and $4,000 on August 27, and then increased to $5,000 (the maximum) on August 28, 2020.  (See Declaration of Jamila G. Benkato in Support of Plaintiffs' Motion for Summary Adjudication ("Benkato Decl."), ¶ 151, Exhibit 191, Columns B and C.)  The fine then accrued at $5,000 every day that Defendants failed to submit an SDP, totaling $1,327,750 on May 18, 2021. (DSU Nos. 31-34.)

The November 9, 2020 NOV imposed two $1,000 fines (the minimum)- one for failing to require personnel to wear face coverings and one for failing to require members of the public to do the same. (PSU Nos. 20, 21.)  Because Defendants continued to violate the face covering requirements, the fines continued to accrue as follows: doubled to $2,000 on November 10, doubled again to $4,000 on November 11, and then increased to $5,000 (the maximum) on November 12, 2020, after which they accrued at $5,000 for every day that Defendants continued to violate the orders.  (Benkato Decl., Exhibit 191, Columns D-F.)  By June 21, 2021,

16

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY

1  Defendants had accrued $2,234,000 in fines for failing to correct the two face covering

2  violations. (PSU Nos. 25-26.)

3       Under the Urgency Ordinance, fines are due within 30 days of service of an NOV or 30

4  days after the conclusion of any administrative appeal. (Plaintiffs' RJN, Exhibit 159 at § 6(g).)

5  Defendants filed an administrative appeal of the August 23, 2020 NOV, and the Hearing Officer

6  issued its decision on November 2, 2020, meaning that the fine for the SDP violation was due

7  30 days later.  (DSU Nos. 35-38.)  Defendants did not seek administrative appeal of the

8  November 9, 2020 NOV; consequently, those fines were due within 30 days of that NOV.

9  (PSU No. 27.)  To date, Defendants have not paid any of the administrative fines.  (DSU No.

10 44.)  The Urgency Ordinance authorizes a late fee of 10 percent of any fines not timely paid,

11 resulting in late fees totaling $356,175. (Plaintiffs' RJN, Exhibit 159 at § 6(i); PSU No. 45.)

12      Given the foregoing, Plaintiffs have established that Defendants accrued administrative

13 fines through their continued violations of the Public Health Orders and have failed to pay those

14 amounts, resulting in the imposition of late fees.  Thus, they have met their initial burden on the

15 fourth and fifth causes of action.

16 **D. Defendants' Constitutional Defenses**

17         1.  Defendants' Constitutional Challenges are Not Precluded By the Superior

18             Court Order on County Hearing Officer's Decision

19      Relying on the doctrine of collateral estoppel, Plaintiffs insist summary adjudication of

20 these claims is warranted, at least with respect to the SPD-related fines, for the additional reason

21 that this Court's April 8, 2021 order on Defendants' appeal of the County Hearing Officer's

22 decision sustaining the August 23, 2020 NOV and the fines in *Calvary Chapel v. County of*

23 *Santa Clara*, Case No. 20CV374470 has a preclusive effect on Defendants' ability to litigate the

24 existence of the SDP violations here.

25      The doctrine of collateral estoppel bars "relitigation of an issue decided at a previous

26 proceeding 'if (1) the issue necessarily decided at the previous [proceeding] is identical to the

27 one which is sought to be relitigated; (2) the previous [proceeding] resulted in a final judgment

28 on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY**

privity with a party at the prior [proceeding]." (*Rodgers v. Sargent Controls & Aerospace* (2006) 136 Cal.App.4th 82, 90, quoting *People v. Carter* (2005) 36 Cal.4th 1215, 1240; see also *Lucido v. Super. Ct. (People)* (1990) 51 Cal.3d 335, 341.)

Here, Plaintiffs appealed the County Hearing Officer's final administrative decision under Government Code section 53069.4, which permits a person contesting the final administrative order or decision of a local agency made pursuant to an ordinance regarding the imposition, enforcement, or collection of administrative fines or penalties to seek review by filing an appeal with the superior court as a limited civil proceeding. (Gov. Code, § 530069.4, subd. (b)(1).) Notably, the parties do not dispute that the hearing officer is expressly precluded from considering constitutional challenges to the Public Health Orders as part of the administrative hearing. Defendants were not precluded, however, from making such arguments on their appeal of the County Hearing Officer's decision to the Superior Court. After the Court issued its order sustaining the County Hearing Officer's decision, Defendants filed a notice of their intention to appeal the decision, but then abandoned it. Because of this, Plaintiffs insist, Defendants cannot relitigate the same issues in this action.

The Court's decision affirming the County Hearing Officer's ruling discusses the Defendants' Free Exercise and unconstitutional conditions arguments, "reject[ing] Petitioner's claim that the requirement of an [SDP] burdens Petitioner's free exercise" and finding that Petitioner Calvary failed to show that submission of an SDP "would in any way infringe on its worship services." (Plaintiffs' RJN, Ex. 169 at pp. 5-9; Exhibit 170 at p. 7.) The Court also appears to have decided the constitutionality of the face coverings and sustained the fines based on violations identical to those at issue in the November 9, 2020 NOV (they proceeded the violations reflected in the November 9 NOV) because it found that "no court has relieved Petitioner of its obligation comply with the requirement of face coverings and physical distancing." (Plaintiffs' RJN, Exhibit 170 at p. 6.)

However, review of the parties' briefing and the portions of transcript of the hearing on Defendants' appeal reveals that collateral estoppel should not be applied here. While it is clear that Defendants' briefed and argued the unconstitutionality of the fines, their argument in that

18

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

proceeding was based on the prohibition on indoor gathering, which had then recently been found unconstitutional by the U.S. Supreme Court in *Gateway City Church v. Newsom* (2021) 592 U.S. __ [141 S.Ct. 1460]. Defendants did not brief the constitutionality of face coverings. And, while the opinion does seem to consider (and plainly rejects) a constitutionality argument regarding Defendants' failure to submit an SDP, the Defendants' argument regarding the unconstitutionality of the SDP also focused on its requirement that they agree not to hold indoor gatherings. Thus, on this record, the Court declines to apply collateral estoppel as a basis to grant summary adjudication for Plaintiffs.

Collateral estoppel is but one component of the doctrine of res judicata, which prohibits the relitigating of a cause of action litigated in a prior proceeding as a claim or defense in a subsequent proceeding involving the same parties or parties in privity with them. (See *Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896.) Res judicata bars "not only the reopening of the original controversy, but also subsequent litigation of all issues which were or could have been raised in the original suit." (*Torrey Pines Bank v. Superior Court* (1989) 216 Cal.App.3d 813, 821.) Because the Court finds that the constitutionality of requiring face coverings and the SDP (separated from the indoor gathering requirement) were not fully addressed by Defendants during their appeal of the County Hearing Officer's ruling, the Court also finds res judicata not to be applicable to the present proceedings.[1]

### 2. The Public Health Orders Do Not Violate the First Amendment or Due Process Clause[2]

"The Free Exercise Clause of the First Amendment, which has been made applicable to the States by incorporation into the Fourteenth Amendment, see *Cantwell v. Connecticut* (1940) 310 U.S. 298, 303, provides that 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.'" (*Employment Div. v. Smith* (1989) 494 U.S.

---

[1] Defendants also argue that the first and third causes of action are moot because the orders on which they are predicated have been rescinded. This argument is without merit because Plaintiffs are not seeking declaratory relief, and the finding that Defendants violated the Public Health Orders is necessary to the Court's determination of the fines under the first and third claims, which is still a live issue.

[2] Defendants concede that their Free Exercise and Equal Protection arguments rise and fall together. (Opp. at p. 14, fn. 1.)

19

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

872, 876-77, quoting U.S. Const., Amdt. 1.)  "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." (*Id.*) "But the 'exercise of religion' often involves not only belief and profession but the performance of (or abstention from) physical acts...." (*Id.*; see also *Kennedy v. Bremerton Sch. Dist.* (2022) 142 S. Ct. 2407, 2422 ("The Clause protects not only the right to harbor religious beliefs inwardly and secretly.  It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." (internal citation and quotations omitted).)

However, "[c]onscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs.  The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities.'" (*Smith* 494 U.S. at 886, quoting (1940) *Minersville School Dist. Bd. of Ed. v. Gobitis* 310 U.S. 586, 594-595).

Accordingly, in *Reynolds v. United States* (1879) 98 U.S. 145, the court held that a criminal conviction for violating a statute prohibiting polygamy did not violate the Free Exercise Clause even though polygamy was a part of the defendant's sincerely held religious convictions.  In so finding the court observed: "Can a man excuse his practices to the contrary [of the prohibition] because of his religious belief?  To permit this would be to make the professed doctrines of religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself.  Government could exist only in name under such circumstances." *Id.* at 166-167.

Similarly, in *Prince v. Massachusetts* (1944) 321 U.S. 158, the court found a statute prohibiting minors from selling or offering for sale "any newspapers, magazines, periodicals, or other articles of merchandise" on the streets did not violate the Free Exercise Clause when it was applied to a parent and child distributing Jehovah's Witness's literature, noting "neither rights of religion nor rights of parenthood are beyond limitation." (*Id.* at 166; see also *Smith*, 494 U.S. at 878-879 ("We have never held that an individual's religious beliefs excuse him

20

1  from compliance with an otherwise valid law prohibiting conduct that the State is free to

2  regulate.")

3          Accordingly, United States Supreme Court cases "establish the general proposition that

4  a law that is neutral and of general applicability need not be justified by a compelling

5  governmental interest even if the law has the incidental effect of burdening a particular religious

6  practice." (*Church of Lukumi Babalu Aye v. City of Hialeah* (1992) 508 U.S. 520, 531.) Thus,

7  the court held, for example, that an Oregon state law prohibiting sacramental peyote use and

8  denial of unemployment benefits did not violate the Free Exercise Clause. (*Smith*, 494 U.S.

9  872.)

10         However, a "law [that] discriminates against some or all religious beliefs or regulates or

11  prohibits conduct because it is undertaken for religious reasons", must withstand "the most

12  rigorous of scrutiny." (*Church of Lukumi Babalu Aye*, 508 U.S. at 532; *Fulton v. City of*

13  *Philadelphia* (2020) 592 U.S. __, [141 S. Ct. 1868, 1881].) Under this principle, the court

14  "invalidated a state law that disqualified members of the clergy from holding certain public

15  offices, because it 'impose[d] special disabilities on the basis of . . . religious status.'" (*Church*

16  *of Lukumi Babalu Aye*, 508 U.S. at 532, quoting *McDaniel v. Paty* (1978) 435 U.S. 618.)

17  Similarly, in *Fowler v. Rhode Island*, the court found an ordinance interpreted to prohibit

18  Jehovah's Witness preaching in a public park but to permit preaching in a Catholic mass or

19  Protestant church service was applied in an unconstitutional manner. (*Fowler v. Rhode Island*

20  (1953) 345 U.S. 67; see also *Church of Lukumi Babalu Aye*, 508 U.S. 520 (law prohibiting

21  animal sacrifice unconstitutional because targeted the Santeria religion).)

22         To determine neutrality of a particular law or government policy, the court is to begin by

23  examining the text. (*Church of Lukumi Babalu Aye*, 508 U.S. at 533.) "A law lacks facial

24  neutrality if it refers to a religious practice without a secular meaning discernable from the

25  language or context." (*Id.*) However, "[f]acial neutrality is not determinative. The Free

26  Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The

27  Clause 'forbids subtle departures from neutrality.'" (*Id.*, quoting *Gillette v. United States*

28  (1971) 401 U.S. 437, 452.) "The creation of a formal mechanism for granting exceptions

21

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

renders a policy not generally applicable [and thus not neutral], regardless of whether any exceptions have [actually] been given, because it "invite[s] the government to decide which reasons for not complying with the policy are worthy of solicitude."' (*Fulton*, 141 S. Ct. at 1871, quoting *Smith*, 494 U.S. at 884.) Such "[a] government policy can survive strict scrutiny only if it advances 'interests of the highest order' and is narrowly tailored to achieve those interests." (*Fulton*, 141 S. Ct. at 1881.)

Here, the face covering requirement imposed by the Public Health Orders applied to "all individuals, businesses, and other entities in the County" (See Plaintiffs' RJN, Exhibit 153 at § 2, Exhibit 154 at § 2 and Exhibit 156 at § 2) and thus were facially neutral, generally applicable requirements for all comparable, regulated entities in the County.

Defendants insist that the face covering requirements were nevertheless unconstitutional because various businesses, such as restaurants, personal care services, athletic activities, and youth programs, were "exempt" from both the mask and the social distancing requirements. (Opp. at pp. 11-12.) Defendants rely, in part, on the Declarations of William M. Shepherd and Barry Arata to support this contention. Mr. Shepherd explains that workers in his construction business, which he has owned since 2015, "removed their masks if it was impossible or unsafe to wear a mask to perform their job, as allowed by Santa Clara County's guidance for construction workers." (Shepherd Decl., ¶ 4.) Mr. Arata, a fire engineer in San Jose, explains that "even though the San Jose Fire Department required us to wear masks, most firefighters did not wear masks indoors." (Arata Decl., ¶ 3.) Mr. Arata also states that he never wore a mask during his 90-minute "intense cardio" work outs he engaged in with other firefighters. (Arata Decl., ¶ 2.) Mr. Shepard's examples appear to have been outside, and neither witness says anyone made a complaint with the County or that the County even knew about this absence of mask wearing. These statements therefore do not provide any evidence that *the County* was applying the Public Health Ordinances differently in these contexts than to Defendants; they merely demonstrate how these individuals were and were not following the Public Health Ordinances in their daily routines.

22

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY

1    Defendants also argue the Public Health Orders were unconstitutional because "the
2    County exempted government entities and their contractors *at their own discretion* from social
3    distancing, wearing masks, or any other restriction to the extent that such requirements would
4    impede or interfere with an essential government function. . ." (Opposition, p. 12 (emphasis in
5    original; internal citations omitted).) Again, this is different than *Fulton*, for example, where
6    *the government* was permitted to grant exceptions to some foster care providers, and the
7    Supreme Court held the government therefore had to withstand strict scrutiny. Here, the
8    County, operating on an emergency basis to take steps to prevent the spread of COVID-19,
9    granted discretion to individuals to determine on a case by case basis whether their job might
10   require them to remove their mask or get close to another person. The government was not
11   engaging in an analysis to determine when an exception was warranted, and the default
12   assumption was that face coverings were required to be worn.

13   Moreover, Defendants do not contend they sought or engaged in incidental or periodic
14   exceptions to the mask requirements as the Public Health Orders allowed in certain
15   circumstances, but rather, as evidenced from their conduct, Defendants unilaterally gave
16   themselves a blanket exception for all of their activities at any time in any location, regardless
17   of the number of attendees. Nor do Defendants submit any *evidence* to establish that any of the
18   foregoing activities are comparable to Defendants' gatherings with respect to the risk of Covid-
19   19 transmission. Defendants concede that they routinely held events where 300-600 people
20   were in attendance—people who were not necessarily in regular contact with one another as
21   was the case with the small number of Mr. Shephard's workers or the firefighters Mr. Arata
22   worked with.

23   In addition, many of the businesses Defendants accuse of being "exempt" were subject
24   to unique restrictions that were not applicable to gatherings like those that took place at the
25   church, and the County's directive for gatherings specifically stated that food or drink could be
26   served and face coverings could be removed for purposes of religious ceremony. (Defendants'
27   RJN, Exhibits 4, 12, 13 and 22.) The Court previously noted Defendants' mischaracterization
28   of many of the face covering and distancing requirements in its order on their demurrer to the

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY**

FAC and explained that it was "not accurate to portray restaurant patrons as being permitted to maintain social experiences completely unfettered and without *any* restriction as compared to church congregants." Defendants simply fail to demonstrate that the Public Health Orders treated *comparable* secular activities more favorably with respect to face coverings and SDP requirements.

Defendants' cited authorities are also distinguishable.  There, comparisons were made (1) in the context of analyzing bans and capacity restrictions, which are not at issue here (see, *Tandon*, 141 S. Ct. at 1296), (2) at the preliminary injunction stage subject to a lower evidentiary standard (see *Roman Catholic Diocese*, 141 S. Ct. at 65-66), and (3) on completely different records (see *Calvary Chapel Daytona Valley* (9th Cir. 2020) 982 F.3d 1228, 1230-1231).  It is also critical to note that in *Roman Catholic Diocese*, which Defendants rely heavily on in their Opposition,[3] the religious institutions that challenged the capacity limitations "rigorously implemented and adhered to all health protocols", and the capacity limitations were facially different for religious institutions than for nearly all other businesses.  141 S. Ct. at 67. In none of these prior cases was a religious institution challenging wearing face coverings. And, in none of these prior cases was a religious institution asking not to comply with Public Health Orders that were applicable to all other business, like the Defendants here and the parties in *Reynolds, Prince* and *Smith*.

However, even if the Court were to apply strict scrutiny to the County's orders regarding face coverings and SDP, the face covering and SDP requirements did not run afoul of the Free Exercise Clause.  It is undisputed that the government interest in reducing the spread of Covid-19 is compelling, and requiring face coverings and an SDP were reasonable, unobtrusive means

---

[3] Defendants emphasize the Ninth Circuit's observation that "The Supreme Court's recent decision in *Roman Catholic Diocese of Brooklyn v. Cuomo* (2020) 141 S. Ct. 63 (per curiam) arguably represented a seismic shift in Free Exercise law, and compels the result in this case." *Calvary Chapel Dayton Valley v Sisolak* (2020) 982 F.3d 1228, 1231.  The Ninth Circuit does not explain what "seismic shift" it observed in that opinion—perhaps it referred to the application of strict scrutiny in the context of an emergency health order given its further observations in footnote 3.  However, the fact remains that, like *Roman Catholic Diocese*, the Ninth Circuit was addressing strict and unevenly applied capacity restrictions, not a more narrowly tailored, generally applicable masking requirement.

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY

of addressing that indisputable compelling government interest.[4] In fact, the United States Supreme Court recognized face coverings (and social distancing requirements) as a basic public health measure consistent with being able to conduct indoor religious worship and a "narrower option[]" than an outright ban on such gatherings. (*South Bay United Pentecostal Church v. Newsom* (2021) 592 U.S. \_\_, 141 S. Ct. 716, 718-719; see also, e.g., *Gateway City Church v. Newsom* (2021) 592 U.S. \_\_, 141 S. Ct. 1460, and *Roman Catholic Diocese of Brooklyn v. Cuomo* (2020) 592 U.S. \_\_, 141 S. Ct. 63.)

In *South Bay United Pentecostal Church v. Newsom*, which enjoined the County from enforcing a prohibition on indoor worship by order dated February 5, 2021, Justice Gorsuch's concurrence, which Justices Thomas and Alito joined, states:

> [California] insists that religious worship is so different that it demands especially onerous regulation. The State offers essentially four reasons why: (1) It says that religious exercises involve (1) large numbers of people mixing from different households; (2) in close physical proximity; (3) for extended periods; (4) with singing.

> No one before us disputes that factors like these may increase the risk of transmitting COVID-19. And no one need doubt that the State has a compelling interest in reducing that risk.

Justice Gorsuch goes on to chastise California for not considering less intrusive means—like masks and social distancing—than outright banning indoor worship:

> Nor, again, does California explain why the narrower options it thinks adequate in many secular settings—such as ***social distancing requirements, masks,*** cleaning, plexiglass barriers, and the like—cannot suffice here. Especially when those measures are in routine use in religious services across the country today. (emphasis added.)

Justice Gorsuch again raises the use of masks as a less restrictive means when fleshing out his "quibble" with the opinion regarding singing: "Once more, too, the State has not explained how a total ban on religious singing is narrowly tailored to its legitimate public health concerns. Even if a full congregation singing hymns is too risky, California does not explain

---

[4] Because the Court finds the SDP and masking requirements constitutional even if strict scrutiny applies, Defendants' arguments regarding the California Constitution are unavailing. (See Opposition, p. 11.)

25

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

why even a single *masked* cantor cannot lead worship behind a *mask* and a plexiglass shield." (emphasis added.)

At argument, Defendant urged the Court not to be persuaded by these comments from the Justices, insisting that the fact that the United States Supreme Court mentioned masks and social distancing in its prior opinions does not mean those restrictions are constitutional under the First Amendment. While it is true that the Supreme Court was there focused on the ban on indoor gatherings, the court's references to masks and social distancing as less intrusive means plainly provide guidance for potential forms of protections that might pass constitutional muster, and Defendants do not dispute that they continued to refuse to enforce masking or social distancing requirements during church activities. From Defendants' perspective *any* protections the County sought to put into place to decrease the spread of COVID-19 between May 2020 and June 2021 that were applied to Calvary's religious services and activities would be unconstitutional. That is simply not the law. As the Supreme Court explained in a related context almost 80 years ago: "The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death." *Prince v. Massachusetts* (1944) 321 U.S. 158, 166-67.

Because Plaintiffs have demonstrated that Defendants violated the Public Health Orders and thus committed a public nuisance, and Defendants have failed to demonstrate that those orders were unconstitutional, the Court finds that Plaintiffs are entitled to summary adjudication of their first and third causes of action.

### 3. The Fines Do Not Violate Due Process

Defendants assert that they received the November 9, 2020 NOV for the first time during discovery in this action and their rights were violated because it was never served on a proper party, i.e., one who was authorized to receive service on behalf of the church. The Court does not find this argument persuasive.

Plaintiffs proffer evidence demonstrating Defendants' counsel was served with the NOV only 8 days after its issuance, on November 17, and again on November 30, 2020. (See Supplemental Declaration of Jamila G. Benkato in Support of Reply ("Benkato Supp. Decl."),

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANTS' MOTION TO STAY**

1  ¶¶ 7-13, 23.)  The Due Process Clause only requires that notice be "reasonably calculated, under
2  all the circumstances, to apprise interested parties of the pendency of the action and afford them
3  an opportunity to present their objections."  (*Mullane v. Central Hanover Bank & Trust Co.*
4  (1950) 306, 314.)  The Urgency Ordinance, which is the relevant authority on this point and *not*
5  state rules for service of summons or other court filings that Defendants cite in their opposition,
6  authorized the County to serve NOVs by a variety of methods, including: personal service on a
7  Responsible Party, posting the NOV conspicuously at the property entrance, or any other
8  method "reasonably calculated to effectuate notice." (Plaintiffs' RJN, Exhibit 159, § 7(b).)  A
9  "Responsible Party" is defined to include an "agent" of the violating entity.  (*Id.*, § 2(i).)

10      Here, the evidence submitted by the County establishes that it met these requirements.
11  The November 9 NOV was conspicuously posted on the building and was also personally
12  served on an agent of the church who had apparent authority to accept service by engaging in
13  the following conduct: leading a prayer event at the church; letting people into the closed
14  church building; allowing enforcement officers into church spaces; demanding legal authority
15  for and granting permission to post notices; and verbally affirming that he had authority to
16  accept service. (Benkato Supp. Decl., Exhibit 7, ¶ 23; Exhibit 10, ¶ 22; Exhibit 12 at _035052,
17  058; and Exhibit 13 at pp. 119:23-121:9.)  Given the foregoing, the County has established that
18  it reasonably served an agent of Defendants with the November 9 NOV.

19      Defendants further insist that their due process rights were violated because the County
20  engaged in arbitrary and discriminatory enforcement of the Public Health Orders under the
21  Urgency Ordinance, but they fail to establish as much with admissible evidence. (See Opp. at p.
22  18:1-11.)  None of the NOVs Defendants cite demonstrate a deliberate singling out of the
23  recipient entity, especially where one was for another church and others were issued months
24  later under *different* protocols and the offending parties came into compliance after admitting
25  wrongdoing.  (See Benkato Supp. Decl., Exhibit 13 at pp. 128:25-130:2, 132:14-19, 139:6-16
26  and exs. 43, 57, 58; Exhibits 17 and 18.)  Further, with regard to non-commercial activities, as
27  Defendants own evidence demonstrates, the County received complaints about *both* secular and
28  religious gatherings at private homes, and thus any difference in private versus business

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY

enforcement strategies does not, by itself, show discriminatory enforcement against religious activities.   (See Declaration of Moriah Gondeiro in Support of Defendants' Opposition to Motion for Summary Adjudication, ¶ 24, Exhibit 41.)

During argument, Defendants attempted to further clarify that the *amount* they were fined as compared to other entities demonstrates an unconstitutionally arbitrary enforcement, pointing out that other entities were fined for only a few days, at most.  This argument ignores that the other entities promptly came into compliance with the rules and Defendants, through their own choices and actions, did not.

### 4. The Fines Do Not Violate the Eighth Amendment

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality." (*United States v. Bajakjian* (1998) 524 U.S. 321, 334.)   The Supreme Court sets out four considerations to determine proportionality: "(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay." (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728, citing *Bajakjian* (19524 U.S. 321, 326).   Under this analysis, the fines imposed for Defendants' repeated violations of the Public Health Orders are not unconstitutionally excessive.

First, Defendants' culpability is plain.  Defendants were on notice of their violations of the County's Public Health Orders for many months, they encouraged others to violate those orders (PSU Nos. 18-19, 29, 37, 46; Benkato Decl., Exhibit 179 at pp. 141:5-142:5.), and they refused to come into compliance even in the face of knowing that church attendees had contracted Covid-19 and displayed symptoms of the virus (PSU Nos. 47, 48), and that the Academy had to be closed because of a major outbreak among students and teachers (PSU Nos. 49-51).

The relationship between the penalty and the harm is also plain.  In all of Defendants' briefing and argument, they simply ignore that when their meetings, services and other activities ended, scores or sometimes hundreds of attendees would leave the church, fan out throughout the County and put at risk the physically vulnerable for whom contracting Covid-19 could mean

28

1  death.  It should appear clear to all—regardless of religious affiliation—that wearing a mask

2  while worshiping one's god and communing with other congregants is a simple, unobtrusive,

3  giving way to protect others while still exercising your right to religious freedom.

4  Unfortunately, Defendants repeatedly refused to model, much less, enforce this gesture.

5  Instead, they repeatedly flouted their refusal to comply with the Public Health Orders and urged

6  others to do so "who cares what the cost", including death.[5]

7          The cumulative fine amount Defendants now argue is excessive is solely the result of

8  Defendants' own egregious conduct and election to continue violating Public Health Orders

9  despite repeated efforts by the County to compel them to comply.  Defendants cannot complain

10  about the "cumulative size of the penalty" "when they had control over [the relevant time

11  period] yet allowed the penalties to accumulate."  (*City and County of San Francisco v. Sainez*

12  (2000) 77 Cal.App.4[th] 1302, 1315-1316.)

13          Third, the fines imposed by the Urgency Ordinance are in line with similar ordinances

14  enacted by other counties and with fines imposed by other County and state laws.  (See RJN,

15  Exhibit 177 at § 7.99.05(D), (F) [Marin County- fines up to $10,000 for Covid-19 violations by

16  commercial entities, including fines that double daily up to that amount]; Exhibit 178 aat §

17  VI(E) [Sonoma County- fines of $1,000 for a first violation, $5,000 for a second violation, and

18  $10,000 for each additional violation for commercial entities]; Exhibit 176 at § 8.85.050(D)(2)

19  [Napa County- fines of $5,000 for commercial activities]; Exhibit 175 at § 6 [San Mateo

20  County- fines of up to $3,000 for each violation].)  The Urgency Ordinance also comports with

21  other Santa Clara County Ordinance Code provisions that impose similar fine amounts for a

22  variety of violations.  (See, e.g., Santa Clara County Ordinance Code §§ A1-37, A1-42(b)(2)

23  [authorizing daily fines up to $5,000 for second and subsequent violations of, among other

24  things, any code provision declaring a violation to be a public nuisance].)

25

26  _____

[5] Defendants argue the County cannot point to a single case of Covid-19 that came from Defendants' activities.

27  Defendants ignore, however, that they refused to report any cases, and the easy spread and difficulty of contract tracing was part of the reasoning for the generally applicable face covering and social distancing requirements to

28  begin with.

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY

Finally, Defendants are indisputably able to pay the amounts owed; their revenues increased during the pandemic, and the Church received donations specifically for the purpose of paying the fines. (PSU No. 53.)

In their opposition, Defendants do not dispute their ability to pay the fines but instead endeavor to downplay their culpability by asserting they acted in good faith adherence with their sincerely held religious beliefs. (Opp. at p. 17:15.) But Defendants' religious beliefs did not give them carte blanche to regularly violate face covering and SDP requirements that were neutral and generally applicable to *all* comparable, regulated entities in the County, and otherwise enabled them to continue to conduct indoor religious worship as they desired. As the Supreme Court noted, such public health measures were "routine [] in religious services across the country" during the initial stages of the pandemic, and deemed permissible. (*South Bay United Pentecostal Church, supra,* 141 S. Ct. at 718-719 (Gorsuch, J., conc.).)

Although the Court finds that the fines do not violate the Eight Amendment, after careful study of the spreadsheet attached to the Benkato Declaration as Exhibit 191, the Court does find that certain of the fines should not be imposed for other reasons. First, certain of the fines related to the August 23, 2020 NOV have already been found to be unconstitutional, and the Court of Appeal therefore reversed imposition of those fines. The Court therefore finds it would be improper to impose those fines now.

Next, the Court agrees with Defendants that imposing fines for both failing to submit an SDP and to enforce mask wearing requirements is akin to fining Defendants for the same violation twice. The Court reaches this conclusion because according to Plaintiffs, the SDP required Defendants "to certify that [they] were taking protective measures including (1) training personnel about COVID-19, (2) instituting a process for reporting positive COVID-19 cases to the County, and (3) *agreeing to follow any applicable Public Health Orders, guidance or directives.*" (Plaintiff's Opening Brief, p. 8 (emphasis added), citing PRJN, Ex. 164, Cody Decl. ¶ 32.) Defendants concede they did not agree to and did not enforce the masking requirements imposed by the County. That refusal is already subsumed in the fine for refusing to submit and comply with a complete SDP, which required masking. Defendants further argue

30

1    that if any aspect of the SDP is found unconstitutional, then the entire fine for the SDP must be

2    found unconstitutional, and that the masking fine should not be imposed daily because there is

3    insufficient evidence in the record that Defendants failed to enforce masking requirements every

4    single day, since inspections were not conducted every single day.

5           While the Court agrees that the refusal to enforce masking requirements can be

6    considered covered by the refusal to submit an SDP[6] and the Court will therefore not impose

7    separate fines for those violations, the Court disagrees with Defendants that the record is

8    insufficient to demonstrate Defendants refused to comply with masking from November 9, 2020

9    through June 21, 2021.  Defendants repeatedly announced their refusal to comply with masking

10   requirements, never reported to the County that they had come into compliance with the

11   masking requirement, and to this day maintain that they were never required to comply with that

12   requirement at 'any time under any circumstances.

13          Looking only at the face covering fines from November 9, 2020 through June 21, 2021

14   (columns D and E in Exhibit 191 to the Benkato Declaration), and adding the 10% interest, the

15   Court therefore finds the appropriate fine total to be $1,228,700.

16          Plaintiffs' motion for summary adjudication is accordingly GRANTED.[7]

18   **IT IS SO ORDERED.**

21   Date: _April 7, 2023_

                                    _____
22
                                    The Honorable Evette D. Pennypacker
23                                  Judge of the Superior Court

---

27   [6] The Court need not address Defendants' other arguments regarding the SDP both because the Court is not
     imposing the fine for failure to submit an SDP and because Defendants have not individually challenged the
28   various aspects of the SDP requirements.
     [7] Defendants' Renewed Motion for Stay is denied.  Most of the federal court action was dismissed and the rest
     stayed by an order in the federal action dated March 10, 2023, rendering Defendants' motion moot.

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING
DEFENDANTS' MOTION TO STAY**



**SUPERIOR COURT OF CALIFORNIA**
**COUNTY OF SANTA CLARA**
DOWNTOWN COURTHOUSE
191 NORTH FIRST STREET
SAN JOSÉ, CALIFORNIA 95113
CIVIL DIVISION



FILED
APR 0 7 2023
Clerk of the Court
Superior Court of CA County of Santa Clara
BY _____ D. CRISWELL _____ DEPUTY

RE:     **THE PEOPLE OF THE STATE OF CALIFORNIA et al vs CALVARY CHAPEL SAN JOSE et al**

Case Number:    **20CV372285**

### PROOF OF SERVICE

**ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION; DENYING DEFENDANT'S MOTION TO STAY** was delivered to the parties listed below the above entitled case as set forth in the sworn declaration below.

---

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line (408) 882-2690 or the Voice/TDD California Relay Service (800) 735-2922.

**DECLARATION OF SERVICE BY MAIL:** I declare that I served this notice by enclosing a true copy in a sealed envelope, addressed to each person whose name is shown below, and by depositing the envelope with postage fully prepaid, in the United States Mail at San Jose, CA on April 07, 2023. CLERK OF THE COURT, by David Criswell, Deputy.

cc:    Robert Henry Tyler  Advocates for FAith & Freedom  25026 Las Brisas Rd  Murrieta CA  92562
      Jamila G Benkato  Office of the County Counsel  70 W Hedding Street  East Wing 9th Floor  San Jose CA  95110-1770

# EXHIBIT 3

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

CALVARY CHAPEL SAN JOSE, et al.,

               Plaintiffs,

      v.

SARA CODY, et al.,

               Defendants.

Case No. 20-cv-03794-BLF

**ORDER GRANTING MOTION TO DISMISS AND STAY UNDER *YOUNGER* ABSTENTION DOCTRINE**

[Re: ECF No. 224]

In this case, Plaintiffs Calvary Chapel San Jose and its Pastor Mike McClure (together "Calvary") challenge Defendant the County of Santa Clara's enforcement of public health orders related to the COVID-19 pandemic. Calvary asks this Court to find that the public health orders violate its civil rights and that fines predicated on the orders that the County seeks to collect in a proceeding in state court are unlawful.

Before the Court is the County's motion to dismiss and stay Calvary's claims under the *Younger* abstention doctrine. *See* Mot., ECF No. 224; Reply ECF No. 242. Calvary opposes the motion. Opp'n, ECF No. 234. The Court heard oral argument on the motion on January 26, 2023. ECF No. 269. For the reasons discussed below and during oral argument, the County's motion to dismiss and stay is GRANTED.

## I. BACKGROUND

Calvary brought this action on June 9, 2020, against Santa Clara County's Public Health Officer and members of Santa Clara County's Board of Supervisors. Compl., ECF No. 1. The complaint asserted causes of action under the federal and California constitutions and sought to enjoin enforcement of certain public health orders related to COVID-19. *Id.* The County moved to dismiss the Complaint on July 20, 2020. *See* ECF No. 20.

United States District Court
Northern District of California

1    On October 27, 2020, the County and its Public Health Officer filed a complaint in Santa

2   Clara County Superior Court.  *See* Request for Judicial Notice ("RJN") Ex. A, ECF No. 242-1.

3   The County sought to enjoin Calvary from violating public health orders.  *Id.*  At the time, no

4   matters had come before the Court.  Pending matters were scheduled for hearing in November

5   2020.

6    This Court heard argument on the County's motion to dismiss on November 5, 2020.  *See*

7   ECF No. 32.  The Court granted the motion to dismiss that day in a four-page order.  ECF No. 30.

8   Calvary filed an amended complaint about three weeks later.  Am. Compl., ECF No. 38.  The

9   complaint added several causes of action, including a claim under the Bane Act, for which Calvary

10   sought penalties.  *Id.* at p.35.

11    Shortly after filing its amended complaint, Calvary applied for a temporary restraining

12   order.  *Ex Parte* Appl. for TRO ("TRO Appl."), ECF No. 42.  Calvary asked this Court to enjoin

13   enforcement of a preliminary injunction issued by the Santa Clara Superior Court that "allow[ed]

14   enforcement officers to ensure compliance with State and County public health orders."  *Id.* at 3,

15   14.  This Court denied Calvary's application, "find[ing] it inappropriate to interfere with the Santa

16   Clara County Superior Court proceedings" and indicating that *Younger* abstention would preclude

17   federal court involvement.  Order Deny. Appl. For TRO 1, ECF No. 67.  The County did not

18   affirmatively seek an order on *Younger* abstention at that time.

19    This Court held an initial case management conference on January 21, 2021.  ECF No. 71.

20   On March 4, 2021, the Court permitted Calvary to file a second amended complaint pursuant to a

21   stipulation by the parties.  *See* ECF Nos. 80, 81.  Two months later, the parties stipulated to permit

22   Calvary to file a third amended complaint.  *See* ECF Nos. 87, 88.  Shortly thereafter, this Court

23   stayed discovery until 10 days after the filing of Calvary's third amended complaint noting that

24   "[i]t is not reasonable to require Defendants to respond to discovery without knowing the

25   boundaries of the claims against them."  ECF No. 97.

26    In July 2021, the County amended its complaint in the state court action seeking to collect

27   fines for violations of the public health orders.  *See* 1st Am. Compl. for Inj. Relief and to Recover

28   Admin. Fines, *California v. Calvary Chapel San Jose*, No. 20CV372285 (July 29, 2021).

On September 30, 2021, Calvary filed its third amended complaint. Third Am. Compl., ECF No. 116. The complaint again challenged the constitutionality of the public health orders and included a claim under the Bane Act. *Id.* The County filed a motion to dismiss the complaint, which the Court granted in part and denied in part. *See* ECF Nos. 135, 156.

Calvary subsequently filed a fourth amended complaint. 4th Am. Compl. ("4AC"), ECF No. 167. The County again filed a motion to dismiss. ECF No. 179. The Court granted in part and denied in part the County's motion. ECF No. 222. In its order, the Court granted the County's motion to dismiss Calvary's Bane Act claim without leave to amend. *See id.* at 14.

The County filed the present motion to dismiss five days after the Court dismissed Calvary's Bane Act claim. *See* Mot. Shortly thereafter, the County filed its answer to the fourth amended complaint. *See* ECF No. 229.

## II.    JUDICIAL NOTICE

The County requests the Court judicially notice 11 documents filed in the Santa Clara Superior Court in *The People of the State of California v. Calvary Chapel San Jose*, No. 20CV372285 and 4 documents filed in California Court of Appeal in *Calvary Chapel San Jose v. The People of the State of California*, No. H048708. *See* Request for Judicial Notice ("RJN"), ECF No. 242-1.

The documents filed in Santa Clara Superior Court are: (1) Complaint for Injunctive Relief, RJN Ex. A; (2) Opposition to Motion for Preliminary Injunction, RJN Ex. B; (3) Memorandum of Points and Authorities in Opposition to Plaintiff's Request for Contempt and/or Sanctions, RJN Ex. C; (4) Motion for Reconsideration of the Court's Order Granting the Preliminary Injunction, or, in the Alternative, Motion to Dissolve the Preliminary Injunction and Vacate the Contempt Proceedings, RJN Ex. D; (5) Memorandum of Points and Authorities in Opposition to Plaintiffs' Ex Parte Application for Order to Show Cause re: Contempt and/or Sanctions, RJN Ex. E; (6) Defendants Calvary Chapel San Jose and Mike McClure's Closing Argument, RJN Ex. F; (7) Memorandum of Points and Authorities in Support of Defendants' Motion to Dissolve the Preliminary Injunction, RJN Ex. G; (8) Defendants' Notice of Demurrer and Demurrer to the First Amended Complaint, RJN Ex. H; (9) Defendants' Reply in Support of

United States District Court
Northern District of California

1  Motion to Dissolve the Preliminary Injunction, RJN Ex. I; (10) Defendants' Reply in Support of

2  Demurrer to First Amended Complaint, RJN Ex. J; and (11) Defendants' Answer to the First

3  Amended Complaint for Injunctive Relief and to Recover Administrative Fines, RJN Ex. K.

4       The documents filed in the California Court of Appeal are: (1) Verified Petition for

5  Immediate Review, RJN Ex. L; (2) Reply in Support of Petition for Immediate Review, RJN Ex.

6  M; (3) Appellants' Opening Brief, RJN Ex. N; and (4) Reply in Support of Appellants' Opening

7  Brief, RJN Ex. O.

8       Courts may properly take judicial notice of other court filings and matters of public record.

9  *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (citing *Burbank-*

10  *Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998)).

11  Calvary has neither opposed the request for judicial notice nor disputed the authenticity of the

12  documents.  The Court GRANTS the request for judicial notice.

13       The Court also takes judicial notice of the First Amended Complaint for Injunctive Relief

14  and to Recover Administrative Fines filed in *The People of the State of California v. Calvary*

15  *Chapel San Jose*, No. 20CV372285, on July 29, 2021 ("State Court FAC").  *See* Fed. R. Evid.

16  201(c)(1) ("The court . . . may take judicial notice on its own"); *Ray v. Lara*, 31 F.4th 692, 697

17  (9th Cir. 2022) ("Although neither party requested judicial notice of the complaint in [another

18  case], this court may take judicial notice on its own." (internal quotations omitted)).

19  **III.  LEGAL STANDARD**

20       The parties dispute whether the County's motion is procedurally proper.  The County

21  contends that it properly brings its motion under Federal Rule of Civil Procedure 12(h)(3), which

22  requires that a court dismiss an action over which it lacks subject matter jurisdiction.  Mot. 2.  The

23  County further contends that the motion would also be proper under Rule 12(b)(1).  *Id.*  Calvary

24  responds that the County's motion is improper because *Younger* is not jurisdictional.  Opp'n 2-4.

25  Calvary contends that the County's motion should have been brought as "a motion for abstention"

26  or a motion under Rule 12(b)(6).  The County replies that the Ninth Circuit has considered such

27  motions under Rule 12(b)(1), 12(b)(6), or as a freestanding "motion for abstention."  Reply 1.  The

28  County further replies that the procedural vehicle argument is immaterial, as the pleadings closed

United States District Court
Northern District of California

1   shortly after they filed their motion, and the motion can therefore be treated as a motion for

2   judgment on the pleadings under Rule 12(c).  *Id.* at 2.

3           The Court agrees that the County's motion can be treated as a motion for judgment on the

4   pleadings under Federal Rule of Civil Procedure 12(c) now that the pleadings are closed.

5   Accordingly, the Court will interpret the County's motion as a motion brought under Rule 12(c)

6   and finds that *Younger* abstention may be raised in such a motion.  *See, e.g.*, *Saraswati v. Cnty. of*

7   *San Diego*, No. 07CV1415 WQH POR, 2010 WL 4569888, at *2 (S.D. Cal. Nov. 4, 2010)

8   ("*Younger* abstention is properly raised in a motion for judgment on the pleadings pursuant

9   to Rule 12(c)." (citing *San Jose Silicon Valley Chamber of Commerce Political Action Comm. v.*

10  *City of San Jose,* 546 F.3d 1087, 1089 (9th Cir.2008)).

11          Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but

12  early enough not to delay trial—a party may move for judgment on the pleadings."  A Rule 12(c)

13  motion is "functionally identical" to a Rule 12(b)(6) motion, and the same legal standard applies

14  to both.  *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir.

15  2011).  Thus, when considering a Rule 12(c) motion, a district court "must accept the facts as pled

16  by the nonmovant."  *Id.* at 1053.  The district court then must apply the *Iqbal* standard to

17  determine "whether the complaint's factual allegations, together with all reasonable inferences,

18  state a plausible claim for relief."  *Cafasso*, 637 F.3d at 1054 & n.4 (citing *Ashcroft v. Iqbal*, 556

19  U.S. 662 (2009)).

20          "When considering a judgment on the pleadings, a court should not blindly accept the

21  allegations in the pleadings as true if these allegations are contradicted by uncontested facts set

22  forth in (1) exhibits to the nonmoving party's pleading, (2) documents that are referred to in the

23  non-moving party's pleading, or (3) facts that are included in materials that can be judicially

24  noticed."  *Yang v. Dar Al-Handash Consultants*, 250 F. App'x 771, 772 (9th Cir. 2007).

25  **IV.    DISCUSSION**

26          The County seeks *Younger* abstention, asserting that a ruling by this Court on Calvary's

27  federal claims would interfere with state proceedings.  Mot. 1.  The Court is mindful that its

28  "obligation to hear and decide a case is 'virtually unflagging.'"  *Sprint Comm'ns, Inc. v. Jacobs*,

5

United States District Court
Northern District of California

571 U.S. 69, 77 (2013) (citing *Colorado River Water Conservation Distr. v. United States*, 424 U.S. 800, 871 (1976)).  An exception to this general rule is the doctrine of abstention, which involves a "decision by a federal court to decline to exercise jurisdiction over the underlying claims for reasons of comity."  *Washington v. Los Angeles Cty. Sheriff's Dep't*, 833 F.3d 1048, 1058 (9th Cir. 2016) (citations omitted).  *Younger* and its progeny "espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances."  *Middlesex Cnty. Ethics Comm. v. Garden State Bar Assoc.*, 457 U.S. 423, 431 (1982); *Younger v. Harris*, 401 U.S. 37 (1971).  The Supreme Court has "identified two sources for this policy: the constraints of equity jurisdiction and the concern for comity in our federal system." *Gilbertson v. Albright*, 381 F.3d 965, 970 (9th Cir. 2004).  "*Younger* abstention permits federal courts to preserve respect for state functions such that the national government protects federal rights and interests in a way that will not unduly interfere with the legitimate activities of the States." *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019) (internal quotations omitted).  "*Younger* abstention is a jurisprudential rather than a jurisdictional question." *Kleenwell Biohazard Waste & Gen. Ecology Consultants, Inc. v. Nelson*, 48 F.3d 391, 394 n.3 (9th Cir. 1995).

### A. Younger Abstention

A federal court may abstain under *Younger* in three categories of cases: "(1) parallel, pending state criminal proceedings, (2) state civil proceedings that are akin to criminal prosecutions, and (3) state civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts."  *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014) (internal quotation marks and citations omitted).  First identified in *New Orleans Public Service, Inc. v. Council of New Orleans* ("*NOPSI*"), 491 U.S. 350 (1989), these three categories are known as the *NOPSI* categories. *See Sprint*, 571 U.S. at 72-73..

To warrant *Younger* abstention, a state civil action must fall into one of the *NOPSI* categories and must also satisfy three "*Middlesex* factors": the state proceedings must (1) be "ongoing," (2) "implicate important state interests," and (3) provide "an adequate opportunity . . . to raise constitutional challenges."  *Herrera*, 918 F.3d at 1044 (quoting *Middlesex*, 457 U.S. at

432).  If the state proceedings fall into one of the *NOPSI* categories and meet the three *Middlesex* factors, a federal court may abstain under *Younger* so long as "the federal action would have the practical effect of enjoining the state proceedings."[1]  *Id.* quoting (*ReadyLink*, 754 F.3d at 759).

Even if all the requirements for *Younger* abstention have been met, a federal court may reject abstention upon a showing of "bad faith, harassment, or any other unusual circumstance that would call for equitable relief."  *See Younger*, 401 U.S. at 45.  "A plaintiff who seeks to head off *Younger* abstention bears the burden of establishing that one of the exceptions applies."  *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citations omitted).

Calvary argues that the County has not met the *Middlesex* factors and it has waived *Younger* abstention.

### 1. *NOPSI* Categories

The County's suit in state court is a nuisance action to enjoin Calvary's violations of state and county public health orders.  RJN Ex. A; State Court FAC.  The County contends and Calvary does not dispute that the proceeding falls within the third *NOPSI* category because it is a civil enforcement proceeding.  Mot. 4.  And the Ninth Circuit has recognized that such nuisance actions to enforce state and local laws fall within the third *NOPSI* category.  *See Herrera*, 918 F.3d at 1045.  Accordingly, the Court finds that the state proceeding falls within the third *NOPSI* category.  The Court therefore proceeds to analyze whether the state proceeding satisfies the *Middlesex* factors.

### 2. *Middlesex* Factors

As noted above, to warrant *Younger* abstention, a state civil action must satisfy three "*Middlesex* factors": the state proceedings must (1) be "ongoing," (2) "implicate important state interests," and (3) provide "an adequate opportunity . . . to raise constitutional challenges."  *Herrera*, 918 F.3d at 1044 (quoting *Middlesex*, 457 U.S. at 432).

---

[1] The Ninth Circuit has also referred to the three *Middlesex* factors and the requirement that the federal action have the practical effect of enjoining the state court proceedings together as "*Younger* factors."  *See Credit One Bank, N.A. v. Hestrin*, No. 21-56271, 60 F.4th 1260, 2023 WL 2213469, at *3 (9th Cir. Feb. 27, 2023).

United States District Court
Northern District of California

United States District Court
Northern District of California

a. **State Proceedings are Ongoing**

"State proceedings are ongoing for the purposes of *Younger* abstention if they are initiated before any proceedings of substance on the merits have taken place in the federal court. Put another way, the commencement of state proceedings only ceases to require federal abstention after the federal court proceedings have moved beyond an embryonic stage." *Credit One Bank, N.A. v. Hestrin*, 60 F.4th 1260, 2023 WL 2213469, at *4 (9th Cir. Feb. 27, 2023) (citations and internal quotations marks omitted).

The County argues that the state proceedings are considered "ongoing" for *Younger* purposes because County filed its enforcement action in state court before any proceedings of substance on the merits had taken place in this Court. Mot. 5. The County notes that when it filed its complaint in state court, this Court had not yet held a hearing or case management conference. Reply 5. Calvary argues that this factor is not satisfied because this Court has now heard multiple motions to dismiss and motions to stay, the parties have "finalized fact discovery," and the parties have conducted a settlement conference. Opp'n 8.

This factor of the *Younger* analysis looks to the extent to which a federal court has considered the merits of a case before the state proceeding was initiated. *See Credit One*, 2023 WL 2213469, at *4. For example, in *Credit One*, the court held that the state action was "ongoing" where, at the time the state action was filed, the federal docket contained only 25 entries and the only significant proceeding that had occurred in the federal court was the denial of a motion to dismiss that only briefly touched on the merits of the case. *Id.* at *4-5. Conversely, in *Hoye v. City of Oakland*, the court held that the state court proceeding was not "ongoing" where it was filed after the federal court had denied a motion for a temporary restraining order and held four status conferences and hearings. 653 F.3d 835, 844 (9th Cir. 2011). Likewise in *Nationwide Biweekly Administration, Inc. v. Owen*, the court held that the state action was not "ongoing" where it was filed after "the district court spent a substantial amount of time evaluating the merits of the cases in considering and denying (in a detailed and reasoned order) Nationwide's motions for preliminary injunctions." 873 F.3d 716, 729 (9th Cir. 2017).

The Court finds the state court proceeding here is "ongoing" for *Younger* purposes because

the federal court had not considered the merits of the case at all before the state court proceeding was initiated. At the time the state court case was filed, the docket in this federal action contained only 23 entries. Most were routine administrative entries common in all federal cases: the complaint, summonses, clerk's entries, a motion to dismiss, and a clerk's entry setting a scheduling conference. The motion had not yet been heard by the Court. Nor had the Court held any other hearing or issued a substantive ruling on any issue in the case. This Court had done even less on the case before the state court case was filed than the court in *Credit One*, which had ruled on a motion to dismiss and at least briefly considered the merits of the case. *See Credit One*, 2023 WL 2213469, at *4. Therefore, just as the state court proceedings were ongoing for *Younger* purposes in *Credit One*, they are "ongoing" for *Younger* purposes here.

Calvary asks this Court to look to the current status of the federal proceeding, rather than the status when the state court case was filed, to determine whether any proceedings of substance of the merits have taken place. But the cases upon which Calvary relies do not support this standard. *See Hoye*, 653 F.3d at 844 (analyzing status of federal proceedings as of date state case was filed); *Nationwide*, 873 F.3d at 730 (same). Accordingly, the Court declines consider proceedings that occurred in this Court after initiation of the state court proceeding in its analysis of this *Middlesex* factor.

Calvary also notes that the County sought injunctive relief in its original complaint in state court "but did not seek to collect fines from Plaintiffs until July 2021." Opp'n 9. In its briefing, Calvary made no attempt to explain the import of this point. At oral argument, however, Calvary argued that the Court should make this assessment as of the date of the amended complaint. Calvary has not identified, and the Court is not aware of, any case in which a court has taken the approach Calvary endorses. Calvary's contention is contrary to longstanding Ninth Circuit precedent which requires this analysis to be made as of the filing of the state proceedings. *See Credit One*, 2023 WL 2213469, at *4; *Nationwide*, 873 F.3d at 728 ("State proceedings are 'ongoing' if they are initiated 'before any proceedings of substance on the merits have taken place in the federal court.'" (quoting *Hicks v. Miranda*, 422 U.S. 332, 349 (1975)).

United States District Court
Northern District of California

1   As the state court action was initiated before any proceedings of substance on the merits have

2   taken place in this Court, the Court finds that the state proceeding was ongoing and the first

3   *Middlesex* factor is satisfied.

### b. State Proceedings Implicate Important State Interests

5   The second *Middlesex* factor requires that the state proceedings implicate important state

6   interests. *Herrera*, 918 F.3d at 1044. The *Younger* doctrine recognizes that a state's ability to

7   enforce its laws "'against socially harmful conduct that the State believes in good faith to be

8   punishable under its laws and Constitution'" is a "basic state function" with which federal courts

9   should not interfere. *Miofsky v. Superior Court of the State of Cal., In and For Sacramento Cnty.*,

10  703 F.2d 332, 336 (9th Cir. 1983) (quoting *Younger*, 401 U.S. at 51-52). "Where the state is in an

11  enforcement posture in the state proceedings, the 'important state interest' requirement is easily

12  satisfied, as the state's vital interest in carrying out its executive functions is presumptively at

13  stake." *Potrero Hills Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 884 (9th Cir. 2011) (citing

14  *Fresh Int'l Corp. v. Agric. Labor Rels. Bd.*, 805 F.2d 1353, 1360 n.8 (9th Cir. 1986)).

15  The County argues that the state court action implicates important state interests because it

16  seeks to enforce public health orders that were issued to slow the spread of COVID-19. Mot. 6.

17  Calvary concedes that the County has an interest in enforcing health and safety orders but argues

18  that "[the County's] interest in protecting the public from COVID-19 is now a moot issue."

19  Opp'n 9. Calvary also argues that "the County does not have a legitimate interest in collecting

20  unconstitutional fines predicated upon unconstitutional public health orders." *Id.* Finally, Calvary

21  argues that the abstention is inappropriate in cases involving facial challenges based on the First

22  Amendment. *Id.* at 10.

23  The Court finds that the state enforcement action here implicates important state interests.

24  The Ninth Circuit has held that state actions seeking to enforce health and safety provisions and to

25  abate public nuisances implicate important state interests and thus satisfy the second *Middlesex*

26  factor. *See Herrera*, 918 F.3d at 1045 (citing *Woodfeathers, Inc. v. Washington Cnty., Or.*, 180

27  F.3d 1017, 1021 (9th Cir. 1999), and *Potrero Hills Landfill*, 657 F.3d at 884). The state court

28  action here is such a proceeding. This is evident from the face of the complaint, which asserts

United States District Court
Northern District of California

1  causes of action for public nuisance and violation of public health orders.  *See* RJN Ex A, ¶¶ 75-

2  87; State Court FAC.

3        Calvary concedes that "the County does have an interest in enforcing health and safety

4  provisions."  Opp'n 9.  Calvary nevertheless argues that the action does not implicate important

5  state interests because the County "now primarily seeks to collect . . . fines from Plaintiffs."  *Id.*

6  The Ninth Circuit "ha[s] been clear that '[w]here the state is in an enforcement posture in the state

7  proceedings, the 'important state interest' requirement is easily satisfied.'"  *Credit One*, 2023 WL

8  2213469, at *10 (quoting *Landfill, Inc. v. Cnty. of Solano*, 657 F.3d 876, 883-84 (9th Cir. 2011)).

9  Here, the County is seeking to enforce public health orders in the state proceeding and is thus in an

10  "enforcement posture."  This is true whether the County seeks this enforcement through an

11  injunction or through fines.  Accordingly, the "important state interest" requirement is "easily

12  satisfied."  *See id.*

13        Calvary also argues that the action here does not implicate important state interests because

14  "the County does not have a legitimate interest in collecting unconstitutional fines predicated on

15  unconstitutional public health orders."  Opp'n 9.  But Calvary's premise is flawed, as the fines are

16  predicated on multiple public health orders that have not been found unconstitutional by any court.

17  Calvary may prove correct that the orders are unconstitutional, but the Court cannot assume that

18  outcome at this stage in the analysis.  *Cf. Hicks v. Miranda*, 422 U.S. 332, 352 (1975) (reversing

19  district court for not dismissing a under *Younger* and noting that "it seems to us that the District

20  Court's judgment rests almost entirely on its conclusion that the California obscenity statute was

21  unconstitutional and unenforceable. But even assuming that the District Court was correct in its

22  conclusion, the statute had not been so condemned in November 1973.")

23        Finally, Calvary asserts that "[t]he Supreme Court and Ninth Circuit have refrained from

24  abstaining in cases involving facial challenges based on the First Amendment."  Opp at 10.  But

25  *Younger* itself belies this argument, as *Younger* involved a facial First Amendment challenge and

26  the Supreme Court held that the federal court should have abstained.  *See Younger,* 401 U.S. at 38-

27  39, 54.  Indeed, clarifying the primary case upon which Calvary relies, the Supreme Court in

28  *Younger* explained, "We do not think [*Dombrowski v. Pfister*, 380 U.S. 479 (1965),] stands for the

United States District Court
Northern District of California

proposition that a federal court can properly enjoin enforcement of a statute solely on the basis of a showing that the statute 'on its face' abridges First Amendment rights." *Id.* at 53.  Rather, federal intervention requires some additional showing of "bad faith, harassment, or any other unusual circumstance that would call for equitable relief." *Id.* at 54.[2]

In view of the foregoing analysis, the Court finds that the state proceeding implicates the important state interest of enforcing public health orders and therefore satisfies the second *Middlesex* factor.

### c. State Proceedings Provide Adequate Opportunity to Raise Constitutional Challenges

The inquiry under the third *Middlesex* factor is whether the state proceeding will provide plaintiffs a sufficient forum for raising their federal constitutional challenges.  *Younger* abstention reflects a general sense of respect for the integrity of state proceedings, and a presumption "that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 15 (1987).  Thus, "[w]here vital state interests are involved, a federal court should abstain 'unless state law clearly bars the interposition of the constitutional claims.'" *Lebbos v. Judges of Superior Court, Santa Clara Cnty.*, 883 F.2d 810, 815 (9th Cir. 1989) (quoting Middlesex, 457 U.S. at 432).  This factor "does not turn on whether the federal plaintiff actually avails himself of the opportunity to present federal constitutional claims in the state proceeding, but rather whether such an opportunity exists." *Herrera*, 918 F.3d at 1046; *Canatella v. California*, 404 F.3d 1106, 1111 (9th Cir. 2005).  "[T]he burden on this point rests on the federal plaintiff to show 'that state procedural law barred presentation of [its] claims.'" *Herrera*, 918 F.3d at 1037 (quoting *Pennzoil*, 481 U.S. at 14).

The County argues that this factor is met here because Calvary has had an opportunity to raise its federal constitutional challenges in the state proceedings and has, in fact, done so.  Mot. 6; Reply 8.  Calvary responds that the state court is set to hear a summary judgment motion filed by

---

[2] Calvary also relies on *Playtime Theaters, Inc. v. City of Renton*, 748 F.2d 527 (9th Cir. 1984).  That opinion stated that "*Pullman* abstention would almost never be appropriate in first amendment cases."  *Playtime Theaters*, 748 F.2d at 532.  It notably did not invoke the First Amendment as a reason to avoid *Younger* abstention.  *Id.* at 533.

United States District Court
Northern District of California

1    the County and Calvary "does not have an adequate opportunity to file a cross-complaint in state

2    court and reach a decision on the merits before the state court rules on the County's motion."

3    Opp'n 10-11.

4         The Court finds this *Middlesex* factor satisfied.  Calvary has the burden of showing that

5    state procedural law barred presentation of its claims, *Herrera*, 918 F.3d at 1037, and it has made

6    no such showing.  Indeed, it appears that Calvary has presented its constitutional defenses

7    throughout the state court proceedings.  *See* RJN Ex. B, at 7-8; RJN Ex. C, at 1, 5-10; RJN Ex. D,

8    at 1-2, 5-11; RJN Ex. E, at 1, 6-12; RJN Ex. F, at 1-4, 6-7; RJN Ex. G, at 1, 4-10; RJN, Ex. H, at

9    1, 3-12; RJN Ex. I, at 1-7; RJN Ex. J, at 1-7; RJN Ex. K, at 3; RJN Ex. L, at 7-8; RJN Ex. M, at 5-

10   14; RJN Ex. N, at 5, 13-18; RJN Ex. O, at 4-11.  On this record, the Court cannot say that Calvary

11   was barred from presenting its claims.  *See Woodfeathers*, 180 F.3d at 1020 ("State courts are

12   presumed adequate to raise federal questions in the absence of unambiguous authority to the

13   contrary." (internal quotation marks and citation omitted)).

14        The Court finds unconvincing Calvary's argument that it "do[es] not have an adequate

15   opportunity to file a cross-complaint in state court and reach a decision on the merits before the

16   state court rules on the County's [pending motion for summary judgment]."  Opp'n 10-11.

17   Calvary cites no authority for the proposition that it must be able to present its constitutional

18   arguments as claims in a cross-complaint rather than raise them as defenses as it did here.  Even if

19   Calvary were right that this requirement exists, Calvary's argument would fail because Calvary

20   has made no effort to show that it was barred from filing such a cross-complaint.  *See, e.g.*,

21   *Herrera*, 918 F.3d at 1037 ("A federal court's exercise of *Younger* abstention does not turn on

22   whether the federal plaintiff actually avails himself of the opportunity to present federal

23   constitutional claims in the state proceeding, but rather whether such an opportunity exists."); *see*

24   *also Gilbertson v. Albright*, 381 F.3d 965, 983 (9th Cir. 2004) ("Although Gilbertson could have

25   presented all of his constitutional claims in the state proceeding, he chose not to do so. However,

26   failure to avail himself of the opportunity does not mean that the state procedures are

27   inadequate.) (citing *Juidice v. Vail*, 430 U.S. 327, 337 (1977)).

28        The Court finds that Calvary has not shown that state procedural law barred or bars

                                            13

1  presentation of its claims and therefore finds that the state proceeding satisfies the third *Middlesex*

2  factor.

3                                    *       *       *

4       The Court finds that the state proceeding satisfies the three *Middlesex* factors.  The Court

5  therefore proceeds to analyze whether the federal action would have the practical effect of

6  enjoining the state proceedings.

7            **3.  Effect of Relief on Ongoing State Action**

8       The final *Younger* factor requires that "the requested relief seeks to enjoin or has the

9  practical effect of enjoining the ongoing state judicial proceeding."  *Credit One*, 2023 WL

10  2213469, at *3.  Under Ninth Circuit case law, "'direct interference' is not required as a

11  precondition for *Younger* abstention."  *Gilbertson*, 381 F.3d at 978.

12       The County argues that each form of relief Calvary requests—injunctive, declaratory, and

13  monetary—would have the practical effect of enjoining the state proceeding.  Mot. 7-9.  Calvary

14  argues that adjudicating its claims in this Court would not enjoin the state court proceedings

15  because it does not "ask the Court to enjoin the state court proceedings" and "the County would

16  simply be bound by the rulings of this Court under issue and claim preclusion."  Opp'n 11.

17       The Ninth Circuit's decision in *Herrera v. City of Palmdale*, 918 F.3d 1037 (9th Cir.

18  2019), is instructive.  In *Herrera*, the City of Palmdale brought a nuisance suit against a motel

19  owner in state court.  *Herrera*, 918 F.3d at 1041.  The City sought a declaration that the motel is a

20  public nuisance, appointment of a receiver to take possession and control of the property, and

21  injunctive relief prohibiting the motel owner from maintaining public nuisances and requiring the

22  motel owner to abate its violations of the law.  *Id.* at 1041-42.  The motel owner sued the city in

23  federal court under § 1983 alleging numerous federal constitutional violations and violation of the

24  Fair Housing Act.  *Id.* at 1041.  The motel owner sought injunctive, declaratory, and monetary

25  relief.  *Id.*  The Ninth Circuit analyzed each form of relief in turn.  *Id.* at 1048-49.

26       Addressing the request for injunctive relief, the court explained that "[c]ertainly, the [motel

27  owner's] request that the Court enjoin the City from closing the motel and evicting the [owner]

28  would enjoin directly the state action."  *Id.* at 1048.  Turning to the declaratory relief, the court

United States District Court
Northern District of California

14

1   held that abstention was also appropriate because it would have the same practical effect as

2   injunctive relief on a pending state proceeding as a result of the preclusive effect of the federal

3   Court judgment. *Id.* Finally, addressing the request for monetary relief, the Court determined that

4   relief on certain of the claims would create a federal court judgment with preclusive effect over the

5   ongoing state action. *Id.* The court provided the example of a determination by the federal court

6   that the state action constituted an unconstitutional taking. *Id.* The court explained that "[p]lainly,

7   such determination that the state proceeding itself is unconstitutional would interfere with the

8   ongoing enforcement action in the same way as a declaratory judgment by the federal court." *Id.*

9   The court concluded, therefore, that *Younger* abstention was also appropriate to these claims. *Id.*

10  at 1048-49.

11  The Court finds that the injunctive, declaratory, and monetary relief Calvary seeks here,

12  like the relief sought in *Herrera*, would enjoin or have the practical effect of enjoining the state

13  proceeding. As to injunctive relief, Calvary's complaint "seeks to enjoin enforcement of the

14  fines." 4th Am. Compl. ("4AC") ¶¶ 104, 109, 119, 125, 132, 136, ECF No. 167. Calvary thus

15  asks this Court to enjoin the very relief the County seeks in state court to enforce the public health

16  orders. *See* Opp'n 9; State Court FAC, at p.38. Abstention is therefore appropriate because

17  granting the relief Calvary requests would "enjoin directly the state action." *See Herrera*, 918

18  F.3d at 1048.

19  Abstention is also appropriate as to Calvary's request for declaratory relief because

20  granting the relief would have the practical effect of enjoining the state proceeding. Calvary's

21  complaint requests a judicial declaration that the public health orders upon which the fines were

22  predicated are unconstitutional. 4AC ¶¶ 104, 109, 119, 125, 132, 136. As Calvary's complaint

23  concedes, "[s]uch a determination will resolve the constitutionality of the fines levied against the

24  Plaintiffs." *See id.* Thus, a determination in this Court on the constitutionality of the public health

25  orders would preclude the state court from making such a determination and would have the

26  practical effect of enjoining it from ruling on the County's request for fines. Abstention is

27  therefore appropriate because the declaratory relief Calvary requests would "have the same

28  practical impact as injunctive relief on [the] pending state proceeding as a result of the preclusive

United States District Court
Northern District of California

15

effect of [this Court's] judgment." *See Herrera*, 918 F.3d at 1048.

Abstention is appropriate as to Calvary's request for nominal damages for the same reason. Calvary seeks nominal damages for each alleged violation of its civil rights.  4AC ¶¶ 104, 109, 119, 125, 132, 136.  To grant this relief, this Court would first have to determine whether the County violated Calvary's civil rights through its attempts to enforce the public health orders— including through its attempts to collect fines in state court.  Such a determination "would create a federal court judgment with preclusive effect over the ongoing state action."  *See Herrera*, 918 F.3d at 1048.  *Younger* abstention is therefore appropriate here because success by Calvary on its claims for nominal damages "would invalidate the [state] enforcement proceeding."  *See id.* at 1048-49.

Neither of the two cases on which Calvary relies undermines the conclusion that *Younger* abstention is appropriate here.  In the first, *AmerisourceBergen Corp. v. Roden*, the Ninth Circuit held abstention was not appropriate because there was only a "potential conflict" with ongoing state court proceedings.  495 F.3d 1143, 1151 (9th Cir. 2007).  There, a former employee sued his employer in state court for breach of contract related to his termination.  *Id.* at 1145.  While the state court proceeding was ongoing, the employer filed an action in federal court seeking a judgment that the employee breached his contract with the employer by failing to repay a loan.  *Id.* at 1146.  The district court abstained under *Younger*, but the Ninth Circuit reversed.  *Id.* at 1147. The Ninth Circuit held that the employer's claim did not have the practical effect of enjoining the state court proceedings because the employee had not disputed his obligation to repay the loan in state court and the employer had not attempted to enforce its right to receive repayment in state court.  *Id.* at 1151.  Thus, there was only a "potential conflict" because a decision from the federal court would not dictate the outcome of any issue pending before the state court.  Here, however, this Court is being asked to determine the constitutionality of the fines the County seeks to collect in the state court proceeding.  *See* 4AC ¶¶ 104, 109, 119, 125, 132, 136.  The conflict here is therefore not merely "potential," as a decision from this Court that the fines are unconstitutional would have the effect of enjoining the state court proceeding.

The second case on which Calvary relies, *Montclair Parkowners Association v. City of*

16

*Montclair*, 264 F.3d 829 (9th Cir. 2001), is even further afield.  In *Montclair*, the plaintiff brought parallel affirmative litigation in federal and state court, asserting claims under the federal constitution in federal court and claims under state law in state court.  *Id.* at 830-31.  The court held that the "mere pendency of a parallel state court proceeding challenging [a law challenged in federal court] is insufficient to trigger *Younger* abstention."  *Id.* at 831.  *Montclair* is therefore distinguishable from the case before this Court, as it is not the "mere pendency" of the County's enforcement action that renders abstention appropriate here.  Rather, it is the fact that Calvary asks this Court to rule on the constitutionality of the very relief the County seeks to obtain in state court.

In sum, the Court finds that Calvary's requested relief has the practical effect of enjoining the ongoing state judicial proceeding.  Therefore, because the state proceedings fall within a *NOPSI* category and satisfy the *Middlesex* factors, abstention under *Younger* is appropriate absent an exception.

### 4.  Younger Exceptions for Bad Faith and Irreparable Injury

If state proceedings are conducted in bad faith or to harass the litigant, or other extraordinary circumstances exist, the district court may exercise jurisdiction even when the criteria for *Younger* abstention are met.  *Baffert v. California Horse Racing Bd.*, 332 F.3d 613, 621 (9th Cir. 2003) (citing *Gibson v. Berryhill*, 411 U.S. 564, 578–79 (1973), and *Partington v. Gedan*, 961 F.2d 852, 861 (9th Cir.1992)).  "A plaintiff who seeks to head off *Younger* abstention bears the burden of establishing that one of the exceptions applies."  *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citations omitted).  For the following reasons, no such showing has been made here.

#### a.  Bad Faith

In rare cases, a district court may exercise jurisdiction even when *Younger* abstention would otherwise be warranted.  "In the *Younger* abstention context, bad faith 'generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction.'"  *Baffert v. Cal. Horse Racing Bd.*, 332 F.3d 613, 621 (9th Cir. 2003) (quoting *Kugler v. Helfant*, 421 U.S. 117, 126 n.6 (1975)).  Such "bad faith" might arise in cases involving

17

United States District Court
Northern District of California

1    "repeated harassment by enforcement authorities with no intention of securing a conclusive

2    resolution" or where there is evidence of "pecuniary bias by the tribunal." *Partington v. Gedan*,

3    961 F.2d 852, 861–62 (9th Cir. 1992). "'[I]t is only when the state proceeding is brought with no

4    legitimate purpose that [the] state interest in correcting its own mistakes dissipates' and the 'bad

5    faith' exception to *Younger* applies." *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 596-97

6    (9th Cir. 2022) (quoting *Diamond "D" Const.*, 282 F.3d at 200)).

7       Calvary argues that the County has acted in bad faith by filing its motion "at this stage,"

8    after the close of fact discovery, and "is attempting to forum shop to avoid an adverse decision by

9    this Court." Opp'n 12-13. The County responds that it brought its motion as soon as *Younger*

10   applied to all of the remaining claims and did so before the pleadings had even closed. Reply 10.

11   The County further notes that the bad faith exception focuses on whether the state court

12   proceeding, not an action taken in federal court, is in bad faith. *Id.*

13      The Court finds no bad faith here. Calvary does not contend, much less offer any facts to

14   suggest, that the state proceeding was brought with no legitimate purpose. *See Applied*

15   *Underwriters*, 37 F.4th at 596. Calvary instead focuses on the County's filing of this motion as

16   evidence of bad faith. Although there has never been a barrier to earlier filing of this abstention

17   motion, the Court declines to find that filing now was made in bad faith. The Court is also not

18   convinced by Calvary's bald assertion that "[t]he County has acted with no intention of securing a

19   conclusive resolution in this case." Opp'n 13. Indeed, Calvary asserted in its briefing that the

20   state proceeding is nearing a hearing on summary adjudication. *Id.* at 10. Accordingly, the Court

21   finds no bad faith warranting its intervention in the state proceeding.

22                  **b. Other Extraordinary Circumstance**

23      Federal court intervention in a state proceeding may be warranted upon a showing of

24   "extraordinary circumstances" that present a "danger of irreparable loss [that] is both great and

25   immediate." *See Younger*, 401 U.S. at 45. "'[S]uch circumstances must be 'extraordinary' in the

26   sense of creating an extraordinarily pressing need for immediate federal equitable relief, not

27   merely in the sense of presenting a highly unusual factual situation.'" *Moore v. Sims*, 442 U.S.

28   415, 433 (1979) (quoting *Kugler v. Helfant*, 421 U.S. 117, 124 (1975)).

Calvary asserts that it will "suffer irreparable injury if the Court does not continue to exercise its jurisdiction." Opp'n 13. The County responds that Calvary has not identified an irreparable injury because it has not pointed to any alleged constitutional violation that could not be vindicated after the conclusion of the state court proceedings. Reply. 10-11.

Calvary has not demonstrated an irreparable injury that would justify this Court's intervention. Calvary's asserted irreparable injury appears to be that it will have to litigate in state court. This cannot be an irreparable injury within the meaning of *Younger*, as it would nullify the doctrine. To the extent Calvary means to assert that its irreparable injury is that the state court may grant the County's requested relief, this too is not an irreparable injury within the meaning of *Younger*. *Cf. Baffert*, 332 F.3d at 321 ("Plaintiff's claim of 'extraordinary circumstances' is rooted only in the claimed constitutional violation.").

*     *     *

In sum, the Court finds that all of the conditions required for the application of *Younger* are satisfied and Calvary has not demonstrated an exception to *Younger* that would justify federal court intervention in the state proceeding.

### B. Waiver

Calvary contends that even if the requirements for the application of *Younger* are satisfied, the Court should decline to abstain because the County waived its right to raise the doctrine. Specifically, Calvary argues that the County has "waived [*Younger*] abstention through untimely filing." Opp'n 5. Calvary notes that the County litigated multiple motions to dismiss before raising the doctrine. *Id.* at 6. The County replies that it did not waive *Younger* because it never did so through an express statement. Reply 3. The County further notes that it raised *Younger* early in the case in response to Calvary's motion for a temporary restraining order and now raises it again, shortly after this Court's dismissal of Calvary's Bane Act claim, at the first instance at which *Younger* applies to all of Calvary's claims. *Id.* at 2.

A state may waive its right to raise *Younger* abstention where "the State expressly urge[s] . . . the District Court to proceed to an adjudication of the constitutional merits." *See Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 800 (9th Cir. 2001) (citing *Ohio*

19

United States District Court
Northern District of California

*C.R. Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 626 (1986)); *see also Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 480 (1977) ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system.").

The Court finds applicable the Ninth Circuit's analysis in *Columbia Basin Apartment Association v. City of Pasco*, 268 F.3d 791 (9th Cir. 2001). There, the Ninth Circuit held that the City of Pasco did not waive its right to raise *Younger* even though (1) the City had agreed to stay state proceedings pending resolution of the federal proceedings; (2) the City had moved for, and the district court had decided, summary judgment on the merits in the federal proceeding; and (3) *Younger* was raised for the first time on appeal. 268 F.3d at 796, 799-800. The Court explained that "the record [did] not reflect that the City 'expressly urge[d]' the district court to adjudicate the constitutional merits of this case. . . . On the contrary, the City filed its claims in state court. The Appellants filed this matter in a federal forum." *Id.* at 800.

The record here provides an even less compelling basis to find waiver than in *Columbia Basin*. Here, the County raised *Younger* in a motion to dismiss less than a week after the Court dismissed Plaintiffs' Bane Act claim. The County justifies this timing by arguing that this is the "first instance of this litigation during which *all* of Plaintiffs' claims unquestionably require abstention under *Younger*." Reply 3. At the time, the County had not filed a summary judgment motion. On this record, the Court does not find that the County has waived the right to invoke the *Younger* doctrine.

None of the cases on which Calvary relies compels a different outcome. In two of the cases Plaintiffs rely upon, the state voluntarily chose to submit to the federal forum and therefore expressly waived their right to invoke *Younger*. *Ohio Bureau of Emp. Servs. v. Hodory*, 431 U.S. 471, 479 (1977) ("[A]ppellants have not argued that Younger requires a remand with directions to the District Court to abstain, and at oral argument they resisted the suggestion of such a remand."); *Brown v. Hotel & Rest. Emps. & Bartenders Int'l Union Loc. 54*, 468 U.S. 491, 500 n.9 (1984) (no abstention where state's attorney general "submit[ted] to the jurisdiction of [the] Court in order to obtain a more expeditious and final resolution of the merits of the constitutional issue"). In

20

1    another, the Ninth Circuit held that the state court proceedings were not "ongoing" because the

2    state trial court had stayed its proceedings pending resolution of the federal proceedings.  *Walnut*

3    *Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1106-07 (9th Cir. 1988).  In another, the

4    Seventh Circuit held that non-state parties who appealed an order preliminarily enjoining a state

5    commission could not invoke *Younger* on behalf of the state commission because the state

6    commission did not itself appeal.  *Kendall-Jackson Winery, Ltd. v. Branson*, 212 F.3d 995, 997

7    (7th Cir. 2000).

8            Calvary's reliance on *Adibi v. California State Board of Pharmacy*, 461 F. Supp. 2d 1103

9    (N.D. Cal. 2006), is also misplaced.  There, the court held on summary judgment that abstention

10   was warranted under *Younger* and noted "the primacy of *Younger* abstention even when belatedly

11   raised."  *Adibi*, 461 F. Supp. 2d at 1109.  Although the court discussed a court's potential

12   discretion when abstention comes up late in the litigation, it noted Ninth Circuit authority stating

13   that "[i]n addressing *Younger* abstention issues, district courts . . . may not exercise jurisdiction

14   when [the specific legal] standards are met; there is no discretion vested in the district courts to do

15   otherwise."  *Id.* at 1111 & n.3 (citing *Green v. City of Tucson*, 255 F.3d 1086, 1093 (9th Cir.

16   2001)).  Consistent with Ninth Circuit precedent, the Court finds that it does not have discretion to

17   abstain where, as here, the requirements for *Younger* abstention are met.  *See Green*, 255 F.3d at

18   1093; *Canatella*, 404 F.3d at 1113; *see also Columbia Basin*, 268 F.3d at 799 ("When the case is

19   one in which the *Younger* doctrine applies, the case must be dismissed." (quoting *H.C. ex rel.*

20   *Gordon v. Koppel*, 203 F.3d 610, 613 (9th Cir. 2000)).

21           Even if abstention were discretionary, the Court would abstain.  In *Adibi*, the Court stated

22   that "[t]o the extent courts have some discretion in deciding whether to abstain when the issue of

23   abstention comes up late in the litigation, courts generally consider [1] competing 'fairness

24   considerations,' [2] whether abstention would result in 'duplicious [sic] litigation and waste of

25   resources,' and [3] whether belated abstention would serve the 'purposes that animate the

26   abstention principle.'"  461 F. Supp. 2d at 1111-12 (citations omitted).  Calvary contends that

27   "[f]airness requires this case to continue" because abstaining would "allow[] the County to avoid

28   an adverse judgment."  Opp. 7.  The Court finds no merit in the bald assertion that either party has

United States District Court
Northern District of California

21

a greater or lesser chance of an "adverse judgment" in this Court or the state court. Moreover, the other two considerations highlighted in *Adibi* strongly favor abstention. First, the state proceeding remains ongoing, and thus continued action in this Court would result in wasted resources by allowing these matters to proceed in parallel. Second, *Younger* abstention is animated by primarily "the concern for comity in our federal system." *Gilbertson*, 381 F.3d at 970. Abstention here respects this concern, as the state court proceeding remains ongoing and Plaintiffs have not identified any bar to having their rights vindicated in that forum. The Court finds therefore that even if it had discretion to decline to abstain, it would not exercise that discretion.

Finally, *Hill v. Blind Industries and Services of Maryland*, 179 F.3d 754 (9th Cir. 1999), does not undermine the Court's conclusion. There, the Ninth Circuit held that a party waived Eleventh Amendment immunity—not *Younger* abstention—by participating in extensive pretrial activities and waiting until the first day of trial before objecting to the federal court's jurisdiction. *Hill*, 179 F.3d at 756. The court was concerned that the party had sought to hedge its bets by waiting until the first day of trial. *Id.* at 756. The court noted that the trial court properly took the issue under advisement, which gave the party the opportunity to withdraw the motion if it prevailed at trial. *Id.* That issue is not present here. The County filed its motion five days after the Court dismissed Plaintiffs' Bane Act claim, before the pleadings were set and before the Court had ruled on any motion for summary judgment, not during, or even of the eve of trial. Although the Court agrees with Calvary that the County could have raised this issue earlier, it does not perceive that the County is raising the issue at this stage as a tactic to hedge its bets.

Accordingly, the Court finds that the County has not waived its right to invoke *Younger* abstention. As the Court has found that all of the requirements for *Younger* abstention have been met, the Court turns to the impact of *Younger* abstention on the present case.

### C.    Application of *Younger* to the Instant Case

The Ninth Circuit has explained that the application of *Younger* abstention depends on the nature of a plaintiff's claims. Specifically, "when a court abstains under *Younger*, claims for injunctive and declaratory relief are typically dismissed." *Herrera v. City of Palmdale*, 918 F.3d 1037, 1042 (9th Cir. 2019). However, the Ninth Circuit "has also recognized that, when a district

court abstains from considering a *damages* claim under *Younger*, it must *stay*—rather than dismiss—the damages action until state proceedings conclude." *Id.* (emphasis in original).

Here, Calvary seeks injunctive relief, declaratory relief, and nominal damages. *See* 4AC ¶¶ 104, 109, 119, 125, 132, 136. Accordingly, Calvary's claims for injunctive and declaratory relief are DISMISSED WITHOUT PREJUDICE to pursue the claims in the state court proceeding, and Calvary's claims for nominal damages are STAYED pending resolution of the state court proceeding.

## V. ORDER

For the foregoing reasons, it is hereby ordered that Calvary's claims are:

1. DISMISSED WITHOUT PREJUDICE to the extent they seek injunctive relief;

2. DISMISSED WITHOUT PREJUDICE to the extent they seek declaratory relief; and

3. STAYED pending resolution of the state court proceeding to the extent they seek monetary relief.

The Parties shall file a joint status report within 10 days of the conclusion of the state court proceeding.

Dated: March 10, 2023

_____
BETH LABSON FREEMAN
United States District Judge

# EXHIBIT 4

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

CALVARY CHAPEL SAN JOSE, et al.,

            Plaintiffs,

    v.

SARA CODY, et al.,

            Defendants.

Case No. 20-cv-03794-BLF

**ORDER GRANTING IN PART AND DENYING IN PART PARTIAL MOTION TO DISMISS AND MOTION TO STRIKE FOURTH AMENDED COMPLAINT**

[Re: ECF No. 179]

      This case challenges policies and orders of the County of Santa Clara designed to slow the spread of COVID-19, a highly transmissible respiratory disease that has claimed over 1 million lives in the United States and over 6 million lives worldwide since December 2019. Beginning in March 2020, the County issued emergency orders that instituted capacity limits for certain types of facilities, restricted the practice of certain activities (including singing and chanting), and required individuals to wear masks in many situations. Those orders have been repeatedly amended in response to changing circumstances and new variants of COVID-19.

      Plaintiffs Calvary Chapel San Jose, a Christian church; Mike McClure, its lead pastor; Southridge Church, another Christian church; and Micaiah Irmler, its lead pastor, have sued the County, alleging that the emergency orders imposed harsher restrictions on churches than other institutions. Plaintiffs allege that when they admittedly defied the County's orders, the County levied against them millions of dollars in fines for the violations and sent threatening letters to the Calvary Chapel's bank.

      In their Fourth Amended Complaint, Plaintiffs bring eight claims, alleging violations of their First, Eighth, and Fourteenth Amendment rights under the Federal Constitution, violations of

the California Constitution, and a violation of California's Bane Act. Each claim is asserted against Santa Clara County (the "County") and several county officials in their official capacities (the "County Officials"). The County Officials are Dr. Sarah H. Cody in her official capacity as the County's Public Health Officer; James Williams in his official capacity as director of the Santa Clara County Emergency Operations Center; and Mike Wasserman, Cindy Chavez, Dave Cortese, Susan Ellenberg, and Joe Simitian, each in their official capacity as a member of the Santa Clara County Board of Supervisors.

Before the Court is the County's motion to dismiss. Mot., ECF No. 179; Reply, ECF No. 193. The County's motion asks that the court dismiss or strike four components of Plaintiffs' complaint. First, the County asks the Court to dismiss all claims against the County Officials because they are redundant defendants to the County itself. Second, the County asks the Court to strike allegations concerning Defendants' letters to Calvary Chapel's bank because the Court has already held that the *Noerr-Pennington* doctrine protected the defendants from suit for sending the letters. Third, the County asks the Court to dismiss Plaintiffs' Bane Act claim because the conduct upon which Plaintiffs base their claim does not violate the Bane Act and is protected under the *Noerr-Pennington* Doctrine. The County further argues that the Court should dismiss the claim because Plaintiffs failed to plead that they have complied with the claim presentation requirements with the Government Claims Act. Fourth, the County asks the Court to dismiss the damages component of Plaintiffs' California Constitutional claims because, as with their Bane Act claim, Plaintiffs have failed to plead compliance with the Government Claims Act. Plaintiffs oppose the motion. *See* Opp'n, ECF No. 185. The Court held a hearing on September 21, 2022.

For the reasons discussed on the record at the hearing and explained below, the Court GRANTS IN PART WITHOUT LEAVE TO AMEND AND DENIES IN PART the County's partial motion to dismiss.

## I. BACKGROUND

As alleged in Plaintiffs' Fourth Amended Complaint and assumed true for the purposes of this order, in December 2019, the World Health Organization reported the emergence of a novel coronavirus in Wuhan, China. 4th Am. Compl. ¶ 22, ECF No. 167 ("4AC"). The virus, dubbed

COVID-19, was detected in California in late January 2020. *Id.* ¶¶ 22-23. Although State health officials initially characterized the risk of COVID-19 to the general public as "low," on March 3, 2020, the State Department of Public Health issued detailed guidelines for fighting COVID-19. *Id.* ¶¶ 24-26. Governor Newsom declared a state of emergency the next day, and on March 12, 2020, he issued an executive order invoking his emergency powers to "ensure adequate facilities exist to address the impacts of COVID-19." *Id.* ¶¶ 27, 29 & Exhs. 1, 2.

### A. The County's Policies in Response to COVID-19

A few days after Governor Newsom's March 12, 2020, executive order, officials in the County—spurred by Defendants Dr. Cody and Mr. Williams—issued a "Shelter in Place Order" requiring residents to shelter in place indefinitely. 4AC ¶ 32 & Exh. 3. Dr. Cody, as the final policymaker for the Santa Clara County Public Health Department, and Mr. Williams, as the final policymaker for the Emergency Operations Center, made the joint decision to cancel all indoor gatherings. *Id.* ¶ 32.

The County's Shelter in Place Order designated certain activities "essential" and others "non-essential." *Id.* ¶ 36. Essential activities were allowed to continue, while non-essential activities were "shut down." *Id.* Churches were deemed non-essential. *Id.* ¶ 37. Without evidence, County officials asserted that the risk of COVID-19 infection was increased in churches because people gathered close together for extended periods of time and sang. *Id.* ¶ 45. In May, the County extended its Shelter in Place Order indefinitely. *Id.* ¶ 42.

The County banned indoor religious activities and imposed harsher restrictions on churches than similarly situated secular activities even after the federal government declared houses of worship "essential" and the Justice Department sent California's Governor a letter stating that the "lockdown" of churches violated the First Amendment. *Id.* ¶¶ 53, 55.

In the summer of 2020, COVID-19 cases surged across California, including in Santa Clara County. *Id.* ¶ 50. County officials, including Dr. Cody, were aware that the virus was "likely" spreading among individuals gathering at protests following the death of George Floyd, but the County officials did not punish those individuals for violating COVID-19 orders. *Id.* ¶¶ 51-52.

On July 2, 2020, the County issued a Risk Reduction Order, which imposed capacity restrictions

3

on indoor and outdoor gatherings, but exempted certain industries like childcare settings, school settings, transportation, hospitals, offices, stores, and restaurants. *Id.* ¶ 62. Dr. Cody issued a revised order on October 5, 2020, that allowed more businesses to reopen but continued to ban indoor gatherings. *Id.* ¶¶ 64-65. Shortly thereafter, Dr. Cody issued a "Revised Mandatory Gatherings Directive" that allowed indoor religious gatherings but was more restrictive than contemporaneous State guidance. *Id.* ¶ 65.

Around November 16, 2020, the State of California moved the County into the strictest tier of the California Department of Public Health's Blueprint for a Safer Economy ("Blueprint"). *Id.* 73. The Blueprint established a procedure for assigning counties to one of four tiers based on the severity of the COVID-19 outbreak in the county. *Id.* ¶ 63, 73. Around the same time, Dr. Cody issued a "Mandatory Directive on Capacity Limitations" that banned indoor worship services but allowed shopping centers, retail stores, grocery stores, public transit, and construction sites to remain open at limited capacity. *Id.* ¶ 73.

On February 5, 2021, the United States Supreme Court enjoined California from enforcing the Blueprint's Tier 1 prohibition on indoor worship services. *See id.* ¶ 78; *see also S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716 (2021) (mem.). A week later, directed by Dr. Cody and Mr. Williams acting in their capacities as public health policymakers, the County reinstated its ban on indoor worship services. 4AC ¶ 79. The Supreme Court enjoined enforcement of parts of the County's orders banning indoor worship services on February 26, 2021. *Id.*; *see also Gateway City Church v. Newsom*, 141 S. Ct. 1460 (2021) (mem.).

## B. Plaintiffs and Enforcement Actions Against Them

Plaintiffs are two churches and their two lead pastors. Plaintiff Calvary Chapel San Jose is a Christian church located in San Jose, California led by lead pastor Plaintiff Mike McClure. 4AC ¶¶ 10-11. Plaintiff Southridge Church is a Christian church also located in San Jose, California and led by lead pastor Plaintiff Micaiah Irmler. *Id.* ¶¶ 12-13. As churches located in Santa Clara County, Calvary Chapel and Southridge were both subject to County orders issued in the wake of the coronavirus. Plaintiffs admittedly violated County orders by not complying with indoor gathering restrictions, face covering mandates, or the singing and chanting ban and by failing to

4

sign the County's social distancing protocols.  *Id.* ¶ 80.

On August 11, 2020, the County issued an Urgency Ordinance permitting it to issue fines for violations of its COVID-19 orders.  *Id.* ¶ 80 & Exh. 18.  During that month, the County began issuing what would eventually amount to more than $2.8 million in fines against Plaintiffs for violating its COVID-19 orders, despite no COVID-19 case being traced to Plaintiffs' church gatherings.  *Id.*  The County has also sought to enforce its orders in state court.  *See People v. Calvary Chapel San Jose*, No. 20CV372285 (Super. Ct.).

The County has also allegedly taken other "extreme measures to collect the fines."  4AC ¶ 82. The County, led by Williams, sent letters to Calvary Chapel's bank in December 2020 and January 2021 informing it that Calvary Chapel had been fined over $1 million and held in contempt for violating COVID-19 orders.  *Id.* ¶ 81 & Exs. 19-20. The bank allegedly interpreted the letters "as a threat that the County intended to take the church property to satisfy the fines" and sent a notice of default to Calvary Chapel for noncompliance with government regulations (which was only withdrawn when the bank learned the church was contesting the fines).  *Id.* ¶ 83.  Calvary Chapel was forced to make over $800,000 in accelerated payments to the bank, diverting funds from investment in other church efforts.  *Id.* ¶ 84.

The County orders allegedly interfered with the religious practice of Plaintiffs and their members.  *Id.* ¶¶ 86-87.  Plaintiffs and their members believe that it is essential for Christians to gather in person to worship.  *Id.*  Many congregants who are elderly or have health problems have difficulty sitting for long periods of time while wearing a face mask, and social distancing rules inhibited their ability to pray for one another.  *Id.*  Several congregants also felt intimidated by the County's enforcement efforts against Calvary Chapel, with some believing that the County may arrest them for going to church.  *Id.* ¶ 88.

## C.    This Lawsuit

Plaintiffs filed this lawsuit on June 9, 2020, against the County.  *See* ECF No. 1.  On November 5, 2020, the Court granted the County's motion to dismiss the initial complaint with leave to amend.  *See* ECF No. 30.  Plaintiffs amended their complaint and added various state defendants. *See* ECF No. 38.  Plaintiffs then sought a temporary restraining order enjoining the state court

United States District Court
Northern District of California

United States District Court
Northern District of California

proceedings instituted against them for violation of the County orders.  *See* ECF No. 42.  The Court denied the motion for a temporary restraining order, abstaining on the basis of *Younger v. Harris*, 401 U.S. 37 (1971).  *See* ECF No. 67.  By stipulation, Plaintiffs filed a Second Amended Complaint, *see* ECF Nos. 80, 81, and later, the Court granted Plaintiffs' motion for leave to file a Third Amended Complaint, *see* ECF Nos. 115, 116.  On March 18, 2022, the Court concurrently ruled on separate motions to dismiss filed by the state defendants and the County.  *See* ECF No. 156.  The Court granted the state defendants' motion to dismiss and dismissed the state defendants.  *Id.*  The Court granted in part and denied in part the County's motion to dismiss.  *Id.*  Plaintiffs later filed a Fourth Amended Complaint, which is the operative complaint.  *See* ECF No. 167.

   The Fourth Amended Complaint asserts eight causes of action against the County.  Plaintiffs assert four Section 1983 claims for violations of the First Amendment's guarantee of the free exercise of religion, the First Amendment's guarantee of the right to assemble, the Fourteenth Amendment's guarantee of equal protection, the Eighth Amendment's guarantee of freedom from the imposition of excessive fines.  *See* 4AC ¶¶ 95-104 (First Amendment free exercise), 110-19 (First Amendment assembly), 120-125 (Fourteenth Amendment equal protection), 126-132.  Plaintiffs also assert a fifth Section 1983 claim for violations of "First, Eighth and Fourteenth Amendments," citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), as the basis for this claim.  *Id.* ¶¶ 137-40.  Plaintiffs assert two claims under the California Constitution for violations of the free exercise clause (Article I, Section 4) and the excessive fines clause (Article I, Section 17).[1]  *See* 4AC ¶¶ 105-09 (free exercise), ¶¶ 133-36 (excessive fines).  Finally, Plaintiffs assert a claim under California's Bane Act, Cal. Civ. Code § 52.1.  *See id.* ¶¶ 141-45.  This motion followed.

---

[1] Plaintiffs cite Article 1, Section 7 as the basis for their excessive fines claim.  This appears to be a typo, as Section 17 contains the California Constitution's excessive fines clause.  The Court's analysis below is the same regardless of the provision Plaintiffs seek to invoke.

## II.   LEGAL STANDARD

### A.   Federal Rule of Procedure 12(b)(6)

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'" *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

### B.   Federal Rule of Procedure 12(f)

Federal Rule of Civil Procedure 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a motion made under this rule is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (quoting *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), *rev'd on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994)) (internal quotation marks omitted). "Immaterial matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *See*

United States District Court
Northern District of California

7

*Fantasy*, 984 F.2d at 1528 (quoting 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382, at 706–07 (1990) (internal quotations omitted)). "Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.*

"While a Rule 12(f) motion provides the means to excise improper materials from pleadings, such motions are generally disfavored because the motions may be used as delaying tactics and because of the strong policy favoring resolution on the merits." *Barnes v. AT & T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010). "If there is any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004) (citations omitted). "Ultimately, whether to grant a motion to strike lies within the sound discretion of the district court." *Cruz v. Bank of N.Y. Mellon*, 2012 WL 2838957, at *2 (N.D. Cal. July 10, 2012) (citing *Whittlestone*, 618 F.3d at 973).

## III.    DISCUSSION

In its motion, the County asks that the court dismiss or strike four parts of Plaintiffs' complaint. Specifically, the County asks the Court to (1) dismiss all claims against the County Officials (2) strike allegations concerning Defendants' letters to Calvary Chapel's bank (3) dismiss Plaintiffs' Bane Act claim, and (4) dismiss the damages component of Plaintiffs' California Constitutional claims. For the reasons below, the Court grants the County's motion with regard to issues 1, 2, and 3, and denies with regard to issue 4.

### A.    Claims Against County Officials

The County requests that the Court dismiss all claims against the County Officials. The County argues that the County officials are redundant defendants because they are sued only in their official capacity and each claim asserted against them is also asserted against the County itself. Mot. 7-10. Plaintiffs conceded at oral argument that the County Officials are redundant to the County itself.

The Court GRANTS the County's request to dismiss all claims against the County Officials. "When both a municipal officer and a local government entity are named, and the officer is named only in an official capacity, the court may dismiss the officer as a redundant

United States District Court
Northern District of California

1    defendant." *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780,

2    799 (9th Cir. 2008). Here, Plaintiffs assert each of their claims against the County itself and the

3    County Officials in their official capacity. Moreover, Plaintiffs have conceded that the County

4    Officials are redundant to the County. The Court therefore finds it appropriate to DISMISS all

5    claims against the County Officials WITH PREJUDICE, as they are redundant defendants. *See*

6    *Luke v. Abbott*, 954 F. Supp. 202, 204 (C.D. Cal. 1997) ("[I]t is no longer necessary or proper to

7    name as a defendant a particular local government officer acting in official capacity. To do so only

8    leads to a duplication of documents and pleadings, as well as wasted public resources for increased

9    attorneys fees.").

     ### B. Bank Letter Allegations

11   The County requests that the Court strike Plaintiffs' allegations concerning letters the

12   County Officials sent to Cass Commercial Bank ("Cass Bank") telling it that CCSJ had been held

13   in contempt and fined over $1 million for violating COVID-19 orders. *See* Mot. 13; *see also* 4AC

14   ¶¶ 81-83. The County argues that the *Noerr-Pennington* doctrine immunizes the County from suit

15   for sending the letters and that the Court held as much in its Order granting in part the County's

16   motion to dismiss the Third Amended Complaint. Mot. 13. Plaintiffs contend that the *Noerr-*

17   *Pennington* doctrine does not apply and note that they disagree with the Court's prior ruling.

18   Opp'n 1, 8-9. Plaintiffs also argue that the Court should not strike the allegations because they are

19   important to Plaintiffs' claims. *Id.*

20   The Court GRANTS the County's request to strike Plaintiffs' allegations concerning the

21   Cass Bank letters. The Court explained in its order granting in part the County's motion to

22   dismiss Plaintiffs' Third Amended Complaint that the County's conduct—enforcement efforts

23   following judicially approved imposition of fines—is conduct incidental to litigation and therefore

24   falls within the protection of the *Noerr-Pennington* doctrine. *Calvary Chapel San Jose v. Cody*,

25   No. 20-CV-03794-BLF, 2022 WL 827116, at *11 (N.D. Cal. Mar. 18, 2022). The Court is

26   unaware of, and Plaintiffs do not provide, any case law that would change this outcome when the

27   alleged conduct is a "central part of this case." *See* Opp'n 8-9. Because sending the letters was

28   privileged conduct under the *Noerr Pennington* doctrine, it cannot supply a basis for any of

Plaintiffs' claims and thus becomes immaterial.  The Court therefore STRIKES the allegations regarding the letters as immaterial to Plaintiffs' claims.  *See* Fed. R. Civ. P. 12(f) (court may strike "immaterial" matter); *see also Fantasy*, 984 F.2d at 1528 (district court has discretion to strike allegations when there are no legal theories under which the allegations are relevant).

### C.    Bane Act Claim (Eighth Cause of Action)

The County requests that the Court dismiss Plaintiffs' claim alleging violations of California's Tom Bane Civil Rights Act, Cal. Civ. Code § 52.1.  The County correctly notes that the Court dismissed the Bane Act claim in Plaintiffs' Third Amended Complaint for failure to plead compliance with the Government Claims Act's presentation requirement.[2]  *See* Mot. 15; *see also Calvary Chapel San Jose*, 2022 WL 827116, at *14.  The County argues that the Bane Act claim in the Fourth Amended Complaint fails for the same reason.  Mot. 15, 17.  The County also argues that Plaintiffs have failed to plead facts showing threats, intimidation, or coercion required by the Bane Act.  *Id.* at 18.  Plaintiffs respond that the Government Claims Act's presentation requirement does not apply because their Bane Act claim "primarily seeks declaratory and injunctive relief with an ancillary request for nominal damages and a civil penalty."  Opp'n 7.  As to the sufficiency of their pleadings, Plaintiffs argue that the County's imposition of fines and its letters to Cass Bank amount to threats, intimidation, or coercion.  *Id.* at 5-6.

The Court GRANTS the County's motion to dismiss Plaintiffs' Bane Act claim because Plaintiffs were required to comply with the Government Claims Act.  The Court therefore does not reach the County's argument that Plaintiffs have not plausibly pled the threats, intimidation, or coercion required to state a claim under the Bane Act.

Under the Government Claims Act, a claim for money damages against a local public entity must be presented to the entity within six months or a year after the cause of action accrues depending on the cause of action.  *See* Cal. Gov't Code §§ 905, 911.2.  "[F]ailure to allege facts

---

[2] The Government Claims Act covers Sections 810-998.3 of the California Government Code.  *See* Cal. Gov't Code § 810(b).

United States District Court
Northern District of California

United States District Court
Northern District of California

demonstrating or excusing compliance with the claim presentation requirement subjects a claim against a public entity to a [motion to dismiss] for failure to state a cause of action." *State v. Superior Ct.*, 32 Cal. 4th 1234, 1239 (2004) (citing Cal. Gov't Code §§ 905, 911.2, 945.4); *see also Karim-Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 627 (9th Cir. 1988) (claims properly dismissed for failure to allege compliance with Government Claims Act).

Plaintiffs do not dispute that they have failed to comply with the Government Claims Act. They instead argue that they were excused from presenting their Bane Act claim because the damages they seek are "ancillary" to the declaratory and injunctive relief they seek. *See* Opp'n 7. Plaintiffs further contend that the Court should disregard their failure to comply with the Government Claims Act because "the Bane Act claim arose [during the litigation]" and therefore the County had "sufficient notice to satisfy any statutory requirements that applied." *See* Opp'n 7-8. The Court finds neither argument persuasive.

Plaintiffs' Bane Act claim is a "claim for money damages" and is therefore subject to the presentation requirement of the Government Claims Act.   The Fourth Amended Complaint states that Plaintiffs seek damages "pursuant to California Civil Code Sections 52 and 52.1."  4AC ¶ 145; *see also* Opp'n 1 (stating that Plaintiffs seek a "civil penalty" for violations of the Bane Act).  Plaintiffs confirmed at the hearing that they intended to pursue these damages and acknowledged that such damages could amount to hundreds of thousands of dollars.  Such civil penalties constitute "money or damages" within the Bane Act.  *See Lozada v. City & Cnty. of San Francisco*, 145 Cal. App. 4th 1139, 1163 (2006) ("We are not persuaded that substantial civil penalties and actual damages do not constitute 'money or damages' within the meaning of the Government Claims Act."); *see also Gatto v. Cty. of Sonoma*, 98 Cal. App. 4th 744, 763 (2002) ("Exempting damage actions under Sections 51 and 52.1 from the claim filing requirement, even in a case in which that is the primary relief sought, . . . would conflict with the statutory scheme relating to damage claims against public entities and with relevant case law.").

The Court is not convinced by Plaintiffs' argument that the money damages they seek under the Bane Act are incidental to their request for declaratory and injunctive relief and therefore exempt from the claim presentation requirement.  To be sure, courts have suggested that

United States District Court
Northern District of California

a claim may be exempt from the presentation requirement when the monetary relief sought is incidental to the primary injunctive or other extraordinary relief.  *See Lozada*, 145 Cal. App. 4th at 1164-65 (collecting cases).  But Plaintiffs have identified, and the Court is aware of, no case in which a claim seeking civil penalties on the order of hundreds of thousands of dollars was held to be incidental to the requested nonmonetary relief.  *See Williams v. City of Antioch*, No. C 08-02301 SBA, 2010 WL 3632199, at *5 (N.D. Cal. Sept. 2, 2010) ($4,000 fine across 1000 class members not incidental despite Plaintiffs' assertion that primary purpose of action was to obtain injunctive and declaratory relief).  This is unsurprising, as allowing such claims to escape the claim presentation requirement would frustrate the Government Claims Act's purpose of enabling a public entity to engage in fiscal planning for potential liabilities.  *See Gatto*, 98 Cal. App. 4th at 763.

Nor is the Court convinced by Plaintiffs' argument that it should be excused from the presentation requirement because the County was on notice of Plaintiffs' potential claim. Plaintiffs cite the *City of San Jose v. Superior Court*, 12 Cal. 3d 447 (1974), for the proposition that "courts have disregarded technical defects in the notification process if there was 'some compliance with all of the statutory requirements' and the claim discloses sufficient information to enable the public entity to adequately investigate the merits of the claim."   But Plaintiffs do not plead "some compliance with all of the statutory requirements."  They plead no compliance at all.  In such cases, the question of whether a defendant knew about potential claims is irrelevant.  *See City of San Jose*, 12 Cal. 3d at 456-57 (predicate question is whether there has been "some compliance with all of the statutory requirements" (cleaned up)).   As the California Supreme Court explained: "It is well-settled that claims statutes must be satisfied even in face of the public entity's actual knowledge of the circumstances surrounding the claim. Such knowledge—standing alone—constitutes neither substantial compliance nor basis for estoppel."  *Id.* at 455.

Accordingly, Plaintiffs were required to comply with the Government Claims Act's presentation requirement.  Their failure to do so bars their Bane Act claim.  As Plaintiffs have now had multiple opportunities to address the deficiencies in their Bane Act claim, this claim is DISMISSED WITH PREJUDICE.

United States District Court
Northern District of California

### D.    State Law Claims (Second and Sixth Causes of Action)

The County lastly requests that the Court strike or dismiss the damages component of Plaintiffs' claims asserting violations of the California Constitution.  The County argues that these claims, like the Bane Act claim, must fall because Plaintiffs failed to plead compliance with the claim presentation requirement Government Claims Act.  Mot. 19, Reply 9-10.  Plaintiffs counter that that their state law Constitutional Claims seek only nominal damages and are therefore presentation was not required.  Opp'n 9.

The Court DENIES the County's request to dismiss or strike any of the relief Plaintiffs seek under the California Constitution.  Aside from declaratory and injunctive relief, these claims seek only nominal damages.[3]  4AC ¶¶ 109, 136.  Such claims are not subject to the claim presentation requirement of the Government Claims Act, as nominal damages are incidental to the declaratory and injunctive relief.  *Cf.  Indep. Hous. Servs. of San Francisco v. Fillmore Ctr. Assocs.*, 840 F. Supp. 1328, 1358 (N.D. Cal. 1993) (claim presentation requirement does not apply where "potential damages are small and particularly inconsequential compared to the effect of the declarations it seeks"); *M.G.M. Const. Co. v. Alameda Cnty.*, 615 F. Supp. 149, 151 (N.D. Cal. 1985) (same).

## IV.    ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

- The County's motion to dismiss all claims against the County Officials is GRANTED WITHOUT LEAVE TO AMEND.

- The County's motion to strike allegations regarding the County's letters to Cass Bank is GRANTED WITHOUT LEAVE TO AMEND.

---

[3] Plaintiffs also seek costs and attorney's fees.  The County does not argue that these necessitate filing a claim under the Government Claims Act.  Although Plaintiffs do not expressly state the basis for their request for attorney's fees, the Court notes that statutory attorney's fees are costs and therefore not subject to claim presentation requirement.  *See Lozada*, 145 Cal. App. 4th at 1160.

- The County's motion to dismiss Plaintiffs' Bane Act Claim (Eighth Cause of Action) is GRANTED WITHOUT LEAVE TO AMEND.
- The County's motion to dismiss the damages portion of Plaintiffs' state law constitutional claims (Second and Sixth Causes of Action) is DENIED.

Dated:  October 6, 2022

_____
BETH LABSON FREEMAN
United States District Judge

14